UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FUCICH CONTRACTING, INC.                          CIVIL ACTION

VERSUS                                            NO. 18-2885

SHREAD-KUYRKENDALL AND                            SECTION M (4)
ASSOCIATES, INC., *et al.*

## ORDER & REASONS

Before the Court is a motion for preliminary injunction filed on behalf of Travelers

Casualty & Surety Company of America ("Travelers") against Clayton Fucich, Kathleen Fucich,

and Fucich Contracting, Inc. ("FCI") (collectively "Indemnitors") to enforce its right to collateral

under an indemnity agreement.[1]  In preparation for a hearing on Travelers' motion as well as FCI's

and the Indemnitors' own reciprocal motions for preliminary injunction,[2] Travelers filed a

memorandum in support of its motion,[3] and the Indemnitors filed a memorandum in opposition.[4]

The Court held an evidentiary hearing on the cross-motions for preliminary injunction on January

11, 2019.[5]  Having considered the parties' memoranda, the evidence (including exhibits and

testimony), argument presented at the hearing, and the applicable law, the Court issues this Order

& Reasons.

## I.      BACKGROUND

On or about December 22, 2016, FCI entered into a construction contract with the St.

Bernard Parish Government ("Parish") to be the general contractor for the public works

---

[1] R. Doc. 140.
[2] R. Docs. 119 & 157.  Travelers filed a memorandum in opposition to FCI's motion, R. Doc. 126, and FCI filed a supplemental memorandum and reply in support of its motion.  R. Docs. 128 & 131.
[3] R. Doc. 142.
[4] R. Doc. 151.
[5] The Court delayed issuing a ruling on these motions in light of the parties' on-going attempts to arrive at an amicable resolution of their dispute.  Notwithstanding agreement on certain limited issues, the parties have advised the Court that their settlement discussions are now at an impasse.

improvement project known as the Lake Borgne Basin Levee District Pump Station #1 and #4 Pump Upgrade ("Project").[6] The general scope of work for the Project consisted of replacing the engines and right-angle gear reducers that drive four backup storm water drainage pumps.[7] In connection with the Project, FCI furnished a payment and performance bond ("Bond") in the amount of $5,009,908.00, underwritten by Travelers.[8] As a condition precedent of Travelers' agreement to issue bonds to FCI for various projects, Travelers required FCI to sign a General Agreement of Indemnity ("Indemnity Agreement").[9] The Indemnity Agreement provides Travelers the right to demand that FCI deposit collateral security for any "Loss" or "anticipated Loss":

> 5. **Collateral Security:** Indemnitors agree to deposit with [Travelers], upon demand, an amount as determined by [Travelers] sufficient to discharge any Loss or anticipated Loss. Indemnitors further agree to deposit with [Travelers], upon demand, an amount equal to the value of any assets or Contract funds improperly diverted by any Indemnitor. Sums deposited with [Travelers] pursuant to this paragraph may be used by [Travelers] to pay such claim or be held by [Travelers] as collateral security against any Loss or unpaid premium on any Bond. [Travelers] shall have no duty to invest, or provide interest on, the deposit. Indemnitors agree that [Travelers] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph.[10]

The Indemnity Agreement also provides Travelers the right to indemnification from "Loss":

> 3. **Indemnification and Hold Harmless:** Indemnitors shall exonerate, indemnify and save [Travelers] harmless from and against all Loss. An itemized, sworn statement by an employee of [Travelers], or other evidence of payment, shall be prima facie evidence of the propriety, amount and existence of Indemnitors' liability. Amounts due to [Travelers] shall be payable upon demand.[11]

The Indemnity Agreement defines "Loss" as:

> All loss and expense of any kind or nature, including attorneys' and other professional fees, which [Travelers] incurs in connection with any Bond or this Agreement, including but not limited to all loss and expense incurred by reason of

---

[6] R. Doc. 119-1 at 5 (citing R. Doc. 119-4).
[7] *Id.*
[8] *Id.* at 6 (citing R. Doc. 119-5); R. Doc. 126 at 2.
[9] R. Doc. 126 at 2 (citing R. Doc. 126-1).
[10] R. Doc. 140-1 at 3.
[11] *Id.* at 1-2.

> [Traveler's]: (a) making any investigation in connection with any Bond; (b) prosecuting or defending any action in connection with any Bond; (c) obtaining the release of any Bond; (d) recovering or attempting to recover Property in connection with any Bond or this Agreement; (e) enforcing by litigation or otherwise any provision of this Agreement; and (f) all interest accruing thereon at the maximum legal rate.[12]

Furthermore, in the event of a default of the Indemnity Agreement, which includes "a declaration of Contract default by any Obligee," and "[Travelers'] good faith establishment of a reserve," Travelers may invoke certain specified "Remedies" against the Indemnitors.[13]

On October 26, 2017, FCI alleges its crew discovered a design defect in the engines supplied for the Project that made them incompatible with the gears.[14] When the Parish refused to pay FCI, FCI filed suit against the Parish and the Parish's engineer, seeking to recover unpaid contract balances owed to FCI for work performed on the Project and other damages.[15] On July 20, 2018, the Parish, by a letter signed by David C. Jarrell, terminated FCI's contract for FCI's failure to perform and made a formal demand upon Travelers to respond under the Bond.[16] FCI denied fault on the basis of the design defect.[17] Travelers came to the same conclusion, based upon its independent review, and rejected the Parish's demand on August 10, 2018.[18] As a result, the Parish filed suit against Travelers on September 5, 2018, for the penal sum of the Bond, $5,009,908.00.[19]

All parties have engaged in settlement negotiations, but FCI has refused to participate on some occasions.[20] In October 2018, Travelers filed a UCC statement relating to the Indemnitors. On November 12, 2018, Travelers made formal demand upon the Indemnitors to deposit collateral in the amount of $5,036,878.49, representing the penal sum of the Bond and Travelers' costs and

---

[12] *Id.*
[13] *Id.* 1-3.
[14] R. Doc. 119-1 at 6.
[15] *Id.* at 7.
[16] R. Doc. 126 at 2 (citing R. Doc. 119-4).
[17] R. Doc. 119-1 at 6.
[18] R. Doc. 126 at 2 (citing R. Doc. 119-14).
[19] *Id.* (citing R. Doc. 70).
[20] R. Doc. 126 at 3 (citing R. Docs. 126-2 & 126-3).

attorney's fees through that date.[21] The formal demand explained that "[FCI's] recent refusal to participate in discussions regarding the work that remains to be performed on the Project and [FCI's] uncompromising refusal to participate in a formal Settlement Conference with the other parties and the Magistrate [Judge] indicate to Travelers that [FCI] does not intend to act in a manner that mitigates the risk and/or minimizes the risk to Travelers and/or itself."[22] Travelers stated that FCI was in default of the Indemnity Agreement under the provisions that defined default as "a declaration of Default by any Obligee" and "[Travelers'] good faith establishment of any reserve." "As a consequence of this development," Travelers invoked the collateral security clause of the Indemnity Agreement to demand that the Indemnitors deposit collateral, and it asserted other rights under various provisions of the Indemnity Agreement, including the claim settlement provision.[23] After the Indemnitors informed Travelers that it did not have the Indemnity Agreement, Travelers sent a copy to their counsel and granted the Indemnitors an extension to December 3, 2018, to make payment.[24] To date, the Indemnitors have not deposited any collateral with Travelers.[25]

## II.    PENDING MOTIONS

Travelers seeks a preliminary injunction to enforce the collateral security provision of the Indemnity Agreement against the Indemnitors.[26] Travelers claims that it has incurred and

---

[21] *Id.* at 12-13 (citing R. Doc. 119-17).
[22] R. Doc. 119-17 at 2.
[23] *Id.* at 3-4.
[24] R. Docs. 119-1 at 11 (citing R. Doc. 119-18); R. Doc. 142 at 6.
[25] R. Doc. 142 at 7.
[26] R. Doc. 140. FCI seeks a preliminary injunction to enjoin Travelers from enforcing the collateral security provision of the Indemnity Agreement, the remedies provision, and the provisions that permit Travelers to settle the dispute on behalf of FCI. R. Doc. 119 at 1-2. The Indemnitors also filed a motion for preliminary injunction, seeking this same relief in addition to compelling Travelers to withdraw its UCC filing against them and enjoining Travelers from further UCC filing. R. Doc. 157. In opposition to Travelers' motion for preliminary injunction, the Indemnitors adopt argument made by FCI in support of its first motion for preliminary injunction. *Id.* at 40. Because Travelers seeks now only to enforce the collateral security provision of the Indemnity Agreement, the Court declines to rule at this time on the merits of other relief sought in the Indemnitors' motions for preliminary injunction. However, for the same reasons discussed below, the Indemnitors cannot prevail on the substantial-likelihood-of-success, balance-of-harms, and public-interest prongs as to their own motions for preliminary injunction, so their motions for preliminary

continues to incur costs and attorney's fees in relation to the Parish's claim under the Bond that FCI must indemnify and hold harmless under the indemnification provision.[27]  Travelers argues that it is substantially likely to succeed on the merits of its demand for collateral because the clear and unambiguous language of the valid contract between it and FCI gives it the "right to be collateralized, on demand, in an amount as determined by Travelers sufficient to discharge any Loss or anticipated Loss incurred by reason of having issued the Bonds."[28]  Travelers contends that the right to demand collateral is triggered by a claim made on the Bond and not FCI's default under the Bond or Indemnity Agreement.[29]  Travelers also says the Indemnitors stipulated to irreparable harm in the collateral security provision of the Indemnity Agreement, which states in pertinent part: "[Travelers] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph."[30]  Additionally, Travelers argues that the right to collateralization is meaningless if not enforced before judgment.[31]

In opposition,[32] FCI essentially contends that it is not in default as defined by the Indemnity Agreement, so Travelers cannot enforce the collateral security and indemnity provisions; that Travelers breached the Indemnity Agreement in bad faith by demanding an arbitrarily high amount of collateral far exceeding what is "sufficient to discharge any Loss or anticipated Loss" as permitted under the Indemnity Agreement; and that Travelers breached the Bond in bad faith.[33]  The Indemnitors deny that a collateral security provision may, standing alone, create irreparable harm sufficient for the issuance of a preliminary injunction.[34]  Rather, FCI contends that Travelers

---

injunction must be denied insofar as they seek to enjoin Travelers from exercising its right to demand collateral under the Indemnity Agreement.

[27] R. Doc. 140 at 11.

[28] *Id.* at 14.

[29] R. Doc. 150 at 5, 7-13.

[30] *Id.* at 15 (citing R. Doc. 140-1 at 3).

[31] R. Doc. 142 at 13-15.

[32] R. Doc. 151 at 2.  In opposition to Travelers' argument on the merits, the Indemnitors incorporate argument made in support of its likelihood of success on the merits in their own motions for preliminary injunction.

[33] R. Docs. 119-1 at 13-18; 143 at 15-25.

[34] R. Doc. 143 at 4-6.

must show evidence that the Indemnitors are bankrupt or in dire financial straits.  Otherwise, says the Indemnitors, a collateral security provision is properly enforced through the remedy of specific performance upon judgment after a trial on the merits.[35]

## III.    LAW & ANALYSIS

### A.  Preliminary Injunction Standard

A movant seeking a preliminary injunction must establish  (1) a substantial likelihood that the it will prevail on the merits; (2) a substantial threat the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant if the injunction is denied outweighs the potential harm to the non-movant if the injunction is granted; and (4) that granting the injunction will not disserve the public interest.  *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018).  "A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements."  *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).  A preliminary injunction "may only be awarded upon a clear showing that the [movant] is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and is never awarded as a matter of right but only within the sound discretion of the district court.  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).    "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *University of Tex. v. Camensich*, 451 U.S. 390, 395 (1981); *see Atwood Turnkey Drilling, Inc. v. Petroleo Brasilerio, S.A.*, 875 F.2d 1174, 1178 (5th Cir. 1989).  Ultimately, granting a preliminary injunction "is the exception rather than the rule."  *Miss. Power & Light Co.*, 760 F.2d at 621.

---

[35] *Id.* at 6-13.

Generally, a federal court does not render a final judgment on the merits at the preliminary injunction stage; and when it does not render a final judgment, its findings of fact and conclusions of law are not binding at a trial on the merits. *Camensich*, 451 U.S. at 395. Additionally, "at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. Thus, the district court can accept evidence in the form of deposition transcripts and affidavits." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).

**B. Substantial Likelihood of Success on the Merits**

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). A preliminary injunction should not issue if "the law on the question at the heart of the dispute does not favor [the movant's] position." *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010).

**1. Choice of Law**

The parties dispute what state law applies in this diversity, breach-of-contract case.[36] A federal court exercising diversity subject-matter jurisdiction applies the choice-of-law rules of the state in which it sits to determine which substantive law will apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498-97 (1941). Thus, this Court will apply Louisiana's choice-of-law rules.

The parties' claims arise under the Indemnity Agreement and the Bond. Louisiana's general choice-of-law rule applicable to conventional obligations provides:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

---

[36] Travelers applies Louisiana law, *see* R. Doc. 150 at 8 n.10, and the Indemnitors apply Mississippi law. *See* R. Docs. 143 at 16; 157 at 17. No party briefed the choice-of-law issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in [Louisiana Civil Code] Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La. Civ. Code art. 3537.  Article 3515, the general choice-of-law rule for all cases, provides:

Except as otherwise provided in this Book [on conflict of laws], an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

However, when a contract specifies the applicable law, the contract is "governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537."  La. Civ. Code art. 3540.  The parties may choose the law of any state, regardless of whether "that state has a particular factual, geographical, or legal relationship with the contract" subject to the limitation that the chosen law must not contravene "the public policy of the state whose law would have been applicable to the issue 'but for' the parties' choice."  *Id.* at revision cmt. f.

Here, neither the Indemnity Agreement nor the Bond contains an express choice-of-law provision or signals clear reliance on a particular state's law as contemplated by Civil Code article 3540.  Therefore, the Court conducts the impairment analysis described in articles 3537 and 3515.

Travelers is a corporation organized under the laws of Connecticut with its principal place of business in Connecticut.  FCI is a corporation organized under the laws of Mississippi with its

principal place of business in Mississippi. FCI is licensed to do business in both Mississippi and Louisiana. Clayton and Kathleen Fucich are Mississippi citizens.[37] To secure a public works construction bid in Louisiana such as the flood-protection Project here, the Louisiana Public Works Act requires that bidders furnish a payment bond in the event of their default. La. R.S. 38:2241; *Avallone Architectural Specialties, L.L.C. v. DBCS Corp.*, 839 So. 2d 1045, 1048 (La. App. 2003). Accordingly, the Parish required each bidder on the Project to supply a payment bond in the amount of the Project's cost of completion.[38] To bid on the Project, FCI contracted with Travelers to issue the Bond, a typical payment and performance bond. The Bond requires Travelers to act as surety for the Parish by paying or arranging for the completion of the Project in the event of FCI's default. Essentially, the Bond's purpose is to provide security to ensure the completion of the Project.[39] In exchange for Travelers' issuance of the Bond, the Indemnity Agreement obligates FCI to indemnify, provide collateral to, and assign litigation rights to Travelers, among other things. Thus, the Indemnity Agreement's purpose is to make Travelers whole if FCI fails to perform its contract with the Parish, thereby triggering Travelers' surety obligations under the Bond.[40] While the Indemnity Agreement was signed by the Indemnitors in Mississippi, the underlying object of the Indemnity Agreement and the Bond is to ensure completion of the Project in Louisiana.[41] The contract for the Project was executed by FCI in Mississippi and by the Parish in Louisiana, but the Project and performance of the contract were to be completed in Louisiana, and the contract contemplated the application of Louisiana law, including the Louisiana Public Works Act.[42]

---

[37] R. Doc. 157 at 16-17.
[38] *See* R. Doc. 119-2.
[39] *See* R. Doc. 140-2 at 12-19.
[40] *See* R. Doc. 140-1.
[41] *See id.* at 4-6; R. Doc. 140-2 at 1-8. The Bond does not indicate the place where it was signed. *See* R. Doc. 140-2 at 12-19.
[42] R. Doc. 140-2 at 1-8 (citing specifically La. R.S. 38:2248 at page 5).

Notwithstanding the Mississippi contacts, Louisiana's interest in enforcing contracts governed by the Louisiana Public Works Act for a public construction in Louisiana outweighs Mississippi's interest in this case. Louisiana citizens of the Parish have a strong interest in the enforcement of both bonds and indemnity agreements that secure the performance of public construction projects in their region, such as the replacement of engines and gear reducers on storm water drainage pumps designed to protect the Parish and its citizens against flooding. Louisiana's law and policies aimed toward ensuring the financial integrity and completion of public works projects would be most impaired if its law were not applied in construing and enforcing the Bond and Indemnity Agreement securing performance of the contract between FCI and the Parish for the Project. Therefore, the Court applies Louisiana law.

### 2. Demand for Collateral

Under Louisiana law, the general rules of contract interpretation apply to indemnity agreements. *Sovereign Ins. Co. v. Tex. Pipe Line Co.*, 488 So. 2d 982, 985 (La. 1986). A contract is the law between the parties, and the court must give the contract its legal effect according to the parties' common intent. *Sanders v. Ashland Oil, Inc.*, 696 So. 2d 1031, 1036 (La. App. 1997). This intent is to be determined by the words of the contract when they are "clear and explicit and lead to no absurd consequences." La. Civ. Code arts. 2045, 2046; *Sanders*, 696 So. 2d at 1036. "The rules of interpretation establish that, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit." *Sanders*, 696 So. 2d at 1036 (citing La. Civ. Code art. 2046 cmt. b; *Cashio v. Shoriak*, 481 So. 2d 1013, 1015 (La. 1986)) (other citations omitted). "Each provision … must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of

other contracts of a like nature between the same parties." *Id.* art. 2053. "Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." *Id.* art. 2055.

The collateral security provision of the Indemnity Agreement is unambiguous, and the parties do not contend otherwise. Nor do the parties dispute that FCI has an obligation to indemnify Travelers for loss incurred with respect to Travelers' defense of the Parish's claim under the Bond, which is clearly and unambiguously set forth in Section 3.[43] Rather, the parties mainly dispute what triggers Travelers' ability to make a collateral demand under Section 5 (the collateral security provision) and how much Travelers can demand. The Indemnitors contend that Travelers' demand is improper for two main reasons: first, that there was no valid default of the Bond to trigger Travelers' obligation to pay the Parish, and second, that Travelers acted in bad faith to fulfill its obligations under the Bond and Indemnity Agreement.[44] Travelers disagrees, contending that demand may be made "the minute a claim is made under the Bond," which occurred on July 20, 2018, when the Parish sent Travelers a letter stating that the Parish terminated FCI from the Project and making formal demand on the Bond.[45] Travelers further argues that its denial to pay the Parish under the Bond and FCI's ultimate liability are immaterial here because the purpose of the collateral security provision is pre-judgment protection from risk of loss. The amount demanded was not arbitrarily or purposefully chosen to compel FCI to accept a pricey settlement, says Travelers, but was based on the potential damages Travelers may face and the attorney's fees and costs it has incurred or may incur.[46]

Section 5 provides in part: "Indemnitors agree to deposit with [Travelers], upon demand, an amount as determined by [Travelers] sufficient to discharge any Loss or anticipated Loss."[47]

---

[43] *See* R. Doc. 140-1 at 1-2.
[44] R. Doc. 143 at 12-20.
[45] R. Doc. 150 at 9.
[46] *Id.* at 6-15.
[47] R. Doc. 140-1 at 3.

Thus, the collateral security provision delimits *what* Travelers may demand – "an amount as determined by [Travelers] sufficient to discharge any Loss or anticipated Loss" – and *when* Travelers may demand it – anytime a demand or claim is made for "any Loss or anticipated Loss." "Loss" is defined broadly in the Indemnity Agreement as "[a]ll loss and expense of any kind or nature, including attorneys' and other professional fees, which [Travelers] incurs in connection with any Bond or this Agreement, including but not limited to all loss and expense incurred by reason of [Travelers']: … (b) prosecuting or defending any action in connection with any Bond; … (e) enforcing by litigation or otherwise any provision of this Agreement; and (f) all interest accruing thereon at the maximum legal rate."[48]  Applying this broad definition of loss to what Travelers may demand under Section 5, it is clear that Travelers may demand payment for an expansive range of debts, including monies it could expend in completing the Project or in responding to the Parish's lawsuit or its demand against Travelers under the Bond.  "Anticipated Loss" is not defined in the contract, but, by its plain language, "anticipated Loss" must mean future loss, future monies expended in completing the Project, and future damages and attorney's fees. This conclusion is reinforced by the purpose of collateral security provisions in indemnity agreements: to protect the surety against uncertain future loss.  *See Emp'rs Mut. Cas. Co. v. Precision Constr. & Maintenance, LLC*, 2015 WL 5254706, at *7-8 (E.D. La. Sept. 8, 2015).  The contractual provision expressly protects the surety from experiencing post-judgment uncertainty by providing pre-judgment security.  There is no requirement, in the contract or in case law, that the surety must prove the principal's actual liability, which would defeat one purpose of the collateral security provision.  *See id.*

The court in *Travelers Casualty & Surety Company of America v. Padron*, 2017 WL 9360906, at *8 (W.D. Tex. Aug. 2, 2017), analyzed an identical collateral security provision.

---

[48] *Id.* at 1-2.

There, Travelers sought a preliminary injunction to force the indemnitors under an indemnity agreement that secured performance and payment bonds to deposit collateral security for recoverable and incurred losses of $6.6 million and roughly $12.7 million of anticipated loss in relation to bond claims. *Id.* at *1-3, *5. The court reasoned that Travelers satisfied the likelihood-of-success-on-the-merits prong of the preliminary injunction analysis because "(1) such a provision is intended to secure collateral prior to loss and to avoid loss, even if only temporarily, and (2) specific performance is the only available remedy." *Id.* at *8. The Court agrees with this rationale.[49]

Travelers' inartful November 12, 2018 demand letter to FCI may have caused FCI to believe wrongly that a default was necessary before Travelers could demand collateral. But the Indemnity Agreement does not impose such a prerequisite. Instead, Travelers' recourse under the collateral security provision is distinct from the "Remedies" (Section 6 of the Indemnity Agreement) that Travelers may only invoke "[i]n the event of a Default."[50] Therefore, to demand collateral under the collateral security provision, it is unnecessary for Travelers to establish that a default has occurred under either the Bond or the Indemnity Agreement.[51]

FCI also claims that the collateral security provision is unenforceable because Travelers breached its obligations under the Bond and the Indemnity Agreement in bad faith. Specifically, FCI contends that Travelers' demand was made in bad faith because: (1) Travelers denied the Parish's claim under the Bond after having itself concluded that FCI is not at fault, rendering its $5 million demand for collateral an unreasonable estimate of loss presumably chosen only to force

---

[49] Travelers cites to multiple cases upholding the surety's right to demand specific performance of a collateral security provision in an indemnity agreement once the surety is threatened with a claim or lawsuit. *See, e.g.*, R. Doc. 142 at 8-9 & nn.20 & 23 (citing, *inter alia*, *U.S. Fidelity & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579 (M.D. Pa. 1998); *Safeco Ins. Co. v. Hirani/MES, JV*, 480 F. App'x 606 (2d Cir. 2012)).

[50] R. Doc. 140-1 at 3.

[51] *See id.* at 1-2.

FCI to settle; (2) Travelers admitted it has not yet established a reserve; and (3) Travelers acted in bad faith by communicating to the Parish about FCI's nonperformance.[52]

### a. Amount of Demand

The Indemnity Agreement permits demand of "an amount as determined by [Travelers] sufficient to discharge any Loss or anticipated Loss." While Travelers may plainly exercise discretion to determine the amount, its discretion is limited to the determination of an amount "sufficient to discharge any Loss or anticipated Loss." "Sufficient" means "of a quantity, extent, or scope adequate to a certain purpose or object," or "to provide the needs or accommodation of, to satisfy." The Oxford English Dictionary (2019). A sufficient amount would therefore be one to accommodate the scope of Travelers' loss and anticipated loss – the monies it expects to expend to complete the Project as well as the attorney's fees and damages it has incurred or may incur in response to the Parish's claim under the Bond. Although the word "sufficient" is not the same as "reasonable," the use of the adjective "sufficient" in this context implies a similar limitation, where the amount is reasonably related to Travelers' loss or anticipated loss. *Cf. Cincinnati Ins. Co. v. Savarino Constr. Corp.*, 2011 WL 1068022, at *7-13 (E.D. La. Mar. 21, 2011) (surety's reasonableness is relevant when indemnity provision covered payments made by surety "in the reasonable belief that it was liable for the amount disbursed, or that such payment or compromise was reasonable under all the circumstances").

Here, Travelers demanded $5,036,878.49, representing the damages the Parish seeks to recover against it and its attorney's fees and costs incurred as of December 27, 2018, the date of its application for preliminary injunction.[53] The Parish sued Travelers for $5,009,908.00, the penal sum of the Bond, alleging that "the cost to complete the project will greatly exceed the balance of the Contract Price and will probably exceed the total amount of the Performance Bond."[54] The

---

[52] R. Docs. 143 at 19-25; 151 at 10.
[53] R. Doc. 142 at 6 (citing R. Doc. 142-8).
[54] R. Doc. 70 at 89.

Parish demanded this full sum due to FCI's alleged breach of the contract relating to FCI's retention of the engines and equipment and FCI's claim for payment of work allegedly performed.[55]

Rather than addressing whether the amount of Travelers' demand was "sufficient to discharge [the] Loss or anticipated Loss" Travelers faced as a result of the Parish's suit, FCI asserts that Travelers' demand was made in bad faith. FCI relies on cases holding that a surety has an implied duty to demand an amount of collateral in good faith – meaning that the amount demanded is substantiated by existing claims. *See Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 2010 WL 4828103 (E.D.N.Y. Nov. 22, 2010) (establishing amount of reasonable collateral security); *BIB Constr. Co., Inc. v. Fireman's Ins. Co.*, 625 N.Y.S.2d 550, 523 (1995) ("[s]o long as the sum demanded is reasonable," indemnitor obliged to deposit amount set at the "sole discretion" of the surety). FCI contends that $5 million is unreasonable because Travelers has admitted that FCI is not at fault.

But the reasonableness of an amount of collateral does not depend upon FCI's actual liability. As stated by the court in *Safeco Insurance Company of America v. M.E.S., Inc.*:

> [The surety's] demand for collateral security is not assessed under the summary judgment standard; the court is not required to delay setting an amount of collateral security due to the existence of factual disputes. Inherently, it is impossible to determine ex ante the precise amount of future losses [the surety] will incur on the … bonded projects. That amount can only be ascertained upon the completion of all … projects and the resolution of the pending disputes related thereto. Thus, in determining what constitutes a reasonable amount of collateral security, the function of the court is not to seek mathematical certainty. Rather, the function of the court is to determine, in light of the circumstances of the case and the supporting documentation submitted by the parties, whether [the surety's] demand is a reasonable estimate of its anticipated losses. It is not necessary for the court to resolve factual disputes prior to setting the amount of collateral security. Indeed, because the issue of collateral security is distinct from the ultimate issue of indemnity, the existence of factual disputes regarding liability is irrelevant to this determination.

---

[55] R. Doc. 148 at 10.

2010 WL 4828103, at * 4. There, the court concluded that expenses the surety might not ultimately have to bear were reasonably included as anticipated loss because the surety faced the risk it may be liable for them. The indemnitors would be entitled to repayment if the damages were actually less than the posted security. *Id.* at *9. The same reasoning applies here. FCI's actual liability, which remains in dispute, will ultimately be resolved at trial or in settlement, whereupon FCI would be entitled to reimbursement of any posted security above the amount of settlement or damages awarded.

Moreover, the Indemnitors' contention that Travelers' demand was made in bad faith as a tactic to force FCI to settle is unavailing in light of the Indemnity Agreement's settlement provision, which purports to provide Travelers the right, at its sole discretion, to settle any claims made in relation to the Bond.[56] This provision undercuts FCI's contention that Travelers' collateral security demand was aimed at forcing FCI to settle because Travelers, not FCI, arguably has the right to settle the dispute in any event. Nonetheless, it is unnecessary for the Court to resolve this issue at this time because it is certainly credible that Travelers made the demand merely to protect its collateral position.

Much time has passed since Travelers made its $5 million collateral security demand in November 2018 and since the Court heard evidence related to it in January 2019. In the interim, the parties came to a preliminary agreement on some points in dispute that may have altered the analysis of what amount might now be "sufficient to discharge any Loss or anticipated Loss." Thus, the Court must determine what amount would ***currently*** be sufficient to discharge any loss or anticipated loss, and the parties' memoranda and evidence addressing the adequacy of the amount have since gone stale. Therefore, the Court shall order the parties to submit memoranda

---

[56] R. Doc. 140-1 at 1-2.

addressing the question of what amount is sufficient to discharge any loss or anticipated loss, and the Court will set a hearing for argument on this question.

### b. Reserve

FCI next contends that Travelers cannot demand collateral without first having established a good-faith reserve. However, the Indemnity Agreement does not contain any language predicating the collateral demand upon the establishment of a reserve. Nor are any of the terms in Section 5, such as the term "Loss," defined in relation to a reserve. Therefore, Travelers' stipulation to forgo setting a reserve is inconsequential to its demand for collateral.[57]

### c. Bad-Faith Communication

Finally, the Court addresses FCI's contention that Travelers acted in bad faith by communicating to the Parish about FCI's failure to perform under its contract with the Parish concerning the Project. The Louisiana Procurement Code imposes a duty of good faith in the performance and enforcement of public works contracts, such as the contract for replacement of the engines and gears on the Parish's pumps. *See* La. R.S. 39:1551 *et seq.* Courts have applied this duty of good faith to bonds and related indemnity agreements securing public works contracts. *See, e.g., Liberty Mut. Ins. Co. v. Integrated Pro Servs., LLC*, 2015 WL 3620147, at *3 (E.D. La. June 9, 2015). "'Good faith' means honesty in fact in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing." *Id.* (quoting La. R.S. 39:1553(B)).

FCI relies on *Liberty Mutual Insurance Co. v. Integrated Pro Services, LLC*, in which the court applied the statute's good-faith standard to a surety's bad-faith conduct, to assert that Travelers acted in bad faith as did the surety there. But the conduct at issue in *Liberty Mutual* is

---

[57] Notably, though, Travelers did present evidence at the preliminary injunction hearing on January 11, 2019, that it was in the process of establishing a reserve using a "stairstep" approach.

distinguishable. Counsel for the surety in *Liberty Mutual* had not informed the indemnitors of its communication with the principal at the time of the communication. *Id.* at *3-4. In contrast, here, Travelers immediately informed the Indemnitors of the email the Parish sent to Travelers.[58] A surety has obligations not only to the indemnitors but also to the principal, and both were discharged in good faith by Travelers in this case.

* * * *

In sum, Travelers has demonstrated a substantial likelihood of success on the merits of its collateral demand under the Indemnity Agreement. As reviewed above, the law and facts favor Travelers' reading and application of the collateral security provision, and none of FCI's objections to enforcing the provision at this juncture has merit.

### C. Substantial Threat of Irreparable Injury

To prevail on the second element of a preliminary injunction, the movant must show that the threat of injury is likely and irreparable. *See Winter*, 555 U.S. at 22. An injury is irreparable if it cannot be adequately compensated by money damages. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). Thus, "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). Equitable relief is warranted when the injury constitutes "either continuing harm or a real and immediate threat of repeated injury in the future." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992).[59]

---

[58] R. Doc. 150 at 11-12.

[59] Although Travelers cites *Wingsco Energy One v. Vanguard Groups Resources 1984, Inc.*, 1989 WL 223756, at *2 (S.D. Tex. Nov. 15, 1989), for the proposition that a surety is held to a more lenient standard whereby the surety is not required to prove irreparable harm, *Wingsco* discusses the surety's entitlement to *quia timet* relief, a common-law remedy distinct from a preliminary injunction. *See Int'l Fidelity Ins. Co. v. Talbot Constr., Inc.*, 2016 WL 8814367, at *3-4 (N.D. Ga. Apr. 13, 2016). Travelers, as a surety seeking a preliminary injunction to enforce its right to collateral, must establish irreparable harm. *See, e.g., id.*; *Padron*, 2015 WL 1981563, at *4.

Travelers emphasizes that the contract language stipulates that Travelers will suffer irreparable injury in the event collateral is not paid and that courts routinely enforce specific performance of the right to collateral because of its nature as pre-judgment security.[60]  But, as the Indemnitors point out, specific performance is distinct in nature from a preliminary injunction, and in the absence of evidence of an indemnitor's insolvency or alienation of assets, courts are loathe to find irreparable harm sufficient to grant a preliminary injunction.[61]  Nevertheless, Travelers insists that irreparable harm exists because, without an injunction, "Travelers' contracted-for collateral security rights have been rendered meaningless as a result of Indemnitors' refusal to honor their obligations under the [Indemnity Agreement]."[62]

Indeed, the Indemnitors stipulated in the Indemnity Agreement that Travelers would suffer irreparable harm if the demand for collateral is not met.  In particular, the collateral security provision states: "Indemnitors agree that [Travelers] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph."[63]  Thus, the Indemnitors clearly and unambiguously stipulated to Travelers' irreparable harm.  The question is whether such a stipulation is effective.  Courts in the Fifth Circuit are split as to whether a contractual stipulation alone may satisfy the requisite for irreparable harm. *Compare Dickey's Barbecue Restaurants, Inc. v. GEM Inv. Grp., L.L.C.*, 2012 WL 1344352, at *4 (N.D. Tex. Apr. 18, 2018) (stipulation "is merely one factor to be examined in making the irreparable harm determination") (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004)), *with Hartford Fire Ins. Co. v. 4-H Ventures, Inc.*, 2008 WL 11389579, at *3 (S.D. Tex. June 25, 2008) (under "the plain language of indemnity

---

[60] R. Doc. 142 at 13-15.
[61] R. Doc. 151 at 4-12.
[62] R. Doc. 140 at 15.
[63] *Id.* at 3.

agreements," which defeats all "arguments to the contrary," indemnitors "expressly agreed that the failure to provide the requested collateral constitutes irreparable harm"). Considering the evidence adduced concerning the Indemnitors' financial plight if the demand were enforced, the Court finds it unnecessary to weigh in on this legal question at this time.

Without relying on the contractual stipulation of irreparable harm, for a surety to demonstrate irreparable harm in relation to a demand for collateral security, the surety must show that an inability to collect amounts that may become owed by an indemnitor is imminent, including, for example, showing that an indemnitor faces dire financial straits or bankruptcy, thereby increasing the likelihood that damages may not be recovered upon a later judgment awarding specific performance. *Padron*, 2017 WL 9360906, at *4-5, *8-10; *see also W. Sur. Co. v. PASI of La., Inc.*, 334 F. Supp. 3d 764, 796 (M.D. La. Sept. 25, 2018) (imminence of harm may be demonstrated by showing indemnitor to be "insolvent or secreting assets," "in dire financial straits, no longer [having] a traditional source of credit, [having] been dishonest or 'is millions of dollars in the hole with various creditors'") (quoting *Allied World Specialty Ins. Co. v. Abat Lerew Constr., LLC*, 2017 WL 1476131, at *5 (D. Neb. Apr. 24, 2017)). When this showing is made, injunctive relief protects "three interests of the surety: the bargained-for benefit of collateral security, avoidance of present exposure to liability during pending litigation against indemnitors, and avoidance of risk that, should [i]ndemnitors become insolvent, the surety will be left as a general unsecured creditor, frustrating the purpose of the indemnity agreement." *Padron*, 2017 WL 9360906, at *10 (quoting *Int'l Fidelity Ins. Co.*, 2016 WL 8814367, at *7).

For instance, in *Padron*, Travelers sought an injunction to enforce a collateral security provision identical to the one at issue here. *Id.* at *2, *3-6. While the court concluded that Travelers "undisputedly 'bargained for a collateral security clause to protect it from impending

risks of liability once a claim has been made on the bond[s],'" the court had refused two prior motions for preliminary injunctions on the basis that insufficient evidence existed to prove that Travelers would suffer irreparable harm. *Id.* at *8, *10 (quoting *Safeco Ins. Co. of Am. v. Lake Asphalt Paving & Constr., LLC*, 807 F. Supp. 2d 820, 827 (E.D. Mo. 2011)). The court refused to grant a preliminary injunction even when Travelers had "created a serious question [as to] whether [the indemnitors] are capable of fulfilling their obligations under the [i]ndemnity [a]greement." *Id.* at *8. At the evidentiary hearing in support of Travelers' third motion, Travelers presented evidence of the depreciation of the indemnitors' net worth, of several indemnitors' insolvency or near insolvency, that indemnitors were depleting their assets, that the divorces of some indemnitors tied up some assets, and of significant reductions in the indemnitors' available assets. *Id.* at *11. The court finally awarded the preliminary injunction, concluding that "Travelers has shown that [the indemnitors'] financial situation is a *presently existing actual threat* to [the indemnitors'] ability to fulfill their obligations under the [i]ndemnity [a]greement, further compounding the irreparable harm to Travelers if it does not receive injunctive relief by way of specific enforcement of the collateral security provision." *Id.* at *10 (emphasis in original).

Here, Travelers presented evidence at the preliminary injunction hearing that the Indemnitors would be bankrupted if they had to pay the amount demanded by the Parish to complete the Project. FCI submitted a financial statement showing its positive net worth of about $859,000 as of November 16, 2018, and a personal financial statement of Clayton Fucich showing a net worth of approximately $3 million as of February 8, 2018. Clayton Fucich testified that he would be unable to meet his other financial obligations if he were forced to comply with the

collateral demand.[64]  On balance, the evidence at the preliminary injunction hearing established that Indemnitors would be unable to pay a judgment in the amount of $5 million.  Therefore, Travelers established that it would suffer irreparable harm because the Indemnitors cannot respond to a judgment in the amount demanded by the Parish.

### D.  Balance of Hardships

Under the third element for a preliminary injunction, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).  "The third factor requires the plaintiff to establish that his irreparable harm is greater than the hardship that the preliminary injunction would cause the defendant."  *DS Waters of Am., Inc. v. Princess Abita Water, LLC*, 539 F. Supp. 2d 853, 863 (E.D. La. 2008) (citing *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997)).

In the absence of an injunction, Travelers would be forced to face liability for the full sum of the penal bond as claimed by the Parish without the benefit of its bargained-for right to collateralization under the Indemnity Agreement.  On the other hand, the Indemnitors will merely be forced to perform an obligation they agreed to perform under the Indemnity Agreement.  *See, e.g.*, *Padron*, 2017 WL 9360906, at *12 (balance of hardships weighed in favor of surety); *Hartford Fire Ins. Co. v. 4-H Ventures, Inc.* 2008 WL 11389579, at *4 (enforcing collateral security provision because harm to surety in not protecting its bargain outweighed harm to indemnitors in having to make deposit they expressly agreed to make); *Int'l Fidelity Ins. Co. v. Anchor Envtl., Inc.*, 2008 WL 1931004, at *7 (E.D. Pa. May 1, 2008) ("Defendants are not unfairly

---

[64] R. Doc. 150 at 17 ("If Fucich will be bankrupt by having to post collateral in the amount of the $5 million collateral demand, then Travelers will certainly suffer a loss if the Parish is successful on its claim for the penal sum of the Bond because Fucich will not be able to indemnify Travelers.").

prejudiced by being held to the Agreement of Indemnity to which they were signatories."); *Great Am. Ins. Co. v. Conart, Inc.*, 2006 WL 839197, at *6 (M.D. Ga. Mar. 29, 2006) (surety's defense of principal's bonded claims in absence of injunction weighed in favor of surety); *Travelers Cas. & Sur. Co. v. Ockerlund*, 2004 WL 1794915, at *5 (N.D. Ill. Aug. 6, 2004) (breach of contract in absence of injunction weighed in favor of surety, noting that any funds not used to pay claims on bonds will be returned to indemnitors).  Travelers has demonstrated that the hardship it will face if an injunction does not issue outweighs the threatened harm to Indemnitors posed by the injunction.

### E.  Public Interest

Finally, the fourth element one seeking a preliminary injunction must establish is that granting the injunction will not disserve the public interest.  *Miss. Power & Light Co.*, 760 F.2d at 621.  When considering the public interest in a contract made between two private parties, a court is not constrained to the immediate interests of the parties to the contract but considers the situation of the public as it would be affected by injunctive relief.  *Id.* at 625-26.

The Indemnitors contend that forcing them to deposit collateral with Travelers would disserve the public, which has an interest in seeing justice served, because it essentially preempts a decision on the merits of FCI's dispute with the Parish and its engineers and permits Travelers' financial leverage to control the outcome of the litigation.[65]  It is against public policy, the Indemnitors posit, to decide in favor of the commercial surety when doing so forces the contractor out of business while the surety denies that the contractor was ever at fault.[66]

Travelers says that the public has an interest in enforcing valid contracts, particularly where public construction projects require special bonds providing assurances of indemnity.  Travelers

---

[65] R. Doc. 119 at 22-23.
[66] R. Doc. 143 at 14.

broadly asserts that "[t]he indemnity agreement literally represents the foundation of modern suretyship, and its enforcement is essential to the procurement of contract surety bonds to guarantee performance on construction projects," and that failure to enforce the Indemnity Agreement would "undermine the entire surety industry."[67]

In less sweeping terms, the Court concludes that granting Travelers' injunction will not disserve the public interest. Indeed, the public has an interest in courts upholding clearly written contracts, and the surety industry has an interest in the enforcement of collateral security provisions. More importantly, though, the construction project that the Indemnity Agreement and Bond secure provides the vital public service of flood protection. *See Int'l Fidelity Ins. Co.*, 2008 WL 1931004, at *7 (enforcing indemnity agreement to uphold integrity of surety industry and local government in public works construction projects). One of the principal purposes of the surety arrangement is to ensure that public works projects are completed as envisioned for the public's benefit. The public's interest in flood protection in this region is undeniable. Thus, the public interest would not be disserved in granting Travelers' injunction; in fact, the public stands to benefit.

Accordingly, for the foregoing reasons,

IT IS ORDERED that Travelers' application for preliminary injunction (R. Doc. 140) is GRANTED in part. However, the Court reserves decision on the amount of collateral sufficient to discharge Travelers' loss or anticipated loss, so no preliminary injunction will issue until the amount of collateral the Indemnitors are to provide is determined.

IT IS FURTHER ORDERED that Travelers shall file a memorandum, which is to address the amount of collateral sufficient to discharge its loss or anticipated loss, no later than Wednesday,

---

[67] R. Doc. 150 at 23.

May 1, 2019, and that the Indemnitors shall file a memorandum in response no later than Wednesday, May 15, 2019. The Court shall hear argument on this issue on Friday, May 17, 2019, at 9:00 a.m.

IT IS FURTHER ORDERED that FCI's motion for preliminary injunction (R. Doc. 119) and the Indemnitors' application for a preliminary injunction (R. Doc. 157) are DENIED insofar as they seek to enjoin Travelers from exercising its right to demand collateral under the Indemnity Agreement.

IT IS FURTHER ORDERED that the Indemnitors' motion to expedite hearing on their application for preliminary injunction (R. Doc. 159), having been effectively granted by the Court in holding the January 9, 2019 hearing, is DENIED as moot.

New Orleans, Louisiana, this 19th day of April, 2019.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE