UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FUCICH CONTRACTING, INC.                      CIVIL ACTION

VERSUS                                        NO. 18-2885

SHREAD-KUYRKENDALL AND                        SECTION M (4)
ASSOCIATES, INC., *et al.*

## ORDER & REASONS

Before the Court is a motion for partial summary judgment filed by Fucich Contracting, Inc. ("FCI") addressing its contract claims and the contract counterclaims of the St. Bernard Parish Government ("the Parish"),[1] which motion is opposed by the Parish,[2] and by Shread-Kuyrkendall and Associates, Inc. ("SKA") and XL Specialty Insurance Co. ("XL").[3] FCI files a reply in further support of the motion,[4] and SKA and XL a surreply in further opposition.[5] Also before the Court is a second motion for partial summary judgment filed by FCI addressing the invalidity of the Parish's July 20, 2018 termination notice,[6] which motion is opposed by the Parish,[7] and in further support of which FCI replies.[8] Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

## I.      BACKGROUND

On or about December 22, 2016, FCI entered into a construction contract with the Parish to be the general contractor for the public works improvement project known as the Lake Borgne

---

[1] R. Doc. 51.
[2] R. Doc. 93.
[3] R. Doc. 94.
[4] R. Doc. 102.
[5] R. Doc. 140.
[6] R. Doc. 181.
[7] R. Doc. 197.
[8] R. Doc. 215.

Basin Levee District Pump Station #1 & #4 Pump Upgrade ("the Project").[9]  The general scope of work for the Project consisted of replacing the engines and right angle gear reducers that drive four backup storm water drainage pumps.[10] As the engineer for the Project, SKA prepared the design, bidding documents, and contract documents for the Project.[11]  The contract provided that the work would be completed within one year from receiving the order to proceed.[12]

Clayton Fucich, owner of FCI, attended the pre-bid meeting and inspected the site.[13] Fucich testified in his deposition that, while at the site, he did not observe which direction the engines or gear reducers rotated.[14]  Fucich further testified that Steven Breeding, a representative of SKA present during the pre-bid meeting, informed him that a Caterpillar 3512C land engine would be used for the Project.[15]  FCI submitted the lowest bid and signed a document setting out the scope of the contract ("the Agreement") with the Parish.[16]

As required by the Agreement, FCI furnished a payment and performance bond ("the Bond") in the amount of $5,009,908.00, underwritten by Travelers Casualty & Surety Company of America ("Travelers").[17]  As a condition precedent of Travelers's agreement to issue bonds to FCI for the Project and various other projects, Travelers required FCI to sign a General Agreement of Indemnity ("the Indemnity Agreement").[18]  The Indemnity Agreement provides Travelers the right to demand that FCI deposit collateral security for any "Loss" or "anticipated Loss."[19] Furthermore, in the event of a default of the Indemnity Agreement, which includes "a declaration

---

[9] R. Doc. 119-1 at 5 (citing R. Doc. 119-4).
[10] *Id.*; R. Docs. 51-2 at 2; 93-1 at 1.
[11] R. Docs. 51-2 at 2-3; 93-1 at 2-3.
[12] R. Doc. 93-4 at 37.
[13] R. Doc. 93-11 at 35-36.
[14] *Id.* at 37, 41.
[15] *Id.* at 44-45, 48; *see also* R. Doc. 94-2 at 1.
[16] R. Docs. 51-2 at 5; 93-1 at 4; 94-1 at 5.
[17] R. Docs. 119-1 at 6 (citing R. Doc. 119-5); 126 at 2.
[18] R. Doc. 126 at 2 (citing R. Doc. 126-1).
[19] R. Doc. 119-3 at 3.

of Contract default by any Obligee [FCI]," and "[Travelers's] good faith establishment of a

reserve," Travelers may invoke certain specified "Remedies" against the indemnitors.[20]

In the Agreement, FCI represented that it "familiarized [it]self with and is satisfied as to

the nature and extent of the Contract Documents, Work … which may affect cost, progress,

performance or furnishing of the Work," that it "has examined and carefully studied the Contract

Documents," and that it "has given [SKA as engineer on the Project] written notice of all conflicts,

errors, ambiguities or discrepancies that [FCI as contractor] has discovered in the Contract

Documents and the written resolution thereof by [SKA] is acceptable to [FCI], and the Contract

Documents are generally sufficient to indicate and convey an understanding of all terms and

conditions for performance and furnishing of the Work."[21]   The totality of the "Contract

Documents" between FCI and the Parish consisted of documents listed in Article IX of the

Agreement, including performance, payment, and other bonds, standard general conditions of the

construction contract, special provisions, "Contract Documents (drawings and specifications),"

and "documents listed in the Table of Contents."[22]   The Table of Contents lists, *inter alia*, the

following additional documents: "Instructions to Bidders," seventeen categories of documents

denominated "Division 00" through "Division 16" (covering subjects including, most relevantly,

"General Requirements" and "Equipment"), and two appendices.[23]

In the "Instructions to Bidders," section 3(A) provides:

It is the responsibility of each Bidder, before submitting a Bid, to (a) examine the
Contract Documents thoroughly; (b) visit the site to become familiar with local
conditions that may in any manner affect cost, progress, performance or furnishing
of the Work … (d) study and carefully correlate Bidder's observations with the

---

[20] *Id.* at 1-3.

[21] R. Doc. 93-4 at 40-41.

[22] *Id.* at 39.  Article IX of the Agreement effectively incorporates the "Contract Documents" into the terms
of the Agreement.  The term "Agreement" as used in this Order & Reasons is meant to include all of these contract
documents entered between FCI and the Parish concerning the Project.

[23] *Id.* at 2-3.

3

Contract Documents; and (e) notify the Architect or Engineer and Owner of all conflicts, errors or discrepancies in the Contract Documents requiring correction, clarification or interpretation.[24]

Section 3(F) also notes that "[t]he submission of a Bid will constitute an incontrovertible representation by Bidder that … the Contract Documents are sufficient in scope and detail to indicate and convey understanding of all terms and conditions of performance and furnishing of the Work."[25]  Section 4, entitled "Interpretations and Addenda," provides that "[a]ll questions about the meaning or intent of the Contract Documents are to be directed to the Architect or Engineer. … Oral and other interpretations or clarifications will be without legal effect."[26]

Section 23 of the Instructions to Bidders also instructs the contractor to view and "coordinate" the drawings, specifications, and special provisions of the Agreement as a whole: "The Drawings, Specifications, Standard and Supplementary General Conditions, Special Provisions and all supplementary Drawings and documents are essential parts of the Contract.  A requirement occurring in one is just as binding as though occurring in all.  They are ***intended to be complementary*** and to describe and provide for the complete work."[27]  The hierarchy of governing provisions is explained, and the contractor is directed to apprise the engineer of any "conflict, error, or discrepancy in the Contract Documents," if discovered.[28]

In the division addressing "General Requirements," the Agreement provides in Section 01010, "Summary of Work," as follows:

PART 1 – GENERAL
…

1.02    WORK TO BE DONE

---

[24] *Id.* at 10.
[25] *Id.* at 11.
[26] *Id.*
[27] *Id.* at 21 (emphasis added).
[28] *Id.* at 21-22.

A.    ***The Contractor [FCI] shall furnish all labor, materials, equipment,*** tools, services and incidentals ***to complete all work required by these Specifications and as shown on the Drawings***.

B.    The Contractor shall perform the work complete, in place, and ***ready for continuous service***, and shall include repairs, testing, permits, cleanup, replacements and restoration as required as a result of damages caused during this construction.

C.    ***All materials, equipment,*** skills, tools, and labor ***which are reasonably and properly inferable and necessary for the proper completion of the work*** in a substantial manner ***and in compliance with the requirements stated or implied by these Specifications or Drawings shall be furnished and installed by the Contractor*** without additional compensation, whether specifically indicated in the Contract Documents or not.

…

1.03    GENERAL DESCRIPTION OF WORK TO BE PERFORMED

A.    The Work included in the Contract is to ***replace four (4) engines*** with radiators, fuel day tanks, clutches, modify piping and engine pads as necessary, install instrumentation as required, ***rebuild the existing right angle gears as specified***, replace the two (2) overhead cranes, and remove the existing equipment and dispose of legally, according to these Plans and Specifications, and to the satisfaction of the Engineer [SKA] and Owner [the Parish].

B.    ***All work shall be done as described in the Specifications and as shown on the Drawings and Specifications, complete, tested and ready for operation***.

…

1.08    PLANS AND SPECIFICATIONS

A.    Specifications

The Technical Specifications consist of three parts: General, Products, and Execution. The General section contains general requirements which govern the work. The Products and Execution actions modify and supplement these by detailed requirements of the work and shall always govern whenever there appears to be a conflict.

B.    Intent

All work called for in the Specifications applicable to the Contract but not shown on the Plans in their present form or vice versa shall be of like effect as if shown or mentioned in both. **Work not specified in either the Plans or in the Specifications but involved in carrying out their intent or in the complete and proper execution of the work is required and shall be performed by the Contractor as though it were specifically delineated or described.**

The apparent silence of the Specifications as to any detail, or the apparent omission from them of a detailed description concerning any work to be done and materials to be furnished, shall be regarded as meaning that only the best general practice is to prevail and that only material and workmanship of the best quality is to be used, and interpretation of these Specifications shall be made upon that basis.

C.    Conflict between Drawings and Specifications

**Where an obvious conflict exists between the Plans and Specifications, the Engineer shall decide which governs and the Contractor shall comply with the decision.** Such decision shall not be grounds for additional payment to the contractor, i.e., the Contractor shall include the price of the most expensive alternative in his bid.[29]

In addition to the general description of the work to be performed, the Agreement sets out in the division addressing "Equipment" more detailed specifications relating to the engines[30] and right angle gear reducers, which function as the drive interface between the engines and the pumps.[31] Section 11100, "Engine Specification," specifies certain required characteristics of the replacement engines including the following: "The engine shall be a four-cycle type, turbo-charged and after cooled, with single acting piston arrangement. The engine shall have a continuous rating at least 1450 brake horsepower at 1200 RPM continuous operation at maximum ambient temperature including any power transmission losses. … Engine emissions shall be in accordance

---

[29] *Id.* at 53-55 (emphasis added).
[30] *Id.* at 159-66 (Section 11100).
[31] *Id.* at 167-71 (Section 11200).

with present EPA standards."[32] This section does not include a specification of the rotational direction of the drive shaft for the new engines.[33] Nor does this section describe the characteristics of the engines being replaced. Such information, including the rotational direction of the existing engines (and the rotational direction of the existing gear reducers), could be found in Appendix 1, entitled "Existing Pump Data."[34] The existing engines had clockwise drive shafts, and the existing gear reducers had counterclockwise input shafts. Direct drive shafts connected the engines to the gear reducers.[35] It is undisputed that when an engine is connected to a gear reducer with a direct drive shaft, an engine with a clockwise drive shaft requires gear reducers with counterclockwise input shafts, and *vice versa*.[36]

Unlike the specifications for the new engines in Section 11100, the specifications for the right angle gear reducers in Section 11200 contain characteristics of the existing equipment to illustrate the scope of the work:

1.03    SYSTEM PERFORMANCE

A.    System A Description:
EXISTING: Single reduction right angle gear reducer, Western Gear Model 360 GPMR, driven by an engine rated to transmit 1200 HP (828 run HP) with 450 RPM input and transmitting an output to pump speed of 212 RPM, Ratio 2.12:1, 1.5 service factor.

PROPOSED: Same as above, except overhaul of right angle gear reducer to be per work scope below and upgrade gearing to new ratio with 1.75 service factor @ 50,000hrs. Engine is rated for 1450 HP @ 1200 RPM. Output speed, 224 RPM. Ratio 5.36:1. Bearing in gearbox that takes thrust of pump should be rated for 50,000-lbs of down thrust.[37]

---

[32] *Id.* at 159.
[33] The parties acknowledge this fact as undisputed. R. Docs. 51-2 at 4; 93-1 at 3; 94-1 at 4.
[34] *See* R. Doc. 93-4 at 3, 298-327.
[35] R. Doc. 94 at 16-17 (citing R. Docs. 94-1 at 2; 94-13; 94-19 at 44-47).
[36] R. Docs. 93 at 16-19 (citing R. Doc. 93-11 at 150-51); 93-10; *see* R. Doc. 94 at 27.
[37] R. Doc. 93-4 at 167-68.

The parties dispute whether the Agreement required the factory overhaul to maintain the same counterclockwise rotational direction for the input shaft as the existing gear reducers.[38]

On or before March 9, 2017, FCI submitted a proposal to Project engineer SKA for a prospective replacement engine: the Caterpillar 3512C land engine, an engine that FCI believed was specified in Appendix 2.[39] Appendix 2, entitled "Approved Air Permits,"[40] contains documents relating to the issuance of environmental permits from the Louisiana Department of Environmental Quality for the Project.[41] These permits, issued in the 2015-2016 timeframe to secure grant funding for the Project, were completed with data relating to a stationary Caterpillar 3512C engine's emissions.[42] As part of the application for permits, the Lake Borgne Basin Levee District noted in its cover letter that "[t]he engines are Caterpillar 3512C diesel fired engines rated at 1,425 horsepower and will replace existing diesel fired engines at the pump station."[43]

On March 9, 2017, SKA issued a response to FCI's engine proposal. The response instructed FCI to "make corrections noted," which were handwritten on the bottom of the page: "(1) Contractor to verify conformity of outputs to final design. (2) Contractor responsible to coordinate system final design with plans and specifications."[44] On March 21, 2017, SKA also approved FCI's proposed purchase of the overhauled right angle gear reducers from Philadelphia Gear with the same two conditions.[45]

Despite the fact that the drive shaft of the Caterpillar 3512C land engine rotates counterclockwise (and is thus incompatible with the counterclockwise rotation of the existing right

[38] R. Docs. 51-2 at 4; 93-1 at 3; 94-3 at 5.
[39] R. Docs. 93-11 at 107-08; 93-15.
[40] R. Doc. 93-4 at 3.
[41] *Id.* at 328-46.
[42] *See, e.g., id.* at 335 (listing pollutants, emission factors, units, emissions, and sources of emission factors).
[43] *Id.* at 330.
[44] R. Doc. 93-15 at 1.
[45] R. Doc. 93-16.

angle gear reducers), FCI proceeded to purchase two Caterpillar 3512C land engines. FCI also removed two of the right angle gear reducers on the Project and sent them to Philadelphia Gear for a factory overhaul. The factory overhaul requested by FCI maintained the existing counterclockwise rotation.[46] On October 26, 2017, approximately ten months after beginning work on the Project, FCI discovered the rotational conflict between the engines' drive shafts and the gear reducers' input shafts upon attempting to install one of the Caterpillar 3512C land engines. The next day, FCI notified SKA of the problem in writing. FCI has since refused to move forward with the Project absent a change order that would pay FCI for the now increased cost of remediating the rotational conflict.[47]

On March 19, 2018, FCI filed suit against the Parish, SKA, and XL, SKA's insurer, seeking to recover unpaid contract balances owed to FCI for work performed on the Project and other damages.[48] The Parish asserted various counterclaims against FCI for breach of contract, tortious interference with contractual rights, and detrimental reliance;[49] as well as similar crossclaims against SKA and XL.[50] SKA and XL filed a third-party demand against Timken Gears and Services, Inc., doing business as Philadelphia Gear.[51] On July 20, 2018, the Parish, by a letter signed by David C. Jarrell, terminated FCI's contract for FCI's failure to perform and made a formal demand upon Travelers to respond under the Bond.[52] Claiming that the rotational conflict was a design defect, FCI denied fault.[53] Based upon its independent review, Travelers came to the

---

[46] R. Docs. 51-2 at 5; 93-1 at 4; 94-1 at 6.
[47] R. Docs. 51-2 at 6; 93-1 at 4; 94-1 at 7.
[48] R. Doc. 1.
[49] R. Doc. 254 at 95-118 (Fourth Amended Answer and Counterclaims). At the time FCI filed the instant motion for partial summary judgment, the Parish had asserted similar counterclaims consisting of breach of contract and detrimental reliance. R. Doc. 46 at 69-85.
[50] *Id.* at 118-31.
[51] R. Doc. 189.
[52] R. Doc. 126 at 2 (citing R. Doc. 119-13).
[53] R. Doc. 119-1 at 6.

same conclusion and rejected the Parish's demand on August 10, 2018.[54]  As a result, the Parish filed suit against Travelers on September 5, 2018, for the penal sum of the Bond, $5,009,908.00.[55]

On December 4, 2018, FCI filed a preliminary injunction against Travelers that sought to prevent enforcement of the Indemnity Agreement.[56]  On December 19, 2018, Travelers applied for a preliminary and permanent injunction, seeking collateral security in the amount of $5,009,908.00 from indemnitors FCI, Clayton Fucich, and Kathleen Fucich, as provided under the Indemnity Agreement.[57]  The Court denied FCI's motion for a temporary restraining order and held a hearing on the competing motions for preliminary injunction.[58]  However, in light of then ongoing settlement discussions, the Court deferred ruling on the motions for injunctive relief.  Some months later, the Court was advised by the magistrate judge that the settlement was unsuccessful.[59]  On April 19, 2019, the Court denied FCI's motion preliminary injunction insofar as FCI sought to enjoin Travelers from exercising its right to demand collateral security under the Indemnity Agreement,[60] and granted Travelers's motion for preliminary injunction insofar as it sought collateral security.[61]  On May 17, 2019, the Court ordered FCI to deposit collateral security in the amount of $2,563,930.00 with Travelers.[62]

---

[54] R. Doc. 126 at 2 (citing R. Doc. 119-14).
[55] *Id.* (citing R. Doc. 70); R. Doc. 254 at 118-31.
[56] R. Doc. 119.
[57] R. Doc. 140.
[58] R. Docs. 132 & 163.
[59] *See* R. Docs. 195, 244, & 258.  On June 24, 2019, the Court adopted the magistrate judge's report and recommendation to deny FCI's motion to enforce the purported settlement agreement because Fucich had dissented to the terms of the agreement.  R. Docs. 244 & 258.
[60] R. Doc. 184.
[61] *Id*.
[62] R. Doc. 224.

## II.     PENDING MOTIONS

### A.  FCI's Motion for Summary Judgment on the Rotational Conflict

In its first motion for partial summary judgment, FCI seeks a declaratory judgment that the Agreement (1) allowed FCI to furnish Caterpillar 3512C land engines as the replacement engines for the Project and (2) required the factory overhauled gear reducers to maintain the same rotational direction for the input shaft as the existing gear reducers.[63]  FCI contends that these issues are ripe for adjudication because the "four corners of the contract" will not change, making the question of contract interpretation before the Court a purely legal one.[64]  FCI argues that the contract "allowed" it to furnish Caterpillar 3512C land engines because this type of engine was listed six times in Appendix 2.   FCI claims this listing constituted an engine specification that indicated the Caterpillar 3512C land engine would be a permissible product for the Project.  FCI then points to Section 11200 of the Agreement, which it claims plainly requires the reworked gear reducers to retain the same rotational direction as the existing gear reducers.  In light of these provisions, FCI says it complied fully with the Agreement by furnishing (1) a Caterpillar 3512C land engine and (2) overhauled right angle gear reducers retaining the same rotational direction, thus making FCI immune from the Parish's counterclaim under the Louisiana Contractor Immunity Statute, La. R.S. 9:2771.

In opposition, the Parish denies that the Agreement permitted FCI to supply a Caterpillar 3512C land engine absent other steps to address the engine's counterclockwise rotation.[65]  Rather, the Parish submits that the Agreement imposed upon FCI a duty to read the contract as a whole to determine what type of engine would function for the Project.[66]  The Parish emphasizes that neither

---

[63] R. Doc. 51-1 at 12-13.
[64] *Id.* at 13.
[65] R. Doc. 93 at 10.
[66] *Id.* at 11-13, 28, 31, 39.

Section 01010 (General Requirements) nor Section 11100 (Engine Specification) listed an engine brand or model. The Parish maintains that the listing of the Caterpillar 3512C engine in Appendix 2 related solely to estimates of emissions, and that "[a]s long as the engines that were to be utilized in the project did not deviate from the general environmental approval, there would have been no additional need to seek clearance for any other engine brand or model."[67] The Parish argues it was unreasonable for FCI to interpret the engine brand and model listed in Appendix 2 as the sole option because Louisiana Public Bid Law prohibits public works contracts from naming brands, makes, or manufacturers for any purpose other than to represent a general style, character, and quality of the equipment or materials to be used.[68] Furthermore, the Parish says that, upon perceiving any conflict in the contractual provisions, FCI should have consulted SKA, the Project engineer, as required by the Agreement.[69] If FCI had done so, says the Parish, FCI would not have furnished Caterpillar 3512C land engines and counterclockwise gear reducers because such a combination was incompatible. The Parish acknowledges that the Caterpillar 3512C land engine could have been a viable option had FCI sought alterations to the Agreement allowing it to change the type of drive shaft, or the connection of the engine to the right angle gear reducers, which was permitted by Section 01340 of the Agreement.[70] That section required FCI to get permission from SKA before making such changes.[71] The Parish further alleges that, instead of coordinating with the engineer as required by the Agreement, FCI ordered the incompatible parts without permission, and, once ordered, any correction came with a disproportionate cost.[72] In light of the foregoing,

---

[67] *Id.* at 39-40 (quoting R. Doc. 93-18).
[68] *Id.* at 34-37.
[69] *Id.* at 43-49.
[70] *Id.* at 49-63.
[71] *Id.* at 51-54 (citing R. Doc. 93-4 at 83-86).
[72] *Id.* at 56, 60-63.

the Parish maintains that FCI was negligent in failing to read the Agreement and breached it in several respects, and urges the Court to deny FCI's motion for partial summary judgment.

SKA opposes FCI's motion on similar grounds but adds that other disputes of material fact preclude the grant of summary judgment. As to declaratory relief concerning the contract issues, SKA says the Agreement contains technical terms of art (*e.g.,* "performance specification"), but FCI has provided no expert testimony as to their meaning.[73] SKA argues that the Agreement's provisions involve a hybrid of technical and performance specifications that in the end imposed on FCI the requirement to provide functioning engines.[74] SKA also submits that disputed material facts concerning FCI's failure to adhere to the plans and specifications for the Project preclude a finding that FCI is immune under the Louisiana Contractor Immunity Statute.[75] For instance, SKA presents the testimony of its engineer, Breeding, that says several engines other than the Caterpillar 3512C land engine would have satisfied the Agreement's specifications concerning the engines, including emissions and rotational compatibility with the gear reducers.[76]

In reply, FCI contends that the Court cannot consider FCI's alleged non-compliance with the Agreement before the Court addresses the issues of contract interpretation raised by FCI, and the Court should address those issues without looking to parol evidence.[77] Additionally, FCI maintains that the Agreement does not contain performance specifications but rather technical specifications, and asserts without any evidentiary support that no other engine besides the Caterpillar 3512C land engine meets the technical specifications.[78]

---

[73] R. Doc. 94 at 29-30.
[74] *Id.* at 26.
[75] *Id.* at 14-27.
[76] R. Doc. 94-2 at 4.
[77] R. Doc. 102 at 6-7.
[78] *Id.* at 11, 16-17.

## B. FCI's Motion for Partial Summary Judgment to Declare the July 20, 2018 Termination Notice Invalid

FCI also seeks a declaration that the letter purporting to terminate the Agreement between FCI and the Parish is invalid. FCI contends that Jarrell, though an assistant district attorney for the Parish and enrolled counsel for the Parish in this case, had no authority to terminate the contract in place of the Parish president because (1) the Parish's home rule charter does not permit the Parish president to delegate his authority to act on behalf of the Parish to Jarrell; and (2) the attempted delegation of authority failed to conform to the formalities for mandate under Louisiana law.[79] In support of FCI's first contention, FCI claims that section 4-03 of the Parish's home rule charter, which creates an administrative office to manage and monitor Parish contracts, is "the only express designation of the persons who are authorized under the Parish Charter to act on behalf of the Parish Government with respect to contracts."[80] Because Jarrell did not work in the office managing and monitoring contracts, FCI claims that his attempt to act on behalf of the Parish in terminating the Agreement exceeded his authority under the Parish charter.[81] And, FCI continues, even if Jarrell could exercise a delegated authority, the Parish has failed to demonstrate that it delegated authority to Jarrell in compliance with Louisiana Civil Code article 2993 (which addresses the requisite form of mandate). FCI argues that because public works contracts are required to be in writing, and because notices of default are required to be in writing for subcontractor and materialmen claims, Jarrell's mandate would also have to be in writing, and no such writing exists.[82] For these reasons, FCI contends that the July 20, 2018 termination notice should be declared "absolutely null."[83]

---

[79] R. Doc. 181-1.
[80] *Id.* at 4.
[81] *Id.* at 5-7.
[82] *Id.* at 7-9.
[83] *Id.* at 9.

In opposition, the Parish argues that Jarrell acted as a duly authorized agent of the Parish government, pursuant to decisions of the Parish president, the chief administrative officer, the director of public works, and the Parish council.[84]  Indeed, on or before July 6, 2018, the Parish president explicitly authorized and directed Jarrell to issue the notice of termination through "appropriate and necessary" action.[85]  On July 17, 2018, the Parish council voted to approve the action taken in relation to "Fucich v SKA & SBPG, 18-0228."[86]  On July 18, 2018, the Parish council, after meeting in closed executive session, voted to approve the directive to issue the declaration of default and notice of termination.[87]  Jarrell maintains he was at all times acting within his authority as the legal representative and agent of the Parish in terminating the Agreement on behalf of the Parish, as was necessary to secure performance under the Bond and as part of the litigation with FCI.  The Parish further argues that the statutes cited by FCI do not support its contention that a termination of a public works contract must be in writing, but if such a requirement existed, Jarrell's written mandate is set out in section 4-02 of the Parish charter designating the district attorney as legal counsel for the Parish, and in the Parish president's January 10, 2019 letter confirming that Jarrell's July 20, 2018 letter was submitted with his authority and further reiterating the demands, declarations, and notices set forth in the earlier letter.[88]  The Parish suggests that the January 10, 2019 letter illustrates the Parish's ratification of Jarrell's actions as its agent, confirms a relative nullity, and reasserts the default.[89]

In reply, FCI argues that the Parish ignores the distinction between Jarrell as agent for the Parish in matters of litigation and Jarrell as agent for the Parish in matters of business.  FCI claims

---

[84] R. Doc. 197 at 10-15 (citing, *inter alia*, R. Docs. 197-8, 197-12, & 197-13).
[85] *Id.* at 11 (citing R. Doc. 197-8 at 3).
[86] *Id.* (citing R. Doc. 197-11 at 173).
[87] *Id.* (citing R. Docs. 197-11 & 197-12).
[88] *Id.* at 7 (citing R. Doc. 197-8), 12, & 15-22.
[89] *Id.* at 15-22.

that while Jarrell had authority as counsel for the Parish in the present litigation, Jarrell did not have authority to end the "business" contract between FCI and the Parish.[90]  FCI further contends that the affidavit of the Parish president submitted on behalf of the Parish exemplifies his impermissible attempt to delegate authority to Jarrell, and that the language of the Agreement requires the Parish president himself to terminate the contract on behalf of the Parish.[91]

## III.    LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*.  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323.  If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996).  The substantive law identifies which facts are material. *Id.*  Material facts are not genuinely disputed when a

---

[90] R. Doc. 215 at 1-3.
[91] *Id.* at 3-4.

rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment.  *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994).  In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence.  *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).  Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial.  *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2).  Such facts must create more than "some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden.  *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P.

56(c)(B).  Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted.  *See Little*, 37 F.3d at 1075-76.

## B.  FCI's Motion for Summary Judgment Concerning the Agreement

### 1.  Declaratory Judgment

Under the Declaratory Judgment Act, a court "may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  To determine whether declaratory relief should issue, a court conducts a three-step inquiry: "First, the court must determine whether the declaratory action is justiciable. … Second, if it has jurisdiction, then the district court must resolve whether it has the 'authority' to grant declaratory relief in the case presented. … Third, the court has to determine how to exercise its broad discretion to decide or dismiss a declaratory judgment action."  *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000).

FCI's motion seeks in part a declaratory judgment on issues of contract interpretation concerning the Agreement and the dispute about the rotational conflict that lies at the heart of this matter.  Therefore, the motion presents a justiciable controversy ripe for declaratory judgment.  *See, e.g.*, *Axis Oilfield Rentals, LLC v. Mining, Rock, Excavation & Constr., LLC*, 223 F. Supp. 3d 548 (E.D. La. 2016) (exercising discretion under Declaratory Judgment Act to interpret contract to declare limits of negligent misrepresentation claim).  The Court is unaware of any pending state-court proceedings with respect to the controversy between FCI, the Parish, and SKA that might call into question the Court's authority or caution it against addressing the issues raised by FCI's request,[92] *see Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776 (5th Cir. 1993)

---

[92] The Parish is involved in related litigation in state court with dismissed third-party defendants, Southeast Louisiana Flood Protection Authority – East and Lake Borgne Basin Levee District.  However, no party contends that declaratory relief in this case would have deleterious effects on this state litigation.

(cautioning against declaratory judgments that would "be tantamount to issuing an injunction" and "antithetical to the noble principles of federalism and comity") (citations omitted), or would otherwise counsel the Court toward dismissal of the request for declaratory relief. *See St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590-91 (5th Cir. 1994) (listing factors relevant to considering whether dismissal is appropriate, including "whether there is a pending state action in which all of the matters in controversy may be fully litigated" and "whether retaining the lawsuit in federal court would serve the purposes of judicial economy"). No party contends that declaratory relief is inappropriate or that the Court should dismiss the action.[93] Having reviewed the pertinent factors, the Court is satisfied that there is no impediment to declaratory relief in this case under a summary judgment standard, if it is warranted under the undisputed facts and the law – a question to which the Court now turns.

### 2. FCI's Requested Declaration About the Agreement

FCI asks that the Court enter judgment declaring that the Agreement (1) "allowed FCI to furnish Caterpillar Model 3512C land engines as the replacement engines for the Project," and (2) "required FCI to perform a factory overhaul of the existing right angle gear reducers that maintained the existing counterclockwise rotational direction for the input shaft of the gear reducer."[94] In essence, FCI asks that the Court declare that FCI performed these two aspects of the work according to the plans and specifications furnished to it. In doing so, FCI suggests that each of the interpretations of the Agreement it offers is reasonable and, when read together, create an ambiguity that should be interpreted against the drafter of the Agreement, whether viewed as

---

[93] Third-party defendants Southeast Louisiana Flood Protection Authority – East and Lake Borgne Basin Levee District originally raised the issue whether declaratory relief was premature, R. Doc. 89 at 2-3, but these third-party defendants have since been dismissed from the case, R. Doc. 259, and the procedural posture of the case has significantly evolved since the filing of the subject motions for partial summary judgment.

[94] R. Doc. 51 at 2.

the Parish, SKA, or both. FCI says that this matter of "interpretation" requires no resolution of disputed facts. The Court does not agree.

A contract is the law between the parties, and a court must give the contract its legal effect according to the parties' common intent. *Sanders v. Ashland Oil, Inc.*, 696 So. 2d 1031, 1036 (La. App. 1997). This intent is to be determined by the words of the contract when they are "clear and explicit and lead to no absurd consequences." La. Civ. Code arts. 2045, 2046; *Sanders*, 696 So. 2d at 1036. "The rules of interpretation establish that, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit." *Sanders*, 696 So. 2d at 1036 (citing La. Civ. Code art. 2046 cmt. b; *Cashio v. Shoriak*, 481 So. 2d 1013, 1015 (La. 1986)) (other citations omitted). Accordingly, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "The determination of whether a contract is clear or ambiguous is a question of law." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007) (citations omitted).

"The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with the one that renders it ineffective." *Id.* art. 2049. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Id.* art. 2050. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." *Id.* art. 2053. "When the parties made no provision for a particular

situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." *Id.* art. 2054. "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. Usage … is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." *Id.* art. 2055.

If, after applying the foregoing principles of contract interpretation, the common intention of the parties remains ambiguous, the doubtful provision must be interpreted against the drafter of a standard-form contract or against the obligor of a particular obligation. *See Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002) (citing La. Civ Code art. 2056) (other citations omitted). "Yet, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor." La. Civ. Code art. 2057.

Under Louisiana principles of contract interpretation, this Court cannot espouse FCI's interpretation of the Agreement because it renders the rotational conflict inevitable and the object of the contract (working pumps) ineffective. As set out in Section 01010 (Summary of Work) of the Agreement, FCI was to "replace four (4) engines" and "rebuild the existing right angle gears as specified," such that the pumps would be "complete, tested, and ready for operation."[95] Paragraph 1.08 (Plans and Specifications), subparagraph B (Intent) under Section 01010 further required FCI to perform "[w]ork not specified in either the Plans or in the Specifications but

---

[95] R. Doc. 93-4 at 53.

involved in carrying out their intent or in the complete and proper execution of the work … as though it were specifically delineated or described."[96]

The Agreement does not specify a Caterpillar 3512C land engine as the replacement land engine. Neither Section 01010 (Summary of Work) nor Section 11100 (Engine Specification) lists any brand, make, model, or manufacturer of a replacement engine. Instead, these provisions specify certain characteristics of the replacement engines, such as having "a continuous rating at least 1450 brake horsepower at 1200 RPM continuous operation at maximum ambient temperature including any power transmission losses" and "[e]ngine emissions … in accordance with present EPA standards."[97] Thus, the plain language of the provisions expressly and particularly governing the specifications for the engine did not contemplate a specific brand, make, model, or manufacturer for a replacement engine.

Nor does the Agreement specify the rotational direction of the replacement engines or the reworked right angle gear reducers. But the Agreement did include Appendix 1 to apprise the contracting parties, including FCI, about the "Existing Pump Data."[98] This data included multiple references to the rotational direction of the existing engines (clockwise)[99] and of the existing gear reducers (counterclockwise),[100] thus indicating how these two key pieces of equipment fit together in the pump system. Therefore, while the Agreement did not specify the rotational direction of the shafts of the engines or gear reducers, the contract broadly advised that FCI would need to furnish compatible equipment.

---

[96] *Id.* at 55.
[97] *Id.* at 159.
[98] *Id.* at 3, 298-327.
[99] *See, e.g.*, *id.* at 316, 321.
[100] *See, e.g.*, *id.* at 300.

Nevertheless, FCI seizes upon language in Appendix 2 to argue that the Agreement specifies that the replacement engine be a Caterpillar 3512C land engine, even though it has a counterclockwise rotation. Appendix 2 only purports to contain environmental permits providing the Caterpillar 3512C land engine's emissions data, but it contains no information about any other characteristics of the engine. The permits were obtained by the Lake Borgne Basin Levee District as a preliminary step in facilitating the Project, predate the Agreement, and do not purport to be the authoritative document embodying specifications for the replacement engines other than their emission standards as approved by the Louisiana Department of Environmental Quality. In effect, the listing of the Caterpillar 3512C model was used in the permits as a placeholder to delimit a quality (*viz.,* emissions data) of the equipment desired. Thus, while the permits in Appendix 2 reference the Caterpillar 3512C land engine, the listing cannot reasonably be interpreted as an engine specification.

Because the contract documents are "intended to be complementary" and are to be viewed as a whole under Louisiana principles for construing contracts, Appendix 2 must be read in reconciliation with the engine-specification provisions of the Agreement and Appendix 1.[101] Such a reading is not only possible, but preferable from both a textual and public policy perspective. The Agreement informs the contracting parties of the compatibility of the existing equipment – engines and gear reducers – in terms of their rotational direction. And, yet, the Agreement does not contain an explicit specification of the rotational direction of the replacement engines or the reworked gear reducers. As such, the Agreement preserves to the contracting parties the flexibility to employ the most cost-effective equipment, whether having the same rotational direction (clockwise for the replacement engines and counterclockwise for the reworked gear reducers) or

---

[101] *Id.* at 21.

the opposite rotational direction (counterclockwise for the replacement engines and clockwise for the reworked gear reducers), so long as the selected equipment satisfies the Agreement's essential requirement of compatibility in rotational direction.

This reading of the Agreement is supported by an understanding of Louisiana Public Bid Law, which is essentially incorporated into every contract for a public works project in Louisiana. *See* La. R.S. 38:2116(M). Under Louisiana Public Bid Law, a public entity may only specify a brand, make, or manufacturer in its public works contract for "the quality standard of product desired" and cannot "restrict bidders to the specific brand, make, manufacturer or specification named"; rather, the specification is "used only to set forth and convey to prospective bidders the general style, type, character, and quality of product desired"; and the contract must further specify "that equivalent products will be acceptable." La. R.S. 38:2212.1(C). In fact, Louisiana Public Bid Law generally prohibits a public works contract from prescribing a "closed specification." *Id.* 38:2290. The Parish incorporated these provisions into its "Instructions to Bidders," which was made part of the Agreement:

> 28. Substitute Materials or Products
>
> A. In unusual cases where a closed specification has been justified for prior acceptance by the Owner, the naming of that product in the Drawings and Specifications **will be followed by wording indicating that no substitution is permitted.**
>
> B. Otherwise, where the Drawings and Specifications identify a product by a specific brand, make, manufacturer or definite specification, it is to establish the required quality standard for the product regarding style, type, and character, materials of construction, function, accessories, dimensions, appearance and durability. Products which are determined to be equivalent by the Architect or Engineer will be acceptable. Products which are specified by a specific brand, make or manufacturer's name may also be specified by its applicable model or catalog number or other product designation.[102]

---

[102] *Id.* at 30.

Here, the Caterpillar 3512C land engine was listed to reference its emissions data as part of the environmental permits issued for the Project. Even under an expanded reading of Appendix 2 as somehow relevant more broadly to the specification of a replacement engine's characteristics other than emissions, there is no wording in Appendix 2 indicating that "no substitution is permitted" as would denote that the Caterpillar 3512C land engine was a closed specification under the Agreement. Nor is there any evidence to indicate that any other statutory requisite for approval of a closed specification was obtained. At most, then, the permits' reference to the Caterpillar engine could be construed as setting the quality standard for the style, type, and character of the product within the context of the overall contracting process. Therefore, under the Agreement, a Caterpillar 3512C land engine represents an acceptable product for purposes of establishing emission parameters, but it is not required for all purposes. Neither the plain language of the specification provisions of the Agreement, nor law, nor usage supports an interpretation of the Agreement that the Caterpillar 3512C land engine is the one and only specified replacement engine. *See* La Civ. Code arts. 2046, 2053, 2054.

But, says FCI, even if a Caterpillar 3512C land engine was not ***required*** by the Agreement, FCI merely seeks a declaration that it was "***allowed***" to furnish the Caterpillar 3512C land engine as the replacement engine.[103] In the abstract, the Caterpillar 3512C land engine might have constituted an acceptable choice for the replacement engines, had FCI coordinated their compatibility with the reworked right angle gear reducers, as it was allowed, and, in fact, required

---

[103] By asking the Court to declare that the contract "allowed" FCI to furnish the Caterpillar 3512C land engine, FCI actually asks the Court to rule on whether FCI breached the Agreement by doing so. Even if the contract "allowed" FCI to furnish a Caterpillar 3512C land engine, such a determination would not be dispositive of any question whether FCI fulfilled its obligations under the contract. There are clearly disputes of material fact as to whether FCI breached the contract by failing to read the specifications and making other changes without SKA's permission.

to do under the Agreement. FCI could have invoked the provisions of the Agreement to substitute equipment that would have rendered the engines and gear reducers compatible, including arranging for the gear reducers to be reworked in a way to alter their rotational direction. And FCI was required by the Agreement to coordinate the work to facilitate the object of the contract – namely, working pumps. But it is clear to the Court that the Caterpillar 3512C land engine was not "allowed" under the Agreement if FCI retained the counterclockwise rotational direction of the input shafts of the existing right angle gear reducers.

While the Agreement did not explicitly require a rotational direction of either the engines' drive shafts or the gear reducers' input shafts, it was unreasonable for FCI to interpret the Agreement to conclude that an engine with a counterclockwise drive shaft (such as the Caterpillar 3512C land engine) would be compatible with gear reducers having a counterclockwise input shaft (such as the factory overhauled gear reducers here) when connected by a direct drive shaft. It is undisputed that engines with counterclockwise drive shafts and gear reducers with counterclockwise input shafts are incompatible. FCI's proposed interpretation would create the absurd result of a dysfunctional pump, frustrating the object of the contract. In sum, the Court finds that the Agreement cannot be interpreted in the manner proposed by FCI to create an ambiguity or absurdity (the rotational conflict) that is otherwise avoided by a reasonable reading of the Agreement.

### 3. Louisiana Contractor Immunity Statute

In its motion for partial summary judgment, FCI also seeks dismissal of the Parish's counterclaims against FCI arising out of the dispute about the rotational conflict. FCI contends that it "furnished the exact equipment and materials specified" in the Agreement and thus is

entitled to "the statutory immunity afforded by" the Louisiana Contractor Immunity Statute, La. R.S. 9:2771.[104] The Court does not agree.

Under the Louisiana Contractor Immunity Statute, a contractor is not liable for "defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the … defect was due to any fault or insufficiency of the plans or specifications." La. R.S. 9:2771. However, a contractor is not entitled to immunity where the contractor fails to follow the plans and specifications or "the evidence shows that the defects were not the result of the insufficiency of plans and specifications, but were the result of the quality of the work done by a contractor." *Cupit v. Hernandez*, 48 So. 3d 1114, 1119 (La. App. 2010); *see Campo v. Sternberger*, 179 So. 3d 908, 921-22 (La. App. 2015) (contractor not entitled to immunity where evidence adduced at trial demonstrated contractor did not comply with plans and experts testified that there was no deficiency in plans and specifications).

FCI claims that by providing the Caterpillar 3512C land engine and retaining the rotational direction of the reworked right angle gear reducers, it followed the specifications of the Agreement and it cannot be the guarantor of the engineer's fault by being required to resolve design flaws (the rotational conflict) in the contract. The Parish and SKA respond that FCI failed to follow the Agreement's plans and specifications by breaching its duty to read and study the contract, making impermissible alterations to the contract, and other breaches of performance. For instance, SKA points to Fucich's testimony in which he admits to not having read Appendix 1 before ordering the replacement engines.[105] At a minimum, then, disputes of material fact concerning whether FCI followed the plans and specifications of the Agreement preclude summary judgment here. *See,*

---

[104] R. Doc. 51 at 2.
[105] R. Doc. 94 at 17-18 (citing R. Doc. 94-19 at 44-47).

27

*e.g.*, *Banks v. Par. of Jefferson*, 108 So. 3d 1208, 1222 (La. App. 2013) (summary judgment denied for contractor immunity where disputes of material fact remained as to whether contractor performed all work in accordance with the plans and specifications).

### C.  Motion to Declare July 20, 2018 Termination Notice Invalid

In its second motion for partial summary judgment, FCI asks the Court "to declare that the July 20, 2018 letter issued by Mr. David Jarrell, purporting to terminate the [Agreement] between the Parish and FCI, was an illegal act, which is absolutely null and without legal effect."[106]  At the outset, the Court notes that the issue raised by FCI's motion may be moot.  It is undisputed that Parish president Guy McInnis sent a letter to FCI on January 10, 2019, adopting and reiterating the content of Jarrell's July 20, 2018 letter, thereby terminating the Agreement without doubt as of the January 2019 date.  Neither FCI nor the Parish explains why this action does not moot FCI's motion.

Assuming, without deciding, that there is some legal significance attached to an earlier termination date, the Court turns to the parties' arguments.  Louisiana law provides for two kinds of nullities of contracts: relative and absolute.  La. Civ. Code arts. 2030 & 2031.  "A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made.  A contract that is only relatively null may be confirmed."  *Id*. art. 2031.  "A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral.  A contract that is absolutely null may not be confirmed."  *Id*. art. 2030.  A "rule of public order" is generally understood to mean a law enacted "for the protection of the public interest."  *Leija v. Gathright*, 211 So. 3d 592, 596 n.2 (La. App. 2016) (citing cmt. d to La. Civ. Code art. 7).

---

[106] R. Doc. 181 at 1.

A mandatary's authority is composed of actual authority, express or implied, and the apparent authority which the principal has invested in him by his conduct. *Jefferson Par. Hosp. Serv. Dist. No. 2 v. K & W Diners, LLC*, 65 So. 3d 662, 668 (La. App. 2011) (citing *Boulos v. Morrison*, 503 So. 2d 1, 3 (La. 1987)). If the mandatary had no actual or apparent authority, the principal may still be bound to contracts made by a mandatary with a third party if the principal ratifies the mandatary's unauthorized acts. La. Civ. Code art. 3008. Ratification occurs when "the principal, knowing of the contract, does not repudiate it but accepts its benefits." *Bamber Contractors, Inc. v. Morrison Eng'g & Contracting Co.,* 385 So. 2d 327, 331 (La. App. 1980). The party asserting ratification must prove that the principal clearly intended to ratify the act. *Id.*

FCI contends that Jarrell had no authority to act on behalf of the Parish because he acted outside the scope of his authority, and that the termination of the Agreement is therefore absolutely null. At the outset, the Louisiana Civil Code articles addressing the nullity of contracts bear upon the validity of a contract's creation – not termination. *See* La. Civ. Code art. 2029 ("A contract is null when the requirements for its **formation** have not been met.") (emphasis added). Therefore, the nullity inquiry focuses on the authority of persons to create, rather than terminate, the contract. Because FCI solely challenges the authority of Jarrell to terminate the Agreement on behalf of the Parish, there is some doubt whether the nullity inquiry is the appropriate framework for analyzing the issue FCI raises. Nevertheless, the Court need not resolve this question given the outcome of the nullity inquiry in this case.

First, FCI has not proven that the Agreement should be absolutely, rather than relatively, null. While it is well established that Louisiana Public Bid Law is a prohibitory law, *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Auth.*, 867 So. 2d 651, 656 (La. 2004), FCI does not argue that the Parish violated the Public Bid Law. Rather, FCI contends that "[t]he

improper delegation of political power would be a violation of prohibitory law, making the July 20, 2018 termination notice an absolute nullity, as opposed to a relative nullity."[107]  Because the Court finds that the Parish did not violate its Parish charter or attempt to improperly delegate authority, the Court need not determine whether any such act would amount to an absolute or a relative nullity.

The opening paragraph of the Agreement between FCI and the Parish defines the parties to the contract as the Parish and FCI:

> THIS AGREEMENT … by and between the St. Bernard Parish Government,  St. Bernard Parish, Louisiana, referred to in these Contract Documents as "OWNER" acting, as the context requires, either on its own behalf or as the governing authority of the political subdivision which has the legal authority and responsibility for this agreement and for whom the Work is being performed, ***and acting through its President and his authorized agents***, and Fucich Contracting Inc. … referred to in these Contract Documents as "CONTRACTOR."[108]

Under the Agreement, therefore, the president does not act personally but acts on behalf of the Parish alongside "his authorized agents."  By submitting a termination notice at the request of the president, Jarrell acted as a mandatary of the president.  Parish president McInnis testified that he "directed … Jarrell to take all ***appropriate*** and necessary actions to protect the interests of the people of [the Parish] by, among other things, asserting a claim under the performance bond … and taking all of the appropriate and necessary steps to assert such a claim, including, but not limited to declaring a contractor default and terminating the underlying contract for the Project."[109] Jarrell did not act outside the scope of the president's delegated authority; rather, Jarrell acted on behalf of the president, as an agent for him and, by extension, the Parish.  While there is no reason for the Court to believe Jarrell was not authorized at the time he submitted the letter, there is also

---

[107] R. Doc. 215 at 3.
[108] R. Doc. 197-2 at 1 (emphasis added).
[109] R. Doc. 197-8 at 3 (emphasis added).

no doubt that the president ratified Jarrell's acts if Jarrell had acted outside the scope of his authority. The president's affidavit and January 10, 2019 letter evince his ratification.[110]

Furthermore, Jarrell acted on behalf of the Parish when he terminated the Agreement in connection with this litigation. The charter expressly designates the district attorney as the legal representative of the Parish.[111] "The relationship between an attorney and his or her client is one of principal and agent." *Moses v. Moses*, 174 So. 3d 227, 230 (La. App. 2015). By the time the July 20, 2018 notice issued, FCI had already filed suit against the Parish, alleging claims relating to the Agreement. Jarrell was by then the Parish's counsel of record in this suit and acted in a representative capacity on behalf of the Parish regarding all aspects of litigation concerning, in part, FCI's performance of its obligations under the Agreement. The minute entry of the July 17, 2018 Parish council meeting reflects that the council voted to take action in the litigation matter of "Fucich v SKA & SBPG."[112] And the chief administrative officer and the public works director testified that this meeting resulted in a joint decision among the Parish council, administrative officer, and public works director to issue a notice of default and notice of termination to FCI.[113] Therefore, Jarrell also had authority to terminate the Agreement on behalf of the Parish as its legal advisor and agent in the ongoing litigation over the Agreement.

Finally, FCI insists that a mandate for the termination of a public works contract must be in writing, relying upon article 2993 of the Civil Code: "The contract of mandate is not required to be in any particular form. Nevertheless, when the law prescribes a certain form for an act, a mandate authorizing the act must be in that form." La. Civ. Code art. 2993. Thus, FCI reasons

---

[110] R. Doc. 197-8.
[111] R. Doc. 181-6 at 20 ("Sec. 4-02. Legal services. (a) The district attorney of the judicial district serving St. Bernard Parish shall serve as the legal advisor to the council, parish president, and all parish departments, offices, and agencies, unless otherwise decided by the president and council.").
[112] R. Doc. 197-11 at 173.
[113] R. Docs. 197-12 at 2 & 197-14 at 4.

that if the mandatary undertakes to execute a contract required to be in writing on behalf of the principal, the mandate itself must also be in writing. The public works contract at issue here is required by law to be in writing. La. R.S. 38:2216(A) & 2241(A). FCI contends that the termination of a public works contract must also be in writing, arguing by analogy that a notice of default must be in writing under La. R.S. 38:2242(B). That statute provides a remedy to laborers and materialmen for furnishing unpaid labor or materials to contractors of public works. *See Pierce Foundations, Inc. v. Jaroy Constr., Inc.*, 190 So. 3d 298, 301-02 (La. 2016). Under the statute, a claimant may, "after the maturity of his claim," record a claim for unpaid labor or materials "within forty-five days after the recordation of acceptance of the work by the governing authority or of notice of default of the contractor or subcontractor." La. R.S. 38:2242. The statute thus contemplates that a claimant's right of action turns on the recordation of the acceptance or recordation of the notice of default, and so implies that notices of default are required to be in writing. Assuming, without deciding, that a written mandate was required for a notice to terminate the Agreement, the Parish has produced two writings that would suffice: first, the January 10, 2019 letter of the Parish president, and second, section 4-02 of the Parish charter designating the district attorney as the legal advisor for the Parish. Therefore, Jarrell acted with authority and with the appropriate form of authority, and the July 20, 2018 termination notice is valid.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that FCI's motion for partial summary judgment (R. Doc. 51) is DENIED;

IT IS FURTHER ORDERED that FCI's motion for partial summary judgment (R. Doc. 181) is DENIED.

New Orleans, Louisiana, this 20th day of August, 2019.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE