UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FUCICH CONTRACTING, INC., *et al.* | CIVIL ACTION |
| VERSUS | NO. 18-2885 |
| SHREAD-KUYRKENDALL & ASSOCIATES, INC., *et al.* | SECTION M (4) |

## ORDER & REASONS

Before the Court is the motion of defendant St. Bernard Parish Government ("SBPG") to enforce the February 25, 2019 settlement agreement.[1] Plaintiff Fucich Contracting, Inc. ("FCI") opposes the motion.[2] Shread-Kuyrkendall and Associates, Inc. ("SKA") and XL Specialty Insurance Company reply in support of SBPG's motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting the motion and enforcing the February 25, 2019 interim settlement agreement.

**I.   BACKGROUND**

This case arises out of a construction dispute over a component-compatibility problem, specifically, a rotational conflict, between the engines and gear reducers intended for use in back-up storm water drainage pumps critical to a public works improvement project known as the Lake Borgne Basin Levee District Pump Station #1 & #4 Pump Upgrade (the "Project").[4] SBPG hired FCI as the Project contractor and SKA as the Project engineer. Pursuant to the Louisiana Public Works Act, Travelers Casualty and Surety Company of America ("Travelers") issued a

---

[1] R. Doc. 524.
[2] R. Doc. 538.
[3] R. Doc. 544.
[4] R. Doc. 373 at 1-4.

performance and payment surety bond naming FCI as principal and SBPG as obligee.[5] When the rotational conflict became apparent, SBPG informed Travelers that it intended to terminate FCI.[6] FCI filed this lawsuit against SBPG and SKA, and SBPG did, in fact, terminate FCI several months later.[7] SBPG filed a counterclaim and third-party demand seeking to hold FCI and SKA responsible for the rotational conflict and resulting failure to complete the Project.

In the midst of this dispute, the Project was, and still is, unfinished – meaning that the citizens of St. Bernard Parish to this day do not enjoy the protection against flooding the Project intended to afford, though another hurricane season is looming. The Project requires a total of four engines. Three engines were delivered to SBPG but the fourth remained in the possession of the engine vendor.[8] On or around December 27, 2018, FCI picked up the fourth engine.[9]

On February 25, 2019, SBPG and FCI entered into an interim settlement agreement on the record before the magistrate judge.[10] SBPG agreed "to pay [FCI] $194,219.90, which represents the balance of the engines per the scheduled values less the retainage."[11] In exchange, FCI agreed "to irrevocably release any ownership claim as to the four engines, which includes the three that are currently on Pump Stations One and Four and also the one in his possession, which it will allow [SBPG] to pick up at [SBPG's] expense, as well as any and all material or equipment currently on site at either Pump Station One or Four and any materials or supplies in the possession of Philadelphia Gear. All of these things, FCI agrees to release any ownership interest and claim."[12]

---

[5] R. Doc. 431 at 2.
[6] Id.
[7] Id.
[8] R. Doc. 524-1 at 4.
[9] Id.. Clayton Fucich states that "FCI picked up one engine assembly, one muffler, and one loose box of appurtenances from Puckett Power on two separate trips to Puckett Power's facility on or about December 21, 2019 and on or about January 17, 2019." R. Doc. 538-4 at 1.
[10] R. Doc. 524-3.
[11] Id. at 2.
[12] Id. at 3.

SBPG paid the full amount of the settlement sum to FCI.[13] On March 12, 2019, SBPG picked up the engine from FCI's premises.[14]

SBPG asserts that during the bid process for the second phase of the Project, on or around December 11, 2020, "it was discovered that numerous pieces of the engine were missing and that the engines would not be able to be made operational without significant expenses."[15] Steven E. Breeding, an engineer for SKA, took a physical inventory of the engine equipment in preparation for the bid.[16] He states that he "discovered that many items furnished by the Caterpillar engine vendor and included as equipment and attachments to the Caterpillar engines were missing and are not in the possession of the Parish or SKA."[17] While there are disputes as to who might have certain of the missing items, Clayton Fucich, with no apparent qualms, declares: "I do have in my possession a box of engine appurtenances accompanying the engine SBPG picked up from my facility."[18]

## II. PENDING MOTION

In this motion, SBPG argues that FCI breached the interim settlement agreement by retaining possession of "several important pieces to the engine."[19] It contends that these items are component parts of the engine and were not separately purchased.[20] SBPG argues that FCI's "clear breach" was "intentional" considering FCI's "long history of attempting to sabotage the completion of this Project."[21]

---

[13] R. Doc. 524-1 at 5.
[14] R. Docs. 524-1 at 5; 538-4 at 2.
[15] R. Doc. 524-1 at 5-6.
[16] R. Doc. 524-12 at 1-2.
[17] *Id.* at 2.
[18] R. Doc. 538-4 at 2. The packing slip listing the items in the box is attached as R. Doc. 538-1.
[19] R. Doc. 524-1 at 5.
[20] *Id.* at 6.
[21] *Id.*

In opposition, FCI argues that the settlement agreement did not include "*appurtenances held in FCI's possession*, which appurtenances are distinct from the engines as frequently referenced in the contract documents."[22] FCI says it must receive additional compensation before it will deliver appurtenances that were not included in the interim settlement agreement.[23] FCI argues that to hold otherwise would impermissibly extend the bounds of the compromise agreement.[24] Finally, FCI argues that it cannot be held liable for items on SBPG's property which are outside of its control and questions the accuracy of Breeding's attempt to identify missing items in photographs taken at FCI's premises.[25]

In its reply, SKA argues that the use of the term "schedule of values" in the settlement agreement had a technical meaning which included payment for the engines and their appurtenances.[26] SKA suggests that an available interim solution would be for the Court to order FCI to turn over the parts but retain its right to seek reimbursement at trial.[27] Based on the sales tax exemption certificate signed by FCI and SBPG at the beginning of this Project, SKA also argues that ownership of items purchased by the contractor – which would have included the engines and their appurtenances – was transferred to the parish.[28]

### III. LAW & ANALYSIS

#### A. Louisiana Law on Compromise

"'Although federal courts possess the inherent power to enforce agreements entered into in settlement of litigation, the construction and enforcement of settlement agreements is governed by the principles of state law applicable to contracts generally.'" *Sundown Energy, L.P. v. Haller*,

---

[22] R. Doc. 538 at 1 (emphasis in original).
[23] *Id.* at 3.
[24] *Id.* at 4.
[25] *Id.* at 4-5.
[26] R. Doc. 544 at 1-3.
[27] *Id.* at 4-5.
[28] *Id.* at 5. The contract is attached as R. Doc. 544-3.

773 F.3d 606, 611 (5th Cir. 2014) (quoting *E. Energy v. Unico Oil & Gas, Inc.*, 861 F.2d 1379, 1380 (5th Cir 1988)). Under Louisiana law, a settlement agreement is called a compromise. La. Civ. Code art. 3071. A compromise is defined as "a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." *Id.* Compromises are contracts so the "'rules of construction applicable to contracts are therefore used.'" *Celtic Marine Corp. v. James C. Justice Cos..*, 760 F.3d 477, 481-82 (5th Cir. 2014) (quoting *Doré Energy Corp. v. Prospective Inv. & Trading Co.*, 570 F.3d 219, 225 (5th Cir. 2009)). "A compromise instrument is the law between the parties and must be interpreted according to the parties' intent." *Chauvin v. Exxon Mobil Corp.*, 158 So. 3d 761, 766 (La. 2014).[29]

      Article 2046 of the Louisiana Civil Code provides that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." The Louisiana supreme court clarifies that "Article 2046 emphasizes that the process involves no *further* interpretation, as opposed to no interpretation at all." *Ortego v. State, Dep't of Transp. & Dev.*, 689 So. 2d 1358, 1363 (La. 1997) (emphasis in original). "Courts apply this rule of construction in light of the general principle that the instrument must be considered as a whole and in light of attending events and circumstances." *Trahan v. Coca Cola Bottling Co. United, Inc.*, 894 So. 2d 1096, 1107 (La. 2005). While "[t]he words of a contract must be given their generally prevailing meaning," "[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047.

---

[29] A compromise may be "recited in open court, in which case the recitation shall be susceptible of being transcribed from the record of the proceedings." La. Civ. Code art. 3072.

B. Analysis

Because a compromise is the law between the parties, the Court must determine the parties' intent. *Chauvin*, 158 So. 3d at 766. When the interim settlement agreement was recited in open court, the magistrate judge confirmed with Clayton Fucich, who was present in the courtroom, the intent of the agreement:

| | |
|---|---|
| The Court: | … We're just trying to get this project back on track. Right? |
| Mr. Fucich: | Yes, ma'am. |
| The Court: | So you're in agreement? |
| Mr. Fucich: | Yes ma'am.[30] |

Thus, the clear intent of the settlement agreement was to get the Project "back on track" by facilitating transfer of the engines to advance the work far enough so the pumps could begin to operate. While a compromise "settles only those differences that the parties clearly intended to settle," the agreement includes "the necessary consequences of what they express." La. Civ. Code art. 3076. Here, the parts and appurtenances needed for the engines to be installed and operate are within the scope of the settlement agreement. FCI's own actions reinforce this conclusion. FCI has already turned over the so-called appurtenances for the engines located on SBPG's property even though FCI now contends that this was "more than the settlement agreement requires."[31] Clearly this delivery shows FCI understood that the appurtenances were included in the scope of the settlement agreement.

SBPG upheld its end of the bargain by making the settlement payment, and as a result, FCI now must comply with its agreement to relinquish ownership of the four engines lock, stock, and barrel. SBPG paid FCI the sum of $194,219.90 "which represents the balance of the engines *per the scheduled values* less the retainage to FCI as part of this agreement."[32] This amount reflected

---

[30] R. Doc. 524-3 at 4.
[31] R. Doc. 538 at 3.
[32] R. Doc. 524-3 at 2 (emphasis added).

the "current payment due" on the March 19, 2019 contractor's application for payment for the engines.[33] The sum was calculated as the price for the work done that quarter to "Furnish and Install New Engine *with Appurtenances Complete*" of $204,442.00 less the contract's 5% retainage of $10,222.10.[34] The related invoice describes the work as including installation of the engines at pump stations #1 and #4.[35] Reference to the "schedule of values," a document *prepared by FCI* outlining the work, confirms that FCI intended from the beginning for engine appurtenances to be included in the scope of work to furnish and install the engines.[36] And the parties' reference to the technical term "schedule of values" in their interim settlement recited before the magistrate judge confirms that they intended all engine appurtenances to be included in the settlement. *See* La. Civ. Code art. 2047. To get the engines – including the appurtenances – and move the Project back on track, SBPG paid in settlement the amount FCI said was owed even though the parish contested FCI's right to this additional sum. FCI accepted the money and commenced steps to relinquish its claims of ownership to the engines, but these steps are now being frustrated. FCI has held back essential engine parts as a means of extracting additional payments or forcing concessions in litigation. This conduct is unacceptable. FCI must follow through with its part of the bargain, without any more obstruction, delay, or compensation. Accordingly, the Court orders that FCI immediately turn over to SBPG the box of engine appurtenances Clayton Fucich admits he has in his possession as well as any other engine components FCI may hold.

Of course, FCI cannot return items not within its possession or control. Breeding references September 12, 2017 and October 26, 2017 machine shipping orders from Puckett

---

[33] R. Doc. 524-4 at 1.
[34] *Id.* at 1-3 (emphasis added). Retainage was "not due to be paid by the Owner until the Engineer recommends Final Payment." *Id.* at 3.
[35] *Id.*
[36] R. Doc. 544 at 2-3 (discussing R. Docs. 544-1; 544-2).

Machinery Company as encompassing engine items shipped "loose" in boxes but which are now missing.[37] Fucich is correct to point out that both of these boxes were shipped to the Lake Borgne Basin Levee District,[38] so SBPG should have these items unless they were removed. The third machine shipping order, dated January 17, 2019, reflects that a "ship loose box" was picked up from the Puckett site by FCI.[39] This is consistent with Fucich's statement that he made two trips to pick up items, including "one loose box of appurtenances," at Puckett on the same day "because these items could not be transported in one trip."[40] Therefore, the Court further orders that if any of these items – from any of the "loose" boxes of engine appurtenances – are now within FCI's possession or control, for whatever reason, they must be turned over to SBPG immediately as they, too, fall within the scope of the settlement agreement.

Regardless of whether a particular engine item, part, appurtenance, loose box, etc. is referenced by name in this Order & Reasons or in the parties' motion papers, the Court trusts that FCI understands that any and all components needed for the engines to function are deemed by this Court to fall within the intended scope of the settlement agreement and are ordered to be turned over to SBPG immediately.[41] Any failure on FCI's part to comply fully with the Court's orders shall be considered an act of contempt.

### IV.   CONCLUSION

Accordingly, for the foregoing reasons,

---

[37] R. Doc. 524-12 at 5-6 (describing items as "Ship Loose Box").

[38] *Id.* These items were shipped to either 3200 Guerra Drive, Violet, Louisiana 70092 or 4200A Jean Lafitte Parkway, Chalmette, Louisiana 70048. *Id.*

[39] *Id.* at 7.

[40] R. Doc. 538-4 at 1.

[41] For example, the items depicted in R. Doc. 524-12 at 15 & 17, for which FCI claims it should be reimbursed, were included within the settlement agreement because they were purchased *for* the engines, even if from a source separate from Puckett. R. Doc. 538 at 2. In contrast, the items in R. Doc. 524-12 at 16 which are "not associated with, or part of, the engines" were not intended to be turned over as part of the compromise and remain FCI's property. However, any doubt on this score should be resolved in favor of turning over the parts to SBPG, and remaining questions about compensation for disputed items can be addressed later in this litigation.

IT IS ORDERED that the motion of defendant St. Bernard Parish Government to enforce the February 25, 2019 settlement agreement (R. Doc. 524) is GRANTED. FCI must turn over to SBPG any and all components, items, objects, etc. in FCI's possession or control that are needed for the engines to function, within seven (7) days of the date of this Order & Reasons.

New Orleans, Louisiana, this 14th day of May, 2021.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE