UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FUCICH CONTRACTING, INC., *et al.*                    CIVIL ACTION

VERSUS                                                NO. 18-2885

SHREAD-KUYRKENDALL &                                  SECTION M (4)
ASSOCIATES, INC., *et al.*


**<u>FINDINGS OF FACT & CONCLUSIONS OF LAW</u>**

This matter involves claims between Fucich Contracting, Inc. ("FCI"), and Clayton and

Kathleen Fucich ("the Fuciches"), on the one hand, and Travelers Casualty and Surety Company

of America ("Travelers"), on the other hand, arising out of a construction dispute (including the

construction contract, performance bond, and indemnity agreement governing the construction

project) and a settlement agreement entered to resolve the dispute.[1]  On April 12, 2022, after

several years of litigation, Travelers, acting on its own behalf and as attorney-in-fact for FCI and

the Fuciches pursuant to the indemnity agreement, reached a settlement with the St. Bernard Parish

Government ("the Parish"), Shread-Kuyrkendall & Associates, Inc. ("SKA"), XL Specialty

Insurance Company ("XL Specialty"), and Timken Gears and Services, Inc., doing business as

Philadelphia Gear ("Philadelphia Gear") to settle the claims among them, including claims asserted

by and against FCI.[2]  The settlement agreement resolved the Parish's claims against Travelers,

SKA, and XL Specialty; FCI's claims against the Parish, SKA, XL Specialty, and Philadelphia

---

[1] *See generally* R. Doc. 625 at 8-18.
[2] R. Doc. 605-2 at 1-2.

1

Gear; and SKA's claims against FCI and Philadelphia Gear.[3]  FCI and the Fuciches attended the mediation at which these claims were settled but did not reach agreement with any party.[4]

In accordance with the settlement agreement, Travelers[5] and SKA and XL Specialty[6] filed motions to dismiss the settled claims.  After careful review of the motions and the applicable law, the Court granted the motions and dismissed the following causes of action with prejudice: (1) FCI's complaint asserting breach of contract claims against the Parish; (2) FCI's complaint asserting negligence claims against SKA; (3) FCI's complaint asserting negligence claims against XL Specialty; (4) FCI's third-party complaint asserting negligent misrepresentation, detrimental reliance, and breach of contract claims against Philadelphia Gear; (5) SKA's third-party complaint asserting products liability and detrimental reliance claims against Philadelphia Gear; (6) the Parish's crossclaim asserting breach of contract and detrimental reliance claims against SKA and XL Specialty; (7) the Parish's counterclaim asserting breach of contract, bad faith breach of contract, tortious interference with contractual rights, breach of performance bond, and detrimental reliance claims against Travelers; and (8) the Parish's counterclaims for breach of contract, bad faith breach of contract, tortious interference with contractual rights, detrimental reliance, and bad faith breach of the March 26, 2019 settlement against FCI.[7]

In its dismissal order, the Court specifically noted that the following causes remained to be tried: (1) FCI's complaint asserting breach of contract and seeking declaratory judgment against Travelers; (2) Travelers' crossclaim and third-party claim asserting contractual indemnification, *quia timet*, reimbursement, attorney's fees, and seeking a permanent injunction against FCI and

---

[3] *Id.* at 2.
[4] *Id.* at 1.
[5] R. Doc. 605.
[6] R. Doc. 607.
[7] R. Doc. 614 at 9.

the Fuciches; and (3) Philadelphia Gear's counterclaim asserting breach of contract against FCI.[8]

Before trial, Philadelphia Gear entered into a stipulation with FCI and the Fuciches that obviated

the need to address Philadelphia Gear's counterclaim.[9]  The remaining claims were tried to the

Court, sitting without a jury, on June 27-29, 2022.[10]  Having considered the evidence admitted at

trial (including the testimony of witnesses and trial exhibits), the arguments of counsel, the parties'

posttrial submissions (including proposed findings of fact and conclusions of law),[11] and the

applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of

the Federal Rules of Civil Procedure.  To the extent a finding of fact constitutes a conclusion of

law, the Court adopts it as such, and vice versa.

## FINDINGS OF FACT

### I.      The Parties

1.      FCI is a company incorporated and having its principal place of business in

Mississippi; FCI is in the business of working as a general contractor on construction projects.[12]

2.      The Fuciches are the owners of FCI, and they are Mississippi citizens.[13]

3.      Travelers is a foreign insurer, organized under the laws of, and having its principal

place of business in, Connecticut; Travelers is in the business of issuing surety bonds for select

contractors.[14]

4.      The Parish (St. Bernard Parish Government) is a political subdivision of the state

of Louisiana.[15]

---

[8] *Id.* at 10.
[9] R. Docs. 661; 664.
[10] R. Docs. 663; 665; 666.
[11] R. Docs. 671-674.
[12] R. Docs. 7 at 1; 241 at 2-3.
[13] R. Doc. 241 at 2.
[14] *Id.*
[15] R. Doc. 7 at 2.

## II.    The Relationship Between FCI and Travelers

5.    In conducting its business, FCI submits bids to public entities to perform work on public projects.[16]

6.    To bid on and perform certain projects, FCI was required to provide performance and payment bonds and sought to obtain these bonds from Travelers.[17]

7.    Travelers acted as FCI's sole bonding company from 2006 to 2018, providing FCI with bonds for approved projects.[18]

8.    Prior to the project at the center of this lawsuit, Travelers had never become involved in FCI's work through a performance or payment bond.[19]

9.    Travelers was not willing to assume the sole risk that any failure to perform or default by FCI might result in loss to it.  So, as a condition precedent to Travelers' agreement to issue bonds on behalf of FCI for various projects, Travelers required indemnity agreements from FCI and the Fuciches (collectively, the "Indemnitors").[20]

10.    On March 9, 2006, the Fuciches, individually, executed a General Agreement for Indemnity ("GAI") in favor of Travelers.[21]

11.    On April 11, 2006, Clayton Fucich, as the president of FCI, executed the GAI on its behalf.[22]

12.    Section 3 of the GAI expressly provides:

**3.  <u>Indemnification and Hold Harmless</u>:** Indemnitors shall exonerate, indemnify and save [Travelers] harmless from and against all Loss.  An itemized, sworn statement by an employee of [Travelers], or other evidence of payment, shall be

---

[16] R. Doc. 624 at 22 (uncontested material fact ¶ 3); *see* Testimony of Clayton Fucich (June 27, 2022) *passim*.
[17] R. Doc. 624 at 22 (uncontested material fact ¶ 3); *see* Exhibit 71; Testimony of Troy Wagener (June 29, 2022) at 60; Testimony of Clayton Fucich (June 27, 2022) at 13-14, 91.
[18] Testimony of Clayton Fucich (June 27, 2022) at 14, 91-92.
[19] *Id*. at 14-15.
[20] R. Doc. 624 at 22 (uncontested material fact ¶ 4).
[21] Exhibit 14 at 4-5; *see also* Testimony of Clayton Fucich (June 27, 2022) at 92-93.
[22] Exhibit 14 at 6; *see also* Testimony of Clayton Fucich (June 27, 2022) at 92-93.

prima facie evidence of the propriety, amount and existence of Indemnitors' liability. Amounts due to [Travelers] shall be payable upon demand.[23]

13.     By executing the GAI, the Indemnitors obligated themselves as indemnitors to Travelers and agreed that they would exonerate, indemnify, and save Travelers harmless from and against any loss it incurred on a bond issued on behalf of FCI.[24]

14.     The Indemnitors understood that Travelers was only a guarantor and that FCI remained primarily responsible for its obligations and debts.[25]

15.     In Section 3 of the GAI, the Indemnitors agreed to protect Travelers against being exposed to having to pay FCI's debts.[26]

16.     The Indemnitors understood that Travelers relied on the GAI and would not issue bonds on behalf of FCI without an executed GAI.[27]

17.     The Indemnitors signed the GAI to induce Travelers to issue bonds on behalf of FCI.[28]

18.     In reliance on the executed GAI, Travelers established a bonding program for FCI and issued 44 bid bonds and 14 performance bonds on behalf of FCI from 2006 until 2018.[29]

## III.    The Project

19.     This lawsuit arises from disputes concerning a public works improvement project known as the Lake Borgne Basin Levee District Pump Station #1 & #4 Pump Upgrade (the "Project").[30]  The Project was intended, in part, to improve the Parish's hurricane preparedness.

---

[23] Exhibit 14 at 1.
[24] Testimony of Clayton Fucich (June 27, 2022) at 96-97.
[25] *Id.*
[26] *Id.*
[27] *Id.* at 93-94.
[28] *Id.* at 93.
[29] *Id.* at 94-95.
[30] R. Doc. 624 at 22 (uncontested material fact ¶ 1); *see* Testimony of Clayton Fucich (June 27, 2022) at 9-11.

20.     Pump Stations #1 and #4 consisted of four diesel engines manufactured by Deutz and four right-angle gear reducers manufactured by Western Gear Corporation, the predecessor to Philadelphia Gear, which together turned four large pumps that were part of the stormwater drainage system for St. Bernard Parish.[31]

21.     The purpose of the Project was to upgrade Pump Stations #1 and #4 by replacing the existing engines with new diesel engines and refurbishing the existing right-angle gear reducers.[32]

22.     The Parish put the Project out to public bid pursuant to the Louisiana Public Works Act, La. R.S. 38:2241 *et seq*.[33]

23.     Prior to preparing its bid, FCI was provided several documents, including the instructions to bidders, the plans and specifications, and their appendices.[34]

24.     Appendix 1 for the Project showed the rotation of the existing gearbox.[35]  Clayton Fucich testified that he did not review Appendix 1 in its entirety prior to submitting FCI's bid.[36]

25.     On November 1, 2016, FCI submitted its bid for the Project.[37]

26.     Also on November 1, 2016, at 2:00 p.m., the Parish held the bid opening for the Project.[38]

27.     On November 16, 2016, the Parish awarded the Project to FCI as the apparent lowest responsive and responsible bidder. [39]

---

[31] R. Doc. 624 at 22 (uncontested material fact ¶ 2); Exhibit 126.
[32] *See, e.g.*, Exhibits 2 & 6.
[33] *See* Exhibit 7.
[34] Exhibits 4, 31, 32, 59 & 126; Testimony of Clayton Fucich (June 28, 2022) at 6-8.
[35] Exhibit 126 at SKA006131.
[36] Testimony of Clayton Fucich (June 28, 2022) at 8-11.
[37] Exhibit 7.
[38] R. Doc. 624 at 22 (uncontested material fact ¶ 7); Exhibit 9.
[39] R. Doc. 624 at 22 (uncontested material fact ¶ 8).

28.    On December 22, 2016, FCI and the Parish executed an agreement (the "Prime Contract") in the amount of $5,009,908.00 for performance of the Project.  The Prime Contract incorporates the contract documents, instructions to bidders, plans and specifications, drawings, and appendices.[40]

29.    The Prime Contract identifies the Parish as the "Owner" of the Project and FCI as the "Contractor" for the Project.[41]

30.    The Prime Contract was filed with the recorder of mortgages for St. Bernard Parish on January 3, 2017.[42]

31.    In connection with the execution of the Prime Contract, Travelers issued Payment and Performance Bond No. 106593105 (the "Bond") in the amount of $5,009,908.00 for the Project pursuant to the Public Works Act, naming FCI as principal and the Parish as obligee.[43]

32.    Clayton Fucich, as president of FCI, signed the Bond, thereby signifying FCI's agreement to the terms and conditions of Travelers' suretyship and signifying his own understanding and agreement with those terms and conditions.[44]

33.    At over $5 million, the Bond was the largest Travelers had ever issued on behalf of FCI.  The largest bond it had previously issued on behalf of FCI was for approximately $2 million.[45]

34.    The Project was the largest project in FCI's history.[46]

---

[40] R. Doc. 624 at 22 (uncontested material fact ¶ 9); *see* Exhibits 2, 41 & 71.
[41] R. Doc. 624 at 23 (uncontested material fact ¶ 10); *see* Exhibits 2 & 41.
[42] R. Doc. 624 at 23 (uncontested material fact ¶ 12).
[43] *Id*. (uncontested material fact ¶ 11); Exhibits 41 & 71.
[44] Testimony of Clayton Fucich (June 27, 2022) at 98-99.
[45] *Id*. at 95-96.
[46] *See id*. at 27, 96.

35.     The Prime Contract required FCI to procure, furnish, and install the new replacement engines.[47]

36.     Although FCI has been in existence since 1998 and completed approximately 800 to 900 projects, only four or five of those projects had involved the installation of an engine.[48]

37.     Further, prior to the Project, FCI had only furnished engines for one other project.[49]

## IV.     Construction of the Project and the Rotational Conflict

38.     On November 3, 2016, FCI provided SKA with a list of equipment intended to be used on the Project, including Caterpillar 3512C land engines and right-angle gear reducers to be refurbished by Philadelphia Gear, but nowhere in the communication did FCI indicate the rotation it intended for either the Caterpillar 3512C replacement engines or the refurbished right-angle gear reducers.[50]

39.     On December 13, 2016, the Parish issued to FCI a conditional notice to proceed for the Project, directing FCI "to begin preconstruction activities such as subcontractor procurement, product submittal submission for approval by the Owner [*i.e.,* the Parish], placement of order for materials, mobilization and any other provisions pursuant to the scope of the project and contract documents that can be completed in preparation for the start of construction."[51]   However, the conditional notice did not direct FCI to issue purchase orders for the engines, or for the refurbishing of the gear reducers, before the submittals were approved by the Parish, as owner, or by SKA, as engineer for the Project.

---

[47] Exhibits 2, 31, 32 & 41.
[48] Testimony of Clayton Fucich (June 27, 2022) at 8-9.
[49] *Id*. at 8.
[50] Exhibit 12.
[51] Exhibit 49 at SKA011281.

40.     On January 4, 2017, the Parish issued its notice to proceed for the Project to FCI; the notice to proceed stated that FCI was to commence work on the Project on January 11, 2017, and to fully complete the work by January 6, 2018.[52]

41.     On January 5, 2017, six days before work was to commence on the Project, FCI issued a purchase order to Puckett Power Systems, LLC ("Puckett") in the amount of $1,596,853.44 for four Caterpillar 3512C Land Mechanical Engines for the Project.[53]

42.     FCI issued the purchase order to Puckett before the engine submittals were approved by SKA, the engineer for the Project.[54]

43.     On or about January 6, 2017, FCI issued a purchase order in the amount of $864,380.00 to Philadelphia Gear to refurbish all four of the Project's existing right-angle gear reducers.[55]

44.     FCI issued the purchase order to Philadelphia Gear before the right-angle gear reducer submittals were approved by SKA, the engineer for the Project.[56]

45.     On February 2, 2017, the Parish, FCI, and SKA entered into Change Order No. 1, which modified the Prime Contract by increasing its total value from $5,009,908.00 to $5,051,010.00, and extending the Project's completion time by 21 days, or until January 27, 2018.[57]

46.     In the course of its work on the Project, FCI removed two of the existing right-angle gear reducers (one from Pump Station #1 and the other from Pump Station #4) and shipped them to Philadelphia Gear for their refurbishment.[58]

---

[52] R. Doc. 624 at 23 (uncontested material fact ¶ 13); Exhibit 5.
[53] R. Doc. 624 at 23 (uncontested material fact ¶ 15).
[54] *See, e.g.,* Exhibit 125 at 7.
[55] R. Doc. 624 at 23 (uncontested material fact ¶ 16).
[56] *See, e.g.,* Exhibit 125 at 7.
[57] R. Doc. 624 at 23 (uncontested material fact ¶ 17).
[58] *Id.* (uncontested material fact ¶ 18).

47.    Philadelphia Gear performed a factory overhaul of these two right-angle gear reducers.[59]

48.    The plans and specifications for the Project required only a refurbishment of the right-angle gear reducers.  As a result, Philadelphia Gear was not required to change, and it did not change, the counterclockwise rotation of the input shaft for the gear reducers.[60]

49.    Once the factory-overhauled right-angle gear reducers were delivered back from Philadelphia Gear, FCI reinstalled one of them at Pump Station #1 and the other at Pump Station #4.[61]

50.    On October 26, 2017, at one of the pump stations, FCI discovered a conflict between the counterclockwise rotation of the Caterpillar 3512C replacement engine installed by FCI and the counterclockwise rotation of the refurbished right-angle gear reducer it had recently reinstalled (the "Rotational Conflict").[62]  To render a functioning pump system, the rotation of the engines needed to be *clockwise* if the rotation of the gear reducers was *counterclockwise*, or the rotation of the engines needed to be *counterclockwise* if the rotation of the gear reducers was *clockwise*.

51.    Clayton Fucich now says that he "reviewed Appendix 1 extensively after being selected as the lowest responsive and responsible bidder but did not notice the rotational conflict, just as no one else did."[63]

52.    The Rotational Conflict made it impossible for the Project's new Caterpillar 3512C engines and the refurbished right-angle gear reducers to operate together.[64]

---

[59] *Id.* (uncontested material fact ¶ 19).
[60] *Id.* (uncontested material fact ¶ 20).
[61] *Id.* (uncontested material fact ¶ 21).
[62] *Id.* (uncontested material fact ¶ 22).
[63] R. Doc. 674 at 1.
[64] R. Doc. 624 at 24 (uncontested material fact ¶ 23).

53.     As a result of the Rotational Conflict, meaningful progress on the Project came to a halt.  The Rotational Conflict needed to be resolved in order for the Project to be completed.[65]

## V.     Early Attempts at Settlement and the Institution of the Lawsuit

54.     On November 28, 2017, FCI submitted a cost breakdown in the amount of $568,446.28 to perform the work necessary to cure the Rotational Conflict.[66]  The breakdown was essentially an estimate provided to SKA to be used to facilitate a change order for the work.[67]

55.     More specifically, FCI's cost breakdown contemplated that it was to reverse the rotation for all four gear boxes, the two that had been refurbished by Philadelphia Gear and reinstalled, and the two that had yet to be refurbished by Philadelphia Gear.[68]

56.     For the two refurbished and reinstalled gear boxes, the cost breakdown totaled $318,336.00, which included Philadelphia Gear's estimate of $299,970.00 to reverse the rotation and $18,366.00 in other associated costs, including labor to remove and replace the gear boxes, rental of a boom truck, freight, additional bonding, and additional insurance premiums.[69]

57.     For the two gear boxes that had yet to be refurbished, the cost breakdown totaled $143,065.20, which included Philadelphia Gear's estimate of $139,930.00 to reverse the rotation and $3,135.20 for additional bonding and insurance premiums.[70]

58.     Thus, as of November 28, 2017, FCI's estimate of its total cost to cure the Rotational Conflict for all four gear boxes was only $461,401.20, with the difference between this figure and the grand total of the cost breakdown (that is, $568,446.28) consisting of FCI's usual markup for overhead (10% of total cost) and profit (12% of total cost including overhead).[71]

---

[65] Testimony of Clayton Fucich (June 27, 2022) at 104-05, 119-20.
[66] R. Doc. 624 at 24 (uncontested material fact ¶ 24); Exhibit 46.
[67] Testimony of Clayton Fucich (June 27, 2022) at 117-18.
[68] Exhibit 46; Testimony of Clayton Fucich (June 27, 2022) at 115.
[69] Exhibit 46; Testimony of Clayton Fucich (June 27, 2022) at 115-17.
[70] Exhibit 46; Testimony of Clayton Fucich (June 27, 2022) at 117.
[71] Exhibit 46; Testimony of Clayton Fucich (June 27, 2022) at 117-18.

59.     In the November 28, 2017 estimate, the additional amount of $107,045.00, over and above the estimated cost to cure the Rotational Conflict, consisted of the 23.2% markup for overhead and profit.[72]  Following this estimate, as discussions between the parties continued, FCI continually increased its pricing for work to address the Rotational Conflict.[73]

60.     On January 12, 2018, Philadelphia Gear provided a revised quote for the cost to reverse the rotation of the gear boxes.[74]

61.     On January 15, 2018, following its receipt of Philadelphia Gear's revised quote, FCI submitted another cost estimate, this one in the amount of $625,791.94, to perform the work necessary to cure the Rotational Conflict.[75]

62.     The difference between FCI's cost breakdown dated November 28, 2017, and the one dated January 15, 2018, is almost completely found in a slight increase in the quote provided by Philadelphia Gear (about $21,998.00) and the addition of a cost for the storage of the engines ($24,110.00).[76]

63.     As of January 15, 2018, the total cost to FCI to cure the Rotational Conflict for all four gear boxes would have been $507,948.00; however, FCI again added a 23.2% markup to this cost estimate for additional overhead and profit in the amount of $117,843.94.[77]

64.     On January 24, 2018, three months after discovery of the Rotational Conflict, FCI submitted Payment Application No. 5 for the Project in the amount of $442,186.00.[78]  In Payment Application No. 5, FCI requested partial payment for the work that FCI had performed to install

---

[72] R. Doc. 624 at 24 (uncontested material fact ¶ 24); Exhibit 46; Testimony of Clayton Fucich (June 27, 2022) at 118.
[73] Exhibits 13 & 127; R. Doc. 624 at 24 (uncontested material fact ¶ 30).
[74] R. Doc. 624 at 24 (uncontested material fact ¶ 25); Exhibit 149.
[75] Exhibit 127; Testimony of Clayton Fucich (June 27, 2022) at 118-19.
[76] Testimony of Clayton Fucich (June 27, 2022) at 118-19.  *Compare* Exhibit 46 *with* Exhibit 127.
[77] Exhibit 127; Testimony of Clayton Fucich (June 27, 2022) at 119.
[78] R. Doc. 624 at 24 (uncontested material fact ¶ 26); Exhibit 171.

the replacement engines and overhauled gear reducers at Pump Stations #1 and #4, with a value of $345,501.00.[79]  Payment Application No. 5 did not include any costs to cure the Rotational Conflict.[80]  Any work to cure the Rotational Conflict would require a change order.[81]

65.     On February 6, 2018, the Parish sent correspondence to SKA and FCI, notifying them of "a serious performance issue" related to the Project and making "legal demand" for the Parish's rights under its respective contracts with FCI and SKA.[82]

66.     On February 7, 2018, the Parish sent correspondence to FCI and Travelers, stating that "[t]he purpose of this letter is to put Travelers … and [FCI] on notice under Section 3 of the Performance Bond that St. Bernard [Parish] is considering declaring a contractor default."[83]

67.     At the time of the Parish's February 7, 2018 letter, FCI had not completed any work on the engines in four months.  Because the Project could not be completed until the Rotational Conflict was resolved, the Project was largely at a standstill at this point.[84]

68.     The Parish's February 7, 2018 letter was Travelers' first notice that the Parish was considering a contractor default, and, until it received this letter, Travelers had no involvement in the Project, other than issuing the Bond.[85]

69.     In this letter, the Parish also requested a conference with FCI and Travelers to discuss FCI's performance, as required by Section 3.1 of the Performance Bond.[86]

70.     Section 3 of the Performance Bond provides:

---

[79] R. Doc. 624 at 24 (uncontested material fact ¶ 27); Exhibit 171; Testimony of Clayton Fucich (June 27, 2022) at 132.

[80] Exhibit 171; Testimony of Clayton Fucich (June 27, 2022) at 132-33.

[81] Exhibit 59 at SKA002434.

[82] R. Doc. 624 at 24 (uncontested material fact ¶ 28); Exhibit 43.  The Parish sent the letter through its duly authorized agent, William McGoey, the Parish's assistant district attorney.

[83] R. Doc. 624 at 24 (uncontested material fact ¶ 29); Exhibit 83.  Again, McGoey signed the letter on behalf of the Parish.

[84] Testimony of Clayton Fucich (June 27, 2022) at 120 ("We had pretty much gotten as far as we could.").

[85] *Id.* at 105-06, 110; *see* Exhibit 83.

[86] Exhibit 83; Testimony of Clayton Fucich (June 27, 2022) at 106-07.

§ 3   If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

.1      the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default.  Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance.  If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend.  Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice.  If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

.2      the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

.3      the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.[87]

71.    By sending its February 7, 2018 letter, the Parish met the conditions of Section 3.1 of the Bond.[88]

72.    The next day, February 8, 2018, FCI issued its third cost breakdown to correct the Rotational Conflict, increasing its price to $737,890.50 and seeking "an additional 90 days to complete the balance of the work once the first gearbox is received for a total increase in Contract Time of 300 days after a Change Order is issued by the Owner."[89]

---

[87] Exhibit 71 at TRAV-00856.

[88] *Id.*; Exhibit 83; Testimony of Clayton Fucich (June 27, 2022) at 99.  The Indemnitors argue that the Parish cannot have met these conditions then because there was an "Owner Default" within the meaning of the Performance Bond.  As explained below, the Court finds that there was no such Owner Default.  *See infra* at 57-59.

[89] Exhibit 13; *see* R. Doc. 624 at 24 (uncontested material fact ¶ 30).  In the plans and specifications, the term "Contract Time" is defined as "[t]he number of consecutive calendar days stated in the Agreement for the completion of the Work."  Exhibit 32 at LM001163.  Under the Prime Contract, the original Contract Time was 360 days from the date specified in the notice to proceed.  Exhibit 2 at SKA001379.

73.     In comparison to the cost breakdown issued by FCI just three weeks earlier in the amount of $625,791.94, this February 9, 2018 estimate added $112,098.56 in costs for alleged "project delay."[90]

74.     The alleged "project delay" costs included $91,125.00 for nine months of extended home office overhead; $5,618.00 for demobilization and remobilization; $3,345.00 for a temporary shelter to be erected over one of the new engines; and $12,010.00 for a 12% profit markup on the additional costs for "project delay."[91]

75.     Thereafter, SKA refused to certify that payment was due to FCI for the $345,501.00 it had requested in Payment Application No. 5 for installation of the replacement engines and overhauled gear reducers at Pump Stations #1 and #4 because the engines and gear reducers, as installed, did not yield a complete functioning system.[92]

76.     On February 19, 2018, Travelers' claims counsel, Robbi Ziv-Goldstein, sent correspondence to the Parish on behalf of Travelers (with a copy to FCI), acknowledging the Parish's February 7, 2018 letter, stating that an error by the Project engineer would not be encompassed by the Bond, and requesting certain documentation from the Parish.[93]

77.     Also on February 19, 2018, Ziv-Goldstein sent a letter to FCI, advising it of the Parish's claim against the Bond and requesting detailed information about the Project.[94]  Travelers did not deny the claim at that time.

78.     Thus, Travelers requested information and documentation from both the Parish and FCI as part of its own independent investigation of the Parish's claim against the Bond.[95]

---

[90] *Compare* Exhibit 127 *with* Exhibit 13.  *See* Testimony of Clayton Fucich (June 27, 2022) at 126-29.
[91] Exhibit 13.
[92] Testimony of Clayton Fucich (June 27, 2022) at 132-33; Exhibit 171.
[93] R. Doc. 624 at 24 (uncontested material fact ¶ 31); Exhibit 15.
[94] Exhibit 72; Testimony of Clayton Fucich (June 27, 2022) at 124.
[95] Exhibits 15 & 72; Testimony of Clayton Fucich (June 27, 2022) at 123.

79.     As requested by the Parish in its February 7, 2018 letter, a conference pursuant to Section 3.1 of the Bond was held by telephone on March 5, 2018, to address disputes concerning the Project.  On the call were Ziv-Goldstein on behalf of Travelers, Clayton Fucich, Tom Gardner (FCI's counsel at that time), and several representatives of the Parish.[96]

80.     On March 19, 2018, FCI commenced this suit against the Parish and SKA, seeking to recover unpaid contract balances for work performed on the Project and other damages.[97]

81.     On March 27, 2018, SKA sent a letter to FCI (with copies to representatives of the Parish and others), notifying FCI under Section D.01.20 of the Prime Contract's general conditions/instructions to bidders that: (1) the Parish intended to invoke liquidated damages; and (2) "FCI is to complete the referenced project as per the contract documents."   The letter specifically stated that "[t]his does not authorize additional compensation for completion of the work."[98]

82.     Also on March 27, 2018, FCI amended its complaint to assert a negligence claim against SKA.[99]

83.     On April 18, 2018, the Parish sent an email to FCI and SKA, observing that "[i]t appears that the rotational conflict should have been obvious from the inception of the project," but also outlining what the Parish would be willing to offer to resolve its role in the matter on condition that (1) the Parish would be dismissed from the litigation; and (2) work on the Project would resume within 30 days and continue to completion.[100]

---

[96] Exhibit 53; Testimony of Clayton Fucich (June 27, 2022) at 107-09.
[97] R. Doc. 624 at 24 (uncontested material fact ¶ 32); R. Doc. 1.
[98] R. Doc. 624 at 24-25 (uncontested material fact ¶ 33); Exhibit 45.
[99] R. Doc. 7.
[100] Exhibit 134.

84.     In this email, the Parish indicated that it would pay FCI an additional $293,856.00 to finish the Project (including cure of the Rotational Conflict), based on Philadelphia Gear's quote of $73,464 per gear box, which was calculated as the "difference between the scope of the work originally quoted by Philadelphia [Gear] and the scope of work that would have been required to address the rotational conflict had the conflict been known at the time that the project was let out for bid."[101]

85.     In addition, as part of its proposed resolution, the Parish indicated that it would be willing to release to FCI the amount subject to Payment Application No. 5 (*viz.,* $420,076.70), which represented the full sum it billed for installation of the incompatible engines and overhauled gear boxes, except retainage in the amount of $22,109.30 (5%) as permitted by the Prime Contract.[102]

86.     On May 22, 2018, SKA offered to contribute $150,000.00 to a resolution of the parties' disputes and to cure the Rotational Conflict.[103]

87.     Thus, by the end of May 2018, with the Parish's offer of $293,856.00 and SKA's offer of $150,000.00, the two parties essentially offered to pay FCI $443,856.00 to correct the Rotational Conflict.[104]

88.     FCI rejected their offers even though FCI previously indicated that its hard costs to correct the Rotational Conflict was $507,948.00.[105]

89.     Thus, by rejecting their offers, FCI failed, as early as May 2018, both to mitigate its own exposure and to cooperate with the other parties to resolve the matter, including curing the

---

[101] R. Doc. 624 at 25 (uncontested material fact ¶ 34); Exhibit 134; Testimony of Clayton Fucich (June 27, 2022) at 131-32.
[102] Exhibits 134 & 171; Testimony of Clayton Fucich (June 27, 2022) at 131-34.
[103] R. Doc. 624 at 25 (uncontested material fact ¶ 35); Exhibit 130; Testimony of Clayton Fucich (June 27, 2022) at 134.
[104] Exhibits 130 & 134; Testimony of Clayton Fucich (June 27, 2022) at 134-35.
[105] *See, e.g.,* Exhibit 13 & 127; Testimony of Clayton Fucich (June 27, 2022) at 135. *See supra* at 12.

Rotational Conflict, by contributing only about $65,000.00 to settlement – an amount significantly less than each of the contributions offered by the other parties.[106]

90.      In doing so, FCI refused to enter any agreement to complete the Project that would not result in its being paid for all its costs, overhead, and profit, including any additional costs, overhead, and profit associated with the work to correct the Rotational Conflict.[107]  In a post hoc justification of its position, FCI now claims that it needed a change order indicating what the Parish "wanted done" to complete the Project, which was never provided.[108]  The Court finds that this explanation is not credible: after all, before a change order could issue, the parties needed to have come to some agreement on the anticipated cost; and, by this point in time, all parties understood the potential options available to cure the Rotational Conflict in order to provide a fully functional pump system, which is plainly what the Parish "wanted done."[109]

91.      In the wake of the March 5, 2018 Section 3.1 conference, and the ensuing failure of the parties to resolve their disputes, the Parish sent an email to Travelers on June 18, 2018, calling upon Travelers to make its election under Section 5 of the Performance Bond to arrange for FCI to complete the Project or to arrange for another contractor to do so.[110]

92.      Within 45 minutes of receiving the Parish's email, Travelers' claim counsel, Ziv-Goldstein, forwarded it to Clayton Fucich and FCI's counsel.[111]  Prior to this time, Travelers had not participated in settlement communications among FCI, SKA, and the Parish, other than participating in the Section 3.1 conference call.[112]

---

[106] Exhibits 13, 127 & 134; Testimony of Clayton Fucich (June 27, 2022) at 135.
[107] Testimony of Clayton Fucich (June 27, 2022) at 135.
[108] R. Doc. 674 at 3.
[109] *Id.*
[110] Exhibit 100; Testimony of Clayton Fucich (June 27, 2022) at 135-36.
[111] Exhibit 100; Testimony of Clayton Fucich (June 27, 2022) at 136.
[112] Testimony of Clayton Fucich (June 27, 2022) at 136-37.

93.     Because it was convinced at this time that FCI had no real interest in resolving the dispute on a reasonable basis and completing the Project, the Parish sought bids from other contractors to do so.[113]

94.     On June 19, 2018, the Parish received an estimate for the Project's completion from BLD Services, L.L.C., for a total cost of $2,685,000.00.[114]

95.     On June 21, 2018, the Parish notified Travelers that it had $2,143,954.20 in grant funds available to complete the Project.[115]

96.     On July 6, 2018, the Parish sent a letter requesting Travelers to make its election under Section 5 of the Performance Bond (*i.e.,* to complete the Project, obtain a new contractor, or waive its right to do so).[116]

97.     On July 9, 2018, Travelers responded by notifying the Parish that it had not then made this election because the Parish had not yet met the requirements set forth in the Bond, including declaring a contractor default and terminating FCI's contract for the Project.[117]  Nor in this response did Travelers deny the Parish's claim.

98.     On July 12, 2018, Travelers' claim counsel, Ziv-Goldstein, and Travelers' in-house engineer, Russ Werner, met with Clayton Fucich and his counsel to discuss the facts of the dispute ahead of a meeting scheduled for July 13, 2018, between Travelers' representatives and David Jarrell, the attorney representing the Parish in the litigation.[118]

---

[113] Exhibit 134; Testimony of David Jarrell (June 28, 2022) at 122-23.  Jarrell, who serves in the St. Bernard Parish district attorney's office, was the Parish's counsel throughout this matter.
[114] R. Doc. 624 at 25 (uncontested material fact ¶ 36).
[115] *Id*. at 25 (uncontested material fact ¶ 37).
[116] Exhibit 55.
[117] Exhibit 86.
[118] Exhibit 99, ¶ 23; Testimony of Clayton Fucich (June 27, 2022) at 138-42.

99.     More specifically, during this July 12 meeting, Clayton Fucich explained FCI's position concerning its lack of any legal responsibility for the Rotational Conflict, and Ziv-Goldstein stated that Travelers agreed with FCI's position.[119]

100.     Travelers' Ziv-Goldstein, a surety claim attorney with 30 years' experience, explained to FCI that it should nonetheless seek a business resolution of the dispute to avoid the costs of litigation and any risk of loss.[120]

101.     One of the purposes of this meeting between Travelers and FCI was to prepare for the meeting with the Parish set for the following day; FCI did not object to Travelers meeting with the Parish.[121]

## VI.     The Parish's Claim Against the Bond

102.     On July 20, 2018, the Parish, in a letter signed by assistant district attorney Jarrell and directed to FCI and Travelers, terminated FCI's contract for the Project due to FCI's failure to perform and made a formal demand upon Travelers to respond under the Bond.[122]

103.     The Parish's charter expressly designates the district attorney as the legal representative of the Parish.[123]

104.     By the time the July 20, 2018 notice issued, FCI had already filed this lawsuit against the Parish, alleging claims relating to the Prime Contract and the Project.[124]

---

[119] Exhibit 99, ¶ 23; Testimony of Clayton Fucich (June 27, 2022) at 139-40.
[120] Testimony of Clayton Fucich (June 27, 2022) at 139, 141.
[121] *Id*. at 141-42.
[122] R. Doc. 624 at 25 (uncontested material fact ¶ 38); Exhibits 16 & 87.  The Parish had made an earlier demand to Travelers on July 6, 2018, to perform its obligations under the Bond.  Exhibit 55.
[123] R. Doc. 300 at 31 n.111 (citing St. Bernard Parish home rule charter, R. Doc. 181-6 at 20, which provides: "Sec. 4-02. Legal services. (a) The district attorney of the judicial district serving St. Bernard Parish shall serve as the legal advisor to the council, parish president, and all parish departments, offices, and agencies, unless otherwise decided by the president and council.").
[124] *Id*. at 31.

105.     Thus, Jarrell was by then the Parish's counsel of record in this suit and acted in a representative capacity on behalf of the Parish regarding all aspects of the litigation concerning, in part, FCI's performance of its obligations under the Prime Contract.[125]

106.     Further, Jarrell had the authority to terminate the Prime Contract as evidenced by the minute entry for the July 17, 2018 Parish council meeting (which reflects that the council voted to take action regarding the litigation) and the testimony of the Parish's chief administrative officer and its public works director that this meeting resulted in a joint decision among the Parish council, chief administrative officer, and public works director to issue a notice of default and notice of termination to FCI.[126]

107.     The GAI defines "default" in pertinent part as follows:

**Default** – Any of the following shall constitute a Default: (a) a declaration of Contract default by any Obligee; … (c) a breach of any provision of this [GAI]; (d) failure to make payment of a properly due and owing bill in connection with any Contract; (e) [Travelers'] good faith establishment of a reserve ….[127]

108.     Because the Parish's July 20, 2018 letter contained a declaration of contract default by the Parish as obligee under the Prime Contract, the letter constituted a "default" for purposes of the GAI and triggered the remedies under the GAI.[128]

109.     In its July 20, 2018 letter, the Parish also made a formal demand against the Bond and requested that Travelers make its election under Section 5 of the Performance Bond.[129]

110.     Section 5 of the Performance Bond provides as follows:

§ 5  When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

---

[125] *Id.*
[126] *Id.* (citing to R. Docs. 197-11 at 173; 197-12 at 2; 197-14 at 4).
[127] Exhibit 14, § 1.
[128] *Id.* §§ 1, 6.
[129] Exhibit 16; *see also* Exhibit 71.

§ 5.1  Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2  Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3  Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

§ 5.4  Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

> .1  After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or
>
> .2  Deny liability in whole or in part and notify the Owner, citing the reasons for denial.[130]

111.    Prior to the Project, FCI had never defaulted on or been terminated from a project.[131]

112.    On August 10, 2018, after investigating the Parish's claims and determining that FCI was "not responsible for the rotational conflict," Travelers responded to the Parish's July 20, 2018 letter, denying its claim under the Bond.[132]

113.    Travelers effectively elected to proceed under Section 5.4.2 of the Performance Bond by waiving its right to perform and denying liability in whole.[133]

114.    In its August 10, 2018 letter, Travelers notified the Parish with reasonable promptness that its reason for denying the claim was that Travelers' investigation revealed that (1)

---

[130] Exhibit 71 at TRAV-00856.
[131] Testimony of Clayton Fucich (June 27, 2022) at 14; Testimony of Troy Wagener (June 29, 2022) at 61.
[132] R. Doc. 624 at 25 (uncontested material fact ¶ 40); Exhibit 88.
[133] Exhibits 71 & 88.

the Rotational Conflict arose because of a mistake in the plans and specifications drafted by SKA and provided to FCI, and (2) FCI performed in accordance with the plans and specifications.[134]

115.     Thus, as of August 10, 2018, the positions and interests of Travelers and FCI were aligned, but Travelers soon found it necessary to take protective steps as the risks of litigation and its exposure became clearer and FCI's litigation and settlement positions hardened and became increasingly unreasonable.

## VII.   The UCC Filing and the Collateral Demand

116.     On August 14, 2018, Clayton Fucich disputed that the Parish owned the engines that had been obtained by FCI for the Project, and he directed a representative of Puckett not to do anything to preserve them.[135]   At this time, then, FCI was disputing that the Parish owned the engines.

117.     On August 30, 2018, the Parish provided the parties with its initial disclosures under Rule 26 of the Federal Rules of Civil Procedure; the disclosures included a computation of the Parish's alleged damages.[136]   As a result, the Indemnitors knew by this time that the Parish sought damages from Travelers and FCI exceeding the penal sum of the Bond.

118.     Among other things, the Parish's Rule 26 disclosures stated that liquidated damages were accruing "as a result of [FCI's] failure to complete the project on schedule [*i.e.,* by January 2018]."[137]   The Prime Contract provided that liquidated damages would accrue at a rate of $1,500.00 per day.[138]

---

[134] Exhibit 88.
[135] Exhibit 105 at 3.
[136] R. Doc. 624 at 25 (uncontested material fact ¶ 41); Exhibit 103 at 5-6.
[137] Exhibit 103 at 5; Testimony of Clayton Fucich (June 27, 2022) at 147.
[138] Exhibit 2 at SKA001380; Testimony of Clayton Fucich (June 27, 2022) at 147.

119.    After Travelers denied the Parish's claim under the Performance Bond, the Parish began arranging to have the Project completed by another contractor.  Toward that end, SKA started preparing a scope of work to complete the Project.[139]

120.    On September 1, 2018, the Parish filed a crossclaim against SKA for breach of contract for failure to properly design the Project to adequately specify the intended directional rotation of the engines.[140]

121.    On September 5, 2018, the Parish filed a counterclaim against Travelers for breach of the Project's Performance Bond, seeking the full penal sum of the Bond, or $5,009,908.00.[141]

122.    On September 20, 2018, at Travelers' request, a meeting was held between Clayton Fucich, FCI's counsel, Travelers' claim counsel Ziv-Goldstein (who had traveled to New Orleans for the meeting), and Travelers' litigation counsel.[142]

123.    Travelers requested this meeting because it was concerned that Clayton Fucich was improperly using his alleged ownership of the engines purchased for the Project as leverage against the Parish.[143]

124.    Travelers' Ziv-Goldstein, though she was in considerable pain from a fall and resulting injury, traveled to New Orleans for the meeting to personally emphasize to Clayton Fucich and his counsel that FCI's settlement positions, up to this point in time, were not only unreasonable but also detrimental to the Indemnitors' relationship with Travelers given the obligations they owed to Travelers under the GAI.[144]

---

[139] R. Doc. 624 at 25 (uncontested material fact ¶ 42).
[140] Exhibit 101 at 91-92.
[141] R. Doc. 624 at 25 (uncontested material fact ¶ 43); R. Doc. 67.
[142] Exhibits 66 & 142; Testimony of Clayton Fucich (June 27, 2022) at 147-48, 150.
[143] Testimony of Clayton Fucich (June 27, 2022) at 150-51.
[144] Exhibit 91; Testimony of Clayton Fucich (June 27, 2022) at 168.

125.     During the September 20, 2018 meeting, Ziv-Goldstein again suggested to Clayton Fucich that, despite Travelers' agreement with FCI's legal position concerning the Rotational Conflict, FCI should seek a settlement of the matter to avoid the risks and costs of litigation.[145]

126.     There is no evidence that Ziv-Goldstein or anyone else from Travelers ever improperly pressured FCI to settle.  It was not improper for her to remind Clayton Fucich of the risks and costs of litigation, the Indemnitors' obligations to Travelers, and the opportunity for FCI to cooperate with the other parties to reach a settlement.

127.     The Court finds that Clayton Fucich's position as to ownership of the engines could not help but impede progress on completion of the Project and further expose both FCI and Travelers to the Parish's claim for damages, including liquidated damages at $1,500.00 per day.

128.     Ziv-Goldstein's efforts to advise caution and moderation proved futile, as Clayton Fucich's position regarding settlement hardened.[146]

129.     The day after the September 20, 2018 meeting Clayton Fucich sent an email stating that, in any settlement agreement contemplating FCI's completion of the Project, FCI would require, in addition to the contract price, payment of its attorney's fees, all costs billed to FCI by Travelers, filing fees, and costs for delays, all "subject to FCI's standard markup of ten percent overhead and twelve percent profit for change order work."[147]

130.     Clayton Fucich also stated that any settlement agreement must include compensation ("calculated at FCI's standard rates") for the time he and his employees expended to assist with or support the education effort of SKA and the Parish by "finally mak[ing] them

---

[145] Testimony of Clayton Fucich (June 27, 2022) at 168-69.
[146] Exhibit 143.
[147] *Id.*

realize that to finish this project will require a change order, complete with revised Contract Documents, an extension of Contract Time and an increase in Contract Price."[148]

131.    FCI attempts now to dismiss the problematic nature of Clayton Fucich's stance at that time as "wholly in line with the Contract Documents."[149]  However, the Court finds that this post hoc characterization is not credible.  At the time, Clayton Fucich must have known (or, at least, should have known) that his settlement demands, including his demands for additional payments and his insistence upon holding on to engines the Parish had already paid for, were unreasonable and constituted a significant impediment to a constructive resolution of the matter.

132.    During this period, Clayton Fucich maintained that FCI owned the replacement engines (and it would need to be paid by the Parish for them before turning them over), despite the recommendations of his own attorney, who advised him that the Parish had the stronger argument on this point.[150]

133.    FCI's attorneys also advised Clayton Fucich that relinquishing his argument that FCI owned the engines would provide FCI "a little good faith with the Parish" and, more importantly, keep FCI's interests aligned with Travelers.[151]

134.    Nonetheless, Clayton Fucich maintained that if the Parish wanted the engines necessary to complete the Project, the Parish must pay FCI (a) the amount requested in Payment Application No. 5, (b) the currently withheld retainage even though it was not yet due, and (c) $601,087.81 for the value of work FCI claimed it had completed but had not yet billed.[152]

---

[148] *Id.*
[149] R. Doc. 674 at 3.
[150] Exhibit 131.
[151] *Id.*
[152] *Id.*; Testimony of Clayton Fucich (June 27, 2022) at 161-62.

135.    In late September and early October of 2018, counsel for all the parties in this lawsuit engaged in discussions, during which the Parish and SKA stated that they needed clarity from FCI as to what was still left to be completed in the Project so that the Parish could obtain working pumps as quickly as possible.[153]

136.    The parties stated that these discussions would be most efficiently completed at an in-person meeting, which the parties thereafter referred to as the "technical meeting."[154]

137.    Meanwhile, on September 28, 2018, the assigned magistrate judge communicated with all counsel and requested a settlement conference among the parties.[155]  Counsel for FCI and the Fuciches advised Clayton Fucich that FCI will need a settlement outline for the conference.[156]

138.    In response, Clayton Fucich told his counsel that FCI should go into the settlement conference with "a settlement outline asking for everything under the sun including the kitchen sink."  Fucich directed his counsel to "go in asking for big. Very big."  He also instructed them to "[j]ust whip up some numbers, add 20% or so to them and submit," adding, "Remember, aim high!"[157]

139.    On September 28, 2018, FCI's counsel acted in accordance with Clayton Fucich's instructions and provided Travelers' counsel with draft Rule 26 disclosures that included FCI's newly increased damages.[158]

140.    On October 1, 2018, Travelers' counsel responded that he was "very concerned about the direction that [FCI] appear[s] to be going relating to damages."[159]  He noted that FCI

---

[153] Exhibits 128, 138 & 138; Testimony of Clayton Fucich (June 27, 2022) at 162, 166, 189; Testimony of Mark Marino (June 28, 2022) at 75-76.  At the time of trial, Mark Marino was Travelers' assistant vice president for construction services claims.
[154] *Id.*
[155] Exhibit 145.
[156] *Id.*
[157] *Id.*
[158] Exhibit 91 at 2.
[159] *Id*. at 1.

was "hardening [its] position vis-a-vis settlement with the Parish."[160]  He also reminded FCI's counsel that Ziv-Goldstein had traveled to New Orleans in considerable pain to personally emphasize to Clayton Fucich and his counsel that, because the Indemnitors were acting in a way that would eliminate their ability to protect Travelers as they promised in the GAI, Travelers would likely move to protect its own interests.  Travelers' counsel specifically stated that FCI's latest settlement outline seemed "to ignore that reality" and would not be well received when conveyed to Travelers.[161]

141.    Despite these warnings, FCI did not change its settlement position.[162]  It refused to make a single concession to reach a resolution of the matter.

142.    At this point, nearly a year had passed since FCI discovered the Rotational Conflict and meaningful work on the Project had stopped.  By October 1, 2018, FCI and Travelers faced nearly a year of liquidated damages at $1,500.00 per day (which would amount to $547,500.00 per year).[163]

143.    On October 1, 2018, Travelers filed a UCC Financing Statement (the "UCC-1") pursuant to the GAI.[164]  Mark Marino, Travelers' assistant vice president for construction services claims and Ziv-Goldstein's supervisor, testified that Travelers viewed this litigation as "what might likely be a long and protracted battle between the parties, which as [Travelers] would expect [was] going to incur a significant expense to litigate a claim and defend a claim."[165]  Further, Travelers came to see then that "the risk of [its] having to spend much more to defend this claim, investigate the claim, than [it] had already spent was a clear and present danger."[166]

---

[160] *Id.*
[161] *Id.*
[162] *Id.*; *see also* Exhibit 145.
[163] Testimony of Mark Marino (June 28, 2022) at 77-78.
[164] R. Doc. 624 at 25 (uncontested material fact ¶ 45); Exhibit 22.
[165] Testimony of Mark Marino (June 28, 2022) at 77-78.
[166] *Id.*

144.    The GAI expressly provides in pertinent part as follows:

This Agreement shall for all purposes constitute a Security Agreement for the benefit of [Travelers] in accordance with the Uniform Commercial Code ("UCC") and all similar statutes.  Indemnitors hereby irrevocably authorize [Travelers], without notice to any Indemnitor, in order to perfect the security interest granted herein, to file either: (a) this Agreement or a copy or other reproduction of this Agreement; or (b) any initial financing statements or amendments thereto that indicate the Collateral as all assets of Indemnitors or words of similar effect, as being of an equal or lesser scope or with greater detail and that contain any other information relating to any Indemnitor required by Part 5 of Article 9 of the UCC for the jurisdiction where such financing statement or amendment is filed.[167]

145.    On October 2, 2018, after all parties expressed agreement to schedule the technical meeting for October 15, 2018, counsel for FCI emailed all other counsel and stated that "FCI does not intend to participate in the proposed 'technical' meeting."[168]  The Indemnitors now claim that Clayton Fucich was unavailable to attend the technical meeting when scheduled, but that FCI's counsel would attend instead.[169]  At the time, though, FCI's counsel explained that the reason Clayton Fucich refused to participate was because the proposed meeting was "simply another attempt to have FCI perform uncompensated design work for the Parish and SKA, who can then use that work to award a completion contract to another contractor."[170]

146.    Due to this response, Travelers became even more concerned, and Ziv-Goldstein personally asked "if FCI [would] change course and agree to attend the [technical] meeting of all parties that was tentatively set for October 15, or if Clayton ha[d] any alternative dates in October and wishe[d] to participate on a different day."[171]

147.    On October 3, 2018, FCI's counsel reiterated Ziv-Goldstein's advice to Clayton Fucich, noting that there was "a chance for FCI to obtain a walk away without 'getting hurt too

---

[167] Exhibit 14, § 12.
[168] Exhibit 104.
[169] R. Doc. 674 at 5.
[170] Exhibit 104.
[171] Exhibit 98.

bad,' which opportunity [would] be lost if FCI [did] not participate [in the technical meeting]." FCI's counsel explained further that "Travelers keeps holding out the prospect that this case can settle, but that FCI will have to attend the meeting and take a loss to avoid future attorney's fees and indemnity obligations (which analysis, as we have discussed in the past, is correct)."[172]

148.   In short, Clayton Fucich took a hard stance against the technical meeting and was warned by his own counsel that Travelers would not accept his unreasonableness in settlement discussions while incurring significant attorney's fees and being exposed to substantial liability.

149.   On Wednesday, October 10, 2018, FCI circulated a "settlement offer" to the other parties.  This settlement offer itemized FCI's alleged damages (including unpaid work, alleged unrealized lost profits, extended overhead, attorney's fees, estimated indemnity obligations to Travelers, and other costs) to total $2,077,097.08, not including any costs for correcting the Rotational Conflict.[173]   FCI made it clear that these settlement terms were nonnegotiable. Specifically, FCI stated that it was

> requesting only an acceptance or rejection of this proposal.  FCI [would] not willingly agree to a settlement which [would] not make it whole.  An outcome which only partially compensate[d] FCI for the financial losses it ha[d] suffered in connection with this matter will have to be as the result of the Court's judgment.[174]

150.   In other words, FCI informed the other parties that it was only willing to enter a settlement that met its every demand as FCI would not accept a loss other than by order of this Court.[175]

151.   Further, FCI demanded that the parties provide their response, either accepting or rejecting the proposal, by Monday, October 15, 2018, which was within three business days.[176]

---

[172] *Id.*; Testimony of Clayton Fucich (June 27, 2022) at 180-81.
[173] Exhibit 90.
[174] *Id.*
[175] *Id.*; Testimony of Clayton Fucich (June 27, 2022) at 186.
[176] Exhibit 90.

152.    In addition, on October 14, 2018, FCI filed a motion for summary judgment asserting that it fully complied with SKA's plans and specifications and therefore could not be liable for the Parish's alleged damages.[177]

153.    On November 6, 2018, counsel for FCI notified the magistrate judge and counsel for the other parties that FCI had no interest in participating in the settlement conference the magistrate judge had suggested.[178]

154.    Travelers' Marino testified that while Travelers supported FCI's position as to its lack of legal responsibility for the Rotational Conflict, Travelers expected FCI to work towards settlement of the claim due to the significant risks that Travelers and FCI faced.[179]

155.    Following FCI's refusal to attend the settlement conference, Travelers made formal demand upon the Indemnitors on November 12, 2018, to deposit collateral security in the amount of $5,036,878.49, representing the penal sum of the Bond plus Travelers' costs and attorney's fees through that date.[180]  The formal demand explained that "[FCI]'s recent refusal to participate in discussions regarding the work that remains to be performed on the Project [*i.e.,* the technical meeting] and [FCI]'s uncompromising refusal to participate in a formal Settlement Conference with the parties and the Magistrate [Judge] indicate to Travelers that [FCI] does not intend to act in a manner that mitigates the risk and/or minimizes the risk to Travelers and/or itself."[181]

156.    Following counsel's realization that the GAI had not been attached to the November 12, 2018 demand letter, as referenced, Travelers sent the Indemnitors a second letter

---

[177] R. Doc. 624 at 25 (uncontested material fact ¶ 44).
[178] Exhibit 23.
[179] Testimony of Mark Marino (June 28, 2022) at 77.
[180] R. Doc. 624 at 26 (uncontested material fact ¶ 46); Exhibit 25.
[181] Exhibit 25 at 2.

on November 27, 2018, and extended the deadline for posting the required collateral security to December 3, 2018, a two-week extension from the original due date of November 19, 2018.[182]

157.    The GAI gives Travelers the right to demand collateral security at any point after a claim is made on a bond issued by Travelers for the benefit of the Indemnitors:

> 5.    **Collateral Security**: Indemnitors agree to deposit with [Travelers], ***upon demand***, an amount as determined by [Travelers] sufficient to discharge ***any Loss or anticipated Loss.*** ...  Sums deposited with [Travelers] pursuant to this paragraph may be used by [Travelers] to pay such claim or be held by [Travelers] as collateral security against any Loss ....[183]

158.    "Loss" is defined under the GAI as follows:

> **Loss** - All loss and expense of any kind or nature, including attorneys' and other professional fees, which [Travelers] incurs in connection with any Bond or this Agreement, including but not limited to all loss and expense incurred by reason of [Travelers']: (a) making any investigation in connection with any Bond; (b) prosecuting or defending any action in connection with any Bond; (c) obtaining the release of any Bond; (d) recovering or attempting to recover Property in connection with any Bond or this Agreement; (e) enforcing by litigation or otherwise any of the provisions of this Agreement; and (f) all interest accruing thereon at the maximum legal rate.[184]

159.    In addition, an event of default under the GAI is not the same as a default under the bonded contract.  "Default" under the GAI is defined to include "(a) a declaration of Contract default by any Obligee," and "(e) [Travelers'] good faith establishment of a reserve," among a host of other events.[185]

160.    Despite Travelers' demand, and in violation of the GAI, the Indemnitors failed to collateralize Travelers against anticipated Loss by the deadline of December 3, 2018.

---

[182] Exhibit 106.
[183] Exhibit 14, § 5 (emphasis added).
[184] *Id.* § 1.
[185] *Id.*

161.    Instead, on December 4, 2018, in response to Travelers' demand for them to post collateral security, the Indemnitors filed a preliminary injunction and temporary restraining order, in which they sought to avoid their obligations to post collateral security.[186]

162.    On December 10, 2018, this Court denied the Indemnitors' temporary restraining order and set their preliminary injunction for hearing.[187]

163.    On December 14, 2018, the Indemnitors filed their Third Supplemental Complaint for Relief and Damages against Travelers.[188]

164.    On December 19, 2018, Travelers filed its crossclaim and third-party complaint against the Indemnitors concerning the Project and their breaches of the GAI, requesting injunctive relief and specific performance of the collateral deposit clause of the GAI.[189]

165.    On January 11, 2019, this Court conducted a hearing concerning the preliminary injunctive relief sought by Travelers and the Indemnitors against each other.[190]  After the hearing, the parties asked the Court to delay its ruling, including any ruling concerning Travelers' request that the Indemnitors post collateral security, in view of the parties' ongoing settlement efforts.

166.    On January 25, 2019, the magistrate judge held a settlement conference, which was unsuccessful.[191]

167.    On February 25, 2019, another settlement conference was held before the magistrate judge, this one attended by Clayton Fucich and FCI's attorney as well as St. Bernard Parish president Guy McInnis and the Parish's attorney, without the presence of the other parties.[192]

---

[186] R. Doc. 119.
[187] R. Doc. 132.
[188] R. Doc. 137.
[189] R. Doc. 624 at 26 (uncontested material fact ¶ 47); R. Doc. 140.
[190] R. Doc. 163.
[191] R. Doc. 170.
[192] R. Doc. 173; Exhibit 109.

33

168.    During this conference, FCI and the Parish entered into an interim settlement agreement in which the Parish agreed to pay to FCI $194,219.90 in return for FCI's agreement to release any claims to ownership of the four Caterpillar 3512C engines.[193]

169.    The minute entry for this interim settlement expressly notes that Travelers gave its consent to the terms of the interim settlement.[194]

170.    The parties then appeared before the magistrate judge for another settlement conference on March 26, 2019, to mitigate the damages to all parties by having FCI complete the Project under a full reservation of rights.[195]

171.    During the March 26, 2019 settlement conference, a tentative settlement agreement was reached between FCI and the Parish, without input from Travelers (the "Tentative Settlement").[196]

172.    Travelers' only role in the Tentative Settlement was to respond whether its Bond for the Project would remain in place if the settlement went forward.  After that conference, Travelers confirmed that the Bond would remain in place through completion of the Project if the Tentative Settlement was confected.[197]

173.    On April 5, 2019, pursuant to the Tentative Settlement, SKA's Steve Breeding, an experienced engineer well-versed in construction administration and the Project Engineer, sent a draft change order for FCI's review, which included a net increase of $702,822.99 in the contract price and an additional 406 days of Contract Time to cure the Rotational Conflict.[198]

---

[193] R. Doc. 624 at 26 (uncontested material fact ¶ 50); Exhibit 109.  It later became necessary for the Court to enforce the interim settlement agreement due to FCI's failure to turn over to the Parish all engine components required for the engines to function.  R. Docs. 546; 577.
[194] R. Doc. 173.
[195] R. Doc. 244 at 2.
[196] R. Doc. 624 at 26 (uncontested material fact ¶ 51); Exhibit 67; *see also* R. Doc. 179.
[197] Testimony of Mark Marino (June 28, 2022) at 81; Exhibit 69 at 2; *see also* R. Doc. 244 at 2.
[198] Exhibit 150.

174.   The amount of SKA's proposed change order was comprised of FCI's original costs breakdown, including its usual 23.2% markup for overhead and profit, as well as additional costs for curing the Rotational Conflict.[199]

175.   Despite these efforts by SKA's Breeding, Clayton Fucich responded via email on April 8, 2019, by rejecting the proposed change order and mocking the Project Engineer's intelligence.[200]

176.   Specifically, Clayton Fucich attached a marked-up copy of the Prime Contract's change order procedures, critiquing in condescending fashion Breeding's compliance with these procedures, complete with arrows, strikethroughs, and capitalized annotations like "IMPORTANT STUFF," "NOT IMPORTANT STUFF," "PAY ATTENTION TO THIS PHRASE; IT'S IMPORTANT," "INCLUDE THIS," "NOT THIS," "DO THIS," and "THIS IS OUR GOAL."  In the email covering this insulting mark-up, Clayton Fucich told Breeding that school children understood the change order process better than he did:

> To avoid further confusion, let's leave it there for now.  If you need further assistance with the change order process, I have identified a team that, after reviewing the procedure in the Contract Documents, seem to fully understand the process.  I believe they can explain it well enough that any engineer can understand what needs to be done.  Their availability is limited though.  ***You'll have to contact them in the afternoon, after they get out of school and get their homework done.***[201]

177.   Now, in hindsight, the Indemnitors dismiss this exchange and the intemperate nature of Clayton Fucich's remarks by suggesting that "Mr. Fucich and Mr. Breeding had a relationship such that the email was sent in jest."[202]  There is no corroborating evidence for this

---

[199] *See id.*
[200] *Id.*; Testimony of Clayton Fucich (June 27, 2022) at 207-10.
[201] Exhibit 150 at 3 (emphasis added).
[202] R. Doc. 674 at 6 (citing Testimony of Clayton Fucich (June 28, 2022) at 42-43).

characterization of the email, and the Court finds that Fucich's testimony to this effect is not credible.

178.    Once it received a copy of Clayton Fucich's email on April 8, 2019, the Parish passed it on to Travelers' counsel and warned that Fucich's response to the proposed change order process was "a real problem for all of [the parties]."[203]

179.    This Court finds that Clayton Fucich's April 8, 2019 email reveals his and FCI's antipathy towards negotiating a reasonable settlement of the dispute as of that time, which posed an increasingly difficult obstacle to resolving the matter and exacerbated the risks and costs of litigation to FCI and Travelers.

180.    On April 9, 2019, the Parish sent a letter to the magistrate judge, attaching Clayton Fucich's April 8, 2019 email to Breeding and asking her to reconvene a meeting of the parties to discuss the developments following the March 26, 2019 settlement conference.[204]

181.    As noted in the letter, FCI refused on this occasion to provide a proposal or even a preliminary estimate to complete the work to cure the Rotational Conflict, and its "actions ranged from uncooperative to antagonistic."[205]   Acknowledging that the magistrate judge and all parties were "aware of public safety and related time concerns related to this Project," the Parish asked for the magistrate judge's intervention.[206]   The referenced "public safety and related time concerns" included the approaching hurricane season and the Parish's need to have an operating pump system in place to protect its citizens.

---

[203] Exhibit 150 at 1; Testimony of Clayton Fucich (June 27, 2022) at 211.
[204] Exhibit 154.
[205] *Id.*
[206] *Id.*; *see also* Testimony of David Jarrell (June 28, 2022) at 132-34.

182.   On April 10, 2019, the parties reconvened to resolve the outstanding issues with FCI but, as the magistrate judge found, FCI made it clear that it did not intend to honor the terms of the Tentative Settlement:

> After roughly two hours of discussions with Mr. Fucich, it became clear that FCI did not intend to honor any agreement that reassembled the [Tentative Settlement] recited on the record.  As a result, the status conference was terminated, and a minute entry issued … noting that "negotiations were unsuccessful based on the representation of the plaintiff, Mr. Fucich that there was no meeting of the mind[s] as to the interim settlement."[207]

183.   Thus, as found by the magistrate judge, the Tentative Settlement did not fail due to any actions of Travelers.  It failed because FCI attempted to renegotiate its terms.[208]

184.   On April 11, 2019, FCI filed a second motion for summary judgment, asserting that the Parish's purported termination of the Prime Contract was an absolute nullity and, as a result, the contract was still in effect.[209]

185.   On April 17, 2019, FCI circulated a letter to the magistrate judge, Travelers, and the Parish, "seeking to explain that counsel for FCI misrepresented Mr. Fucich's position as to the funding mechanism and that FCI intended to agree to the funding mechanism set forth in the [Tentative Settlement]."[210]  However, FCI's position on this matter would again change before any agreement could be reached.[211]

186.   Two days later, on April 19, 2019, this Court granted the preliminary injunction requested by Travelers to enforce the collateral security provision of the GAI, ordering the

---

[207] Exhibit 69 at 3 (citing R. Doc. 182); R. Doc. 244 at 3.
[208] Exhibit 69 at 3; R. Doc. 244 at 3; *see also* R. Doc. 244 at 2 ("Before Traveler[s] could either accept or reject the terms of the tentative settlement agreement, FCI began attempting to renegotiate the terms of the tentative settlement agreement.").  However, Marino testified that Travelers had already confirmed that its Bond would remain in place through completion of the Project, which is the only step Travelers had been asked to take in conjunction with the Tentative Settlement up to that point.  *See supra* at 34.
[209] R. Doc. 624 at 26 (uncontested material fact ¶ 52); R. Doc. 181.
[210] Exhibit 69 at 3; R. Doc. 244 at 3.
[211] Exhibit 69; Exhibit 108.

Indemnitors to provide collateral security to Travelers.  The Court reserved its determination of the amount of collateral to be provided until May 17, 2019.[212]

187.    On May 1, 2019, having learned of the Indemnitors' obligation to post collateral security, FCI (through Clayton Fucich) had a change of heart and filed a motion to enforce the Tentative Settlement.[213]  The Parish and SKA opposed the motion, arguing that there had been no final agreement (or meeting of the minds) given Fucich's post-conference conduct and contradictory communications, some rejecting the Tentative Settlement and others seeking to renegotiate its terms.[214]

## VIII.   The Parish Moves Towards Completion of the Project

188.    As a result of the failed settlement discussions with FCI, the Parish proceeded to complete the Project with the intention of recovering its costs from FCI and Travelers.[215]

189.    On May 7, 2019, the Parish held a pre-proposal meeting related to the completion of the Project (which was to include correction of the Rotational Conflict).[216]

190.    On or about May 15, 2019, the Parish received three proposals for completion of the Project, including: (1) a May 15, 2019 proposal from Lou-Con, Inc. for $2,496,990.00; (2) a May 15, 2019 proposal from M.R. Pittman Group, L.L.C. for $2,674,000.00; and (3) a proposal from BLD Services, L.L.C. for $2,985,000.00.[217]

---

[212] R. Doc. 184.  As noted, while the Court had held the evidentiary hearing on the cross-motions for preliminary injunction on January 11, 2019, it had "delayed issuing a ruling on these motions in light of the parties' on-going attempts to arrive at an amicable resolution of their dispute."  *Id*. at 1 n.5.  As of April 19, 2019, having been "advised … that their settlement discussions [were] at an impasse," the Court issued its ruling on the motions.  *Id.*

[213] R. Doc. 195.

[214] R. Docs. 212; 216.  Travelers, however, did not take a position on whether the settlement should be enforced.  R. Doc. 218.  On June 7, 2019, the magistrate judge issued her ruling on FCI's motion to enforce the Tentative Settlement, recommending that the motion be denied.  Exhibit 69; R. Doc. 244.  Thereafter, on June 24, 2019, this Court adopted the recommendation and denied the motion to enforce the Tentative Settlement.  Exhibit 108; R. Doc. 258.

[215] R. Doc. 624 at 26 (uncontested material fact ¶¶ 53, 55, 57).

[216] *Id*. (uncontested material fact ¶ 55).

[217] *Id*. (uncontested material fact ¶ 57)

191.    On May 17, 2019, the Court ordered the Indemnitors to provide Travelers with $2,563,930.00 as collateral security.[218]

192.    While the Court ordered that the Indemnitors post just $2,563,930.00 in collateral security, despite Travelers' formal demand that Indemnitors deposit collateral in the amount of $5,036,878.49 (which figure represented the Parish's claim for the penal sum of the Bond plus Travelers' attorney's fees and costs through the date of its demand), the Court finds that the amount of the demand was not unreasonable given FCI's failure, through the date of the demand, to act constructively to mitigate or minimize the risk to Travelers or itself.  Moreover, as of the date of Travelers' demand, the Parish had asserted damages for the full penal sum of the Bond,[219] and at trial, the Parish was prepared to offer evidence of its damages in an amount exceeding $4.5 million.[220]

193.    On June 21, 2019, the Parish sent correspondence to Travelers and FCI, requesting that Travelers provide it with temporary pumping capacity at Travelers' sole cost.[221]

194.    Also on June 21, 2019, FCI's counsel sent a letter to Travelers' counsel outlining what the Indemnitors proposed to pledge or mortgage to satisfy the order for them to provide collateral security.[222]

195.    Also on June 21, 2019, FCI requested that the magistrate judge cancel a settlement conference scheduled for July 1, 2019.[223]

196.    On June 27, 2019, FCI sent the parties a settlement demand, requesting that FCI be paid $1,272,952.56.[224]

---

[218] Exhibit 113; R. Doc. 224.
[219] Exhibit 101.
[220] Exhibit 146; Testimony of David Jarrell (June 28, 2022) at 138-39.
[221] R. Doc. 624 at 27 (uncontested material fact ¶ 61); Exhibit 61.
[222] Exhibit 94.
[223] R. Doc. 624 at 27 (uncontested material fact ¶ 62).
[224] Exhibit 159.

197.    On July 8, 2019, the Parish sent correspondence to SKA, stating that it "would like to formally put the repairs to the engines already installed at pump stations #1 & #4 out for public bid."[225]

198.    In July of 2019, SKA prepared and issued "Specifications and Contract Documents for Completion of the Lake Borgne Basin Levee District Pump Station #1 & #4 Pump Partial Upgrade" (the "Phase I Specifications").[226]

199.    SKA was paid $25,000.00 by the Parish to develop the Phase I Specifications.[227]

200.    On August 16, 2019, the Parish and SKA executed Amendment No. 2 to the December 6, 2013 Contract for Engineering Services, increasing the amount of the Contract for Engineering Services by $25,000.00.[228]

201.    On August 21, 2019, this Court issued its ruling denying FCI's motions for summary judgment concerning its contract claims and the alleged invalidity of the Parish's July 20, 2018 termination notice.[229]

202.    As to the contract claims, the Court reviewed at length relevant provisions of the Prime Contract, including its drawings and specifications, discussing: FCI's contractual representations, including that it had examined and carefully studied the contract documents (including the appendices), it had familiarized itself with and was satisfied as to the nature and extent of the contract documents, and it had given SKA as Project engineer written notice of all problems discovered in the contract documents and a proposed resolution thereof; the instruction that the contractor coordinate the drawings and specifications; and the specifications for the new

---

[225] R. Doc. 624 at 27 (uncontested material fact ¶ 63).
[226] *Id*. (uncontested material fact ¶ 64).
[227] *Id*. (uncontested material fact ¶ 65).
[228] *Id*. (uncontested material fact ¶ 66).
[229] R. Doc. 300.

engines and the refurbished right-angle gear reducers.[230]  The Court examined SKA's responses to FCI's engine and gear reducer proposals, which responses included the following two conditions: "(1) Contractor to verify conformity of outputs to final design.  (2) Contractor responsible to coordinate system final design with plans and specifications."[231]  The Court rejected FCI's request to declare that, in ordering the new Caterpillar 3512C engines with a counterclockwise rotation and arranging for the factory overhaul of the gear reducers maintaining their counterclockwise rotation, FCI had performed the work in accordance with the plans and specifications furnished to it.[232]  The Court specifically observed that "while the [Prime Contract] did not specify the rotational direction of the shafts of the engines or gear reducers, the contract broadly advised that FCI would need to furnish compatible equipment,"[233] and in so doing, the contract "preserve[d] to the contracting parties the flexibility to employ the most cost-effective equipment, whether having the same rotational direction (clockwise for the replacement engines and counterclockwise for the reworked gear reducers) or the opposite rotational direction (counterclockwise for the replacement engines and clockwise for the reworked gear reducers), so long as the selected equipment satisfie[d] the [Prime Contract]'s essential requirement of compatibility in rotational direction."[234]  The Court concluded:

> While the [Prime Contract] did not explicitly require a rotational direction of either the engines' drive shafts or the gear reducers' input shafts, it was unreasonable for FCI to interpret the [contract] to conclude that an engine with a counterclockwise drive shaft (such as the Caterpillar 3512C land engine) would be compatible with gear reducers having a counterclockwise input shaft (such as the factory overhauled gear reducers here) when connected by a direct drive shaft.  *It is undisputed that engines with counterclockwise drive shafts and gear reducers with counterclockwise input shafts are incompatible.*  FCI's proposed interpretation would create the absurd result of a dysfunctional pump, frustrating the object of the

---

[230] *Id.* at 3-8.
[231] *Id.* at 8 (citing R. Docs. 93-15 at 1; 93-16).
[232] *Id.* at 19-25.
[233] *Id.* at 22.
[234] *Id.* at 23-24.

contract.  In sum, the Court finds that the [Prime Contract] cannot be interpreted in the manner proposed by FCI to create an ambiguity or absurdity (the rotational conflict) that is otherwise avoided by a reasonable reading of the [contract].[235]

203.    As to the alleged invalidity of the Parish's July 20, 2018 termination notice, the Court concluded that "Jarrell acted with authority and with the appropriate form of authority, and the July 20, 2018 termination notice is valid."[236]  In arriving at this conclusion, the Court examined the pertinent language of the Prime Contract providing that the Parish could act in regard to the contract through its president and his authorized agents, and found it was satisfied by the evidence that the president had delegated his authority to Jarrell to act on behalf of the Parish and that Jarrell acted as the Parish's agent in the ongoing litigation concerning the Project.[237]

204.    In the wake of the Court's August 21, 2019 ruling, the Indemnitors should have been aware that their legal position in the litigation – whether regarding FCI's responsibility for the Rotational Conflict or the validity of the Parish's termination notice – was not unassailable and carried significant litigation risk.

205.    On November 13, 2019, the Parish and ARC Mechanical Contractors, Inc., entered into an agreement for $895,000.00 for the Lake Borgne Basin Levee District Pump Station #1 & #4 Pump Partial Upgrade, which consisted of reversing the rotation of the two refurbished right-angle gear reducers previously installed by FCI and completing the necessary remaining scope of the Project, including the gear oil cooler installation, to make operational one of the new powertrains at each of the pump stations comprising the Project.[238]

---

[235] *Id.* at 26 (emphasis added).
[236] *Id.* at 32.
[237] *Id.* at 28-32.
[238] R. Doc. 624 at 28 (uncontested material fact ¶ 69); Exhibit 152.

206.    On December 16, 2019, the attorneys then representing FCI withdrew as its counsel.[239]   It later came to light that, unbeknownst to FCI's counsel, Clayton Fucich had personally filed a complaint for judicial misconduct against the magistrate judge assigned to this case.[240]

207.    On April 24, 2020, this Court dismissed FCI's claims and its third-party demand against Philadelphia Gear.[241]

208.    On December 22, 2020, Clayton Fucich personally filed suit in a Mississippi federal court against David Jarrell, the Parish's counsel, and the magistrate judge assigned to this case, asserting the following claims: (a) violation of civil rights (including perjury and manufacturing evidence under color of law); (b) violation of civil rights (including fraud upon the court and conspiracy to commit same); (c) libel; (d) purposefully increasing costs of litigation and harassment; (e) simple battery and verbal abuse; (f) simple assault; (g) violation of civil rights (acting as a federal magistrate judge while disqualified); and (h) violation of civil rights (prejudging without the benefit of investigation, evidence, or argument and making public comments concerning the merits of a case).[242]   In the suit, Fucich also sued judges of the United States Court of Appeals for the Fifth Circuit and of the United States District Courts for the Eastern District of Louisiana and the Southern District of Texas, who served on the Judicial Council for the Fifth Circuit, for allegedly mishandling his complaint for judicial misconduct directed against the magistrate judge (which had been dismissed),[243] asserting the following additional claim:

---

[239] R. Docs. 356; 371; 372.
[240] Exhibit 155.
[241] R. Doc. 416.
[242] Exhibit 157.
[243] Exhibit 155.  The complaint for judicial misconduct had been initiated by Clayton Fucich personally on August 26, 2019.  *Id*. at 2.

violation of civil rights (concealing the commission of crimes of another and misapplying federal law).[244]  Fucich later voluntarily dismissed the suit on March 11, 2021.

## IX.     Evidence Develops Confirming that FCI Might Be Liable for the Rotational Conflict

209.     In the meantime, during discovery in this case, Ziv-Goldstein's warnings to FCI of the risks of litigation were realized as certain facts and expert opinions adverse to FCI's litigation positions were developed.

210.     On October 5, 2020, SKA disclosed Andrew McPhate, PE, as a testifying expert. McPhate opined that FCI failed to properly gather information about the gears and engines to determine their rotational compatibility.[245]

211.     Also on October 5, 2020, SKA disclosed Heather Klingman, PE, as a testifying expert.  Klingman opined that the plans and specifications for the Project included all the information FCI needed to properly complete the Project and that FCI failed to follow the required submittal procedures prior to purchasing the engines for the job.[246]

212.     Also on October 5, 2020, SKA disclosed Michael Carbo as a testifying expert in construction management.  Carbo opined that FCI failed to properly manage and coordinate the procurement of the engines and gears for the Project.[247]

213.     Also on October 5, 2020, the Parish disclosed Roy Carrubba, PE, as a testifying expert.  Carruba opined that FCI bore sole responsibility for the rotational incompatibility because FCI ordered the engines prior to an approved submittal and that FCI had all necessary information to avoid the Rotational Conflict.[248]

---

[244] Exhibit 157.
[245] R. Doc. 624 at 28 (uncontested material fact ¶ 70); Exhibits 121-123.
[246] R. Doc. 624 at 28 (uncontested material fact ¶ 71); Exhibits 124-125.
[247] R. Doc. 624 at 28 (uncontested material fact ¶ 72); Exhibits 119-120.
[248] R. Doc. 624 at 28 (uncontested material fact ¶ 73).

214.    On December 2, 2020, the Parish disclosed Travis J. Terrebonne as a testifying expert in engine acquisition and installation.  Terrebonne opined that rotation (as between the engines and the gear reducers) is the first thing a contractor and supplier should verify for this type of project and that FCI failed to do so.[249]

215.    At the June 2022 trial (over a year and a half after most of these expert opinions were disclosed in the litigation), Clayton Fucich testified that he was unaware of the opinions and had not read the reports.[250]  At best, this amounts to willful ignorance.

216.    The Indemnitors assert that "Travelers and FCI likewise disclosed and produced reports of experts who would opine that FCI was not at fault."[251]  But this misses the point – namely, that evidence of FCI's potential liability, and the attendant risks and costs of litigation, continued to mount, even if FCI believed it could adduce countervailing evidence suggesting that others were at fault.

## X.    Final Settlement Discussions

217.    On March 4, 2022, the parties attended a pretrial conference, which was converted to a status conference, after which SKA offered its remaining policy limits of approximately $350,000.00 towards a settlement.[252]

218.    FCI never accepted this offer.[253]

219.    On March 10, 2022, the Parish contracted with ARC Mechanical Contractors, Inc., for completion of the third engine-gear combination and related work for the sum of $877,000.00.[254]

---

[249] *Id.* (uncontested material fact ¶ 75); Exhibits 115-117.
[250] Testimony of Clayton Fucich (June 28, 2022) at 11-13, 15-17.
[251] R. Doc. 674 at 7.
[252] R Doc. 598; Testimony of Clayton Fucich (June 28, 2022) at 19-20.
[253] Testimony of Clayton Fucich (June 28, 2022) at 19-22.
[254] R. Doc. 624 at 28 (uncontested material fact ¶ 76); Exhibit 158.

220.    As of the June 2022 trial, the fourth engine-gear combination (which was part of the original contract between the Parish and FCI) still had not been completed.[255]

221.    Consequently, as of trial, the Parish's claim for liquidated damages continued to accrue.  Based on the Parish's damages calculation and ability to complete the Project, its claim against FCI and Travelers had climbed to more than $4.5 million.[256]

222.    On April 11, 2022, representatives for Travelers (including its claim counsel Samantha Canterino, engineer Russ Werner, and its outside counsel) met with the Fuciches as well as their and FCI's counsel.[257]

223.    During this meeting, the parties discussed Travelers' hope to reach settlement with the other parties and its intention to enter a settlement agreement on its own behalf as well as that of the Indemnitors.[258]

224.    Following their several unsuccessful attempts to settle the case, the parties mediated their disputes on April 12, 2022, ahead of the trial scheduled for June 2022.[259]

225.    The Indemnitors attended the mediation but reached no agreement with the other parties as to settlement.[260]

226.    Neither during the mediation, nor in the meeting with Travelers that took place on the previous day, did the Indemnitors request that the parties include in any settlement agreement a requirement for the Parish to rescind the termination of FCI for cause and convert it to a termination for convenience.[261]

---

[255] R. Doc. 624 at 28 (uncontested material fact ¶ 77).
[256] Exhibit 146 (reflecting a cost to complete of $1,454,926.89 and liquidated damages of $3,060,000.00); Testimony of David Jarrell (June 28, 2022) at 136-39.
[257] Testimony of Clayton Fucich (June 28, 2022) at 23.
[258] *Id*.
[259] R. Doc. 624 at 29 (uncontested material fact ¶ 78).
[260] *Id*. (uncontested material fact ¶ 79).
[261] *Id*. (uncontested material fact ¶ 80); Testimony of Clayton Fucich (June 28, 2022) at 24, 29-31.  The Indemnitors point to FCI's 2018 demand that it would not settle without the Parish revoking its termination letter, R.

227.    SKA was being defended in this case under an eroding (or depleting) limits insurance policy issued by XL Specialty.[262]

228.    During the pendency of the case, SKA's policy had eroded from $1,000,000 to approximately $350,000.[263]

229.    On April 12, 2022, Travelers, acting on its own behalf and as attorney-in-fact for the Indemnitors, reached an agreement (the "Settlement Agreement") with SKA, XL Specialty, the Parish, and Philadelphia Gear to settle the claims among them, including claims asserted by or against FCI (except for Philadelphia Gear's claim for fees against FCI for storing the gear box components for years).[264]

230.    FCI refused to participate in this settlement even though Travelers held open its offer to the Indemnitors until 5:00 p.m. the following day, April 13, 2022.[265]

231.    The other parties agreed that SKA and XL Specialty would pay the Parish the remaining balance of SKA's policy, in an amount not less than $350,000.00; that Travelers would pay the Parish the sum of $612,000.00; and that Philadelphia Gear would refurbish and change the rotation of the fourth gearbox for $368,500.00, plus field service startup charges of $16,500.00.[266]

232.    Since the amounts agreed to be paid by Travelers and SKA/XL Specialty would not fully fund the Parish's $1,455,398.52 cost to complete the Project (including the cost to cure the Rotational Conflict), the Parish agreed to contribute $462,926.89 towards settlement.[267]

---

Docs. 671 at 6 (citing Exhibit 90; Testimony of Clayton Fucich (June 27, 2022) at 35); 674 at 7, but they cite no evidence that FCI requested back in 2018 that the termination for cause be converted to a termination for convenience, nor any evidence that they requested in 2022 that the settling parties include such a provision in their 2022 settlement agreement.

[262] R. Doc. 624 at 29 (uncontested material fact ¶ 85).
[263] Testimony of Clayton Fucich (June 28, 2022) at 20.
[264] R. Doc. 624 at 29 (uncontested material fact ¶ 81).
[265] Testimony of Clayton Fucich (June 28, 2022) at 26-31.
[266] Exhibit 79, § 3.1.
[267] Exhibit 162; Testimony of David Jarrell (June 28, 2022) at 140.

233.    Travelers made a commercially reasonable decision by entering the Settlement Agreement over the Indemnitors' objection.[268]

234.    The Settlement Agreement was formally executed on May 24, 2022.[269]

235.    The Settlement Agreement resolved the claims against Travelers and the Indemnitors for a fraction of the total potential liability those parties faced.[270]

236.    The Indemnitors were aware that the Parish was insisting on payment from Travelers to dismiss the claims against FCI and Travelers.[271]

237.    On May 24, 2022, Travelers filed a motion to dismiss the claims it had settled pursuant to the authority granted under the GAI.[272]

238.    On May 31, 2022, this Court granted the motion to dismiss, agreeing that Travelers had the authority to settle the claims at issue:

> Applying [the ordinary] rules of [contract] construction, the [GAI], certainly after FCI defaulted on its Agreement with the Parish [*i.e.,* the Prime Contract], gave Travelers the right to settle all claims by or against FCI arising out of the Agreement and the Bond, except for those claims between FCI and the Fuciches, on the one hand, and Travelers, on the other.  Travelers, on its own behalf and for FCI and the Fuciches, used its business judgment to enter into a compromise (*i.e.,* to make concessions to settle a dispute) with the Parish, SKA, XL Specialty, and [Philadelphia Gear] to resolve the claims among them.  The plain and unambiguous terms of the [GAI] gave Travelers the authority to do so.[273]

239.    On June 15, 2022, in the wake of the Settlement Agreement, the Indemnitors filed a supplemental counterclaim against Travelers asserting that Travelers owed them a duty to act in their bests interests in confecting the Settlement Agreement.[274]

---

[268] Testimony of Mark Marino (June 28, 2022) at 82-83; Testimony of David Jarrell (June 28, 2022) at 132.
[269] R. Doc. 624 at 29 (uncontested material fact ¶ 82).
[270] Testimony of Mark Marino (June 28, 2022) at 82-84.
[271] R. Doc. 624 at 29 (uncontested material fact ¶ 83).
[272] R. Doc. 605.
[273] R. Doc. 614 at 7-8.
[274] R. Doc. 637.

240.     On June 16, 2022, the Parish offered to rescind its default for-cause termination of its contract with FCI as an addendum to the Settlement Agreement in return for an additional payment from FCI of $217,747.99.[275]  FCI did not respond.[276]

241.     The GAI unambiguously grants to Travelers, in its sole discretion, the right to settle claims against Travelers or FCI related to any bond issued to FCI:

> **4.  Claim Settlement**: [Travelers] shall have the right, in its sole discretion, to determine for itself and Indemnitors whether any claim, demand or suit brought against [Travelers] or any Indemnitor in connection with or relating to any Bond shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors.[277]

242.     Likewise, the "Remedies" provision of the GAI provides that in the event of a "Default," the Indemnitors "assign convey and transfer to [Travelers] all of their rights, title and interests in [any contract under bond, like the Prime Contract here]."[278]

243.     Once a default has triggered the assignment to Travelers of the Indemnitors' rights in a contract, Travelers has the right to settle the claims at issue as Travelers sees fit: *"*[Travelers] shall have a right in its sole discretion to: ... (c) assert or prosecute any right or claim in the name of any Indemnitor and to settle any such right or claim as [Travelers] sees fit ...."[279]

244.     To facilitate Travelers' exercise of this right, the Indemnitors, in the GAI, appointed Travelers as their attorney-in-fact:

> **11.  Attorney in Fact:** Indemnitors irrevocably constitute, appoint and designate [Travelers] as their attorney in fact with the right, but not the obligation, to exercise all rights of Indemnitors assigned or granted to [Travelers] and to execute and deliver any other ... agreements deemed necessary by [Travelers] to exercise its rights under this Agreement in the names of any Indemnitor.[280]

---

[275] Exhibit 163; Testimony of David Jarrell (June 28, 2022) at 140-42.  As Jarrell testified, Travelers had previously requested that the termination be rescinded as part of the final settlement, and the Parish had agreed to do so if the Indemnitors would make a payment of "the delta plus any incurred costs."

[276] Testimony of David Jarrell (June 28, 2022) at 140-42.

[277] Exhibit 14, § 4.

[278] *Id.* § 6.

[279] *Id.*

[280] *Id.* § 11.

245.     Pursuant to the clear terms of the GAI, the Parish's July 20, 2018 termination letter containing a "declaration of a contractor default" constituted a "Default" under the GAI, triggering its "Remedies" provision, which assigns to Travelers all of FCI's rights, title, and interests in its Prime Contract with the Parish and grants Travelers the right to settle any claim made in the name of any Indemnitor, as Travelers sees fit.[281]

246.     While the GAI mentions "good faith" in relation to Travelers' establishing a reserve, it refers to no such contractual duty with respect to any of the other rights and powers granted to Travelers in the GAI.[282]

247.     On June 27, 2022, FCI and Philadelphia Gear entered into a consent judgment that settled Philadelphia Gear's counterclaim against FCI for a payment of $25,000 plus legal interest from the date of judgment.[283]

## CONCLUSIONS OF LAW

### I.     Jurisdiction and Venue

1.     This Court has diversity subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties have diverse citizenship and the amount in controversy exceeds $75,000.00.

2.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the claims occurred within this judicial district.

---

[281] *Id.* § 6; *see* Exhibit 16 at 2.
[282] *See* Exhibit 14.
[283] R. Docs. 661; 664.

## II.     Applicable Standard

3.     Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, a district court, after the close of the evidence in an action tried on the facts without a jury, must find the facts specially and state its conclusions of law separately.

4.     "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

## III.     Louisiana Law Governs the Bond and the GAI.

5.     Louisiana law applies in construing and enforcing the Bond and the GAI.[284]

6.     As this Court previously concluded:

Essentially, the Bond's purpose is to provide security to ensure the completion of the Project.  In exchange for Travelers' issuance of the Bond, the [GAI] obligates FCI to indemnify, provide collateral to, and assign litigation rights to Travelers, among other things.  Thus, the [GAI]'s purpose is to make Travelers whole if FCI fails to perform its contract with the Parish, thereby triggering Travelers' surety obligations under the Bond. …

… Louisiana's law and policies aimed toward ensuring the financial integrity and completion of public works projects would be most impaired if its law were not applied in construing and enforcing the Bond and [GAI] securing performance of the contract between FCI and the Parish for the Project.  Therefore, the Court applies Louisiana law.[285]

7.     Thus, Louisiana law applies to any claim regarding the GAI, and the Indemnitors cannot seek any remedies or damages pursuant to Mississippi law.

---

[284] R. Doc. 184 at 7-10 (resolving choice-of-law issue in adjudicating Travelers' and Indemnitors' applications for injunctive relief); *see also* Exhibit 110 at 7-10.
[285] R. Doc. 184 at 9-10; *see also* Exhibits 14 & 110 at 9-10.

## IV.    The GAI is Enforceable According to its Terms.

8.    The indemnity agreement – the GAI in this case – is an essential part of the surety-principal relationship.  For example, one state court has explained the agreement's role in the relationship as follows:

> A surety, its principal and its indemnitors are engaged in a commercial business relationship which establishes, by contract, specific benefits and burdens to the parties.  By issuing its bond, the surety takes the risk that the principal will fulfill its obligations.  If the principal does not do so, the surety is required to step in and bear the cost of satisfactorily completing the project and/or paying the principal's subcontractors and suppliers.  In order to protect itself from potentially substantial losses, the surety invariably requires the principal and indemnitors to enter into an indemnity agreement.
>
> At the heart of the surety-principal relationship is the intention of the parties – clearly established in the indemnity agreement – that the surety will be repaid for all claims paid or expenses incurred as a result of issuing bonds on behalf of the principal.[286]

9.    The GAI "forms the law between the parties and must be interpreted according to its own terms and conditions."[287]

10.    Under Louisiana law, the general rules which govern contract interpretation apply in construing an indemnity contract.[288]

11.    "Interpretation of a contract is the determination of the common intent of the parties."[289]  As with any contract, when the terms of an indemnity agreement "are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[290]  "A provision susceptible of different meanings must be interpreted with a meaning that

---

[286] *Andre Constr. Assoc., Inc. v. Catel, Inc.*, 681 A.2d 121, 123 (N.J. Super. Ct. Law Div. 1996).
[287] *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 627 (5th Cir. 1993) (quoting *Com. Union Ins. Co. v. Melikyan*, So. 2d 1217, 1221 (La. App. 1983)).
[288] *Great Am. Ins. Co. v. McElwee Bros., Inc.*, 106 F. App'x 197, 200-01 (5th Cir. 2004); *Sovereign Ins. Co. v. Tex. Pipe Line Co.*, 488 So. 2d 982, 985 (La. 1986).
[289] La. Civ. Code art. 2045.
[290] *Id*. art. 2046.

renders it effective and not with one that renders it ineffective."[291]  "Each provision … must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[292]

12.    The Fifth Circuit has ruled that indemnitors are free to be bound to sureties in any manner they choose.[293]

13.    Travelers and the Indemnitors are governed by the GAI, which forms the law between them, and it must be interpreted according to its own terms and conditions.

14.    Under the GAI, Travelers did not wrongfully issue the UCC-1 but had a contractual right to do so.[294]  Consequently, the filing of the UCC-1 relating to the Indemnitors did not constitute a breach of the GAI and was not done in bad faith on the part of Travelers.

15.    Under the GAI, Travelers did not wrongfully demand collateral security but had a contractual right to do so.[295]  Its demand to the Indemnitors was not excessive or commercially unreasonable.  Consequently, Travelers' demand for collateral security from the Indemnitors did not constitute a breach of the GAI and was not made in bad faith.

**V.    Travelers Had the Contractual Right to Settle the Indemnitors' Claims**.

16.    A surety's right to resolve claims by and against its principals under an indemnity agreement is well settled, and here the Indemnitors authorized Travelers to be their attorney-in-fact to settle any claims by or against them in the event of "Default" as defined by the GAI.

---

[291] *Id*. art. 2049.
[292] *Id*. art. 2050.
[293] *See Abbott*, 2 F.3d at 627 ("In an indemnity contract, the principal and indemnitors can be bound to the surety in any manner they elect in consideration of the surety issuing the bond covering the principal obligation." (quoting *Melikyan*, 430 So. 2d at 1221)); *see also Am. Contractors Indem. Co. v. Galaforo Constr., LLC*, 2021 WL 5998507, at *5 (E.D. La. Dec. 20, 2021).
[294] Exhibit 14, § 12.
[295] *Id*. § 5.

17.     Under the GAI, Travelers had "the right, in its sole discretion, to determine for itself and Indemnitors whether any claim, demand or suit brought against [Travelers] or any Indemnitor in connection with or relating to any Bond shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors."[296] This right is not premised upon there being actual liability under the Bond, as the Indemnitors argue.[297]

18.     In the event of "Default" as defined by the GAI (not the Bond), which includes, *inter alia*, an obligee (*i.e.,* the Parish) declaring a contractor default, the GAI provides that "Indemnitors assign, convey and transfer to [Travelers] all of their rights, title and interests to [the Prime Contract]."[298]  This provision of the GAI also allows Travelers, "in its sole discretion to … assert or prosecute any right or claim in the name of any Indemnitor and to settle any such right or claim as [Travelers] sees fit."[299]  These rights are likewise not premised upon there being actual liability under the Bond, as the Indemnitors argue.[300]  Once the Parish declared FCI to be in default under the Prime Contract for performance of the Project, there existed a "Default" under the GAI and the right to settle the Indemnitors' claims was granted to Travelers regardless of actual liability under the Bond.

19.     The specific terms of an indemnity agreement vary from surety to surety, but most agreements seek to accomplish certain common objectives.  One leading treatise identifies these objectives to include at least the following:

> to provide the surety with a contractual right of recovery against the principal and other named indemnitors of all losses, costs, expenses, including counsel fees, incurred as a result of issuing the bonds; to facilitate the handling of bond claims

---

[296] *Id*. § 4.
[297] R. Doc. 671 at 18.
[298] Exhibit 14, § 6.
[299] *Id*.
[300] R. Doc. 671 at 18.

by providing the surety with the discretion to settle and pay such claims; ... and ***to grant the surety the right to settle the principal's own affirmative claims against the bond obligee.***[301]

20.     To achieve these objectives, including the objective to grant Travelers, as surety, the right to settle the Indemnitors' claims against the Parish and SKA, the GAI contained an assignment provision whereby the Indemnitors assigned their rights, title, and interests in the Prime Contract to Travelers and granted Travelers the right to settle any claim made in the name of any Indemnitor as Travelers sees fit.[302]

21.     The assignment divested the Indemnitors of all their rights in any contract claims against the Parish such that Travelers became the real party in interest as to these claims.[303]

22.     The attorney-in-fact clause makes clear that Travelers had the authority to exercise all assigned rights and to execute documents in the name of the Indemnitors as their attorney-in-fact.[304]

23.     These provisions enabled Travelers to resolve and settle claims promptly without the need for extensive litigation, effectuating one of the principal objectives of the Bond.  The Fifth Circuit has long recognized that similar right-to-settle provisions in indemnity agreements "often have been upheld and are not against public policy."[305]

---

[301] Duncan L. Clore, Richard E. Towle and Michael J. Sugar, III, Bond Default Manual (3d ed. 2005) (Chapter 1, Part VII. General Agreement of Indemnity) (emphasis added).

[302] Exhibit 14, §§ 4, 6, 11.

[303] *Safeco Ins. Co. of Am. v. Lake Asphalt Paving & Constr., LLC*, 2012 WL 234651, at *3 (E.D. Mo. Jan. 25, 2012).

[304] *See Mezzacappa Bros., Inc. v. City of N.Y.*, 2003 WL 22801429, at *7 (S.D.N.Y. Nov. 24, 2003) (holding that, under terms of indemnity agreement, surety had plain and manifest authority to execute release in the name of principal and indemnitors) (citing *Hutton Constr. Co. v. Cnty. of Rockland*, 52 F.3d 1191, 1192 (2d Cir. 1995) (holding that unambiguous assignment and attorney-in-fact clauses of indemnity agreement gave surety the authority to settle all claims on behalf of the assigning contractor)); *see also Fireman's Ins. Co. v. Todesca Equip. Co.*, 310 F.3d 32, 35 (1st Cir. 2002) (holding that indemnity agreement gave surety broad latitude to resolve claims on behalf of its principals); *U.S. for Use of Int'l Bhd. of Elec. Workers v. United Pac. Ins. Co.*, 697 F. Supp. 378, 381 (D. Idaho 1988) ("Under the terms of the Agreement [of Indemnity] executed by the parties in this case … the Indemnitors are liable for any expense relating to any claim, demand, suit, or judgment upon the bonds and [the surety] can settle the claims 'on the basis of liability, expediency or otherwise.'").

[305] *Engbrock v. Fed. Ins. Co.*, 370 F.2d 784, 786 (5th Cir. 1967).

24.    "[W]here a surety has exercised its powers under an indemnity agreement by executing a settlement agreement releasing its principal's affirmative claims against another party, that settlement agreement is binding on the principal."[306]

25.    In addition to the rights assigned or otherwise granted to Travelers under the GAI, Travelers is also equitably subrogated to the property of the Indemnitors (FCI and the Fuciches), including the claims asserted in this matter.[307]

26.    "Subrogation requires (1) the party to have paid a debt to a third party on behalf of the other party and (2) that he must have been compelled to do so, such as by a surety agreement."[308]

27.    Because, pursuant to the Bond issued on behalf of FCI, Travelers paid FCI's debt to a third party (that is, the amount said to be owed for its failure to perform completely its obligations under the Prime Contract) – albeit at a discounted rate – Travelers is equitably subrogated to the claims of the Indemnitors in this matter.

28.    Consequently, Travelers properly settled the Indemnitors' claims to which it was equitably subrogated.

29.    Travelers had a valid and good faith basis for settling the claims among FCI, the Parish, SKA, XL Specialty, and Philadelphia Gear as reflected in the Settlement Agreement.

---

[306] *HRH Constr., LLC v. Fid. & Guar. Ins. Co.*, 2005 WL 8168375, at *4 (S.D.N.Y. July 8, 2005) (discussing and applying *Hutton,* 52 F.3d at 1192).

[307] *See Lyndon Prop. Ins. Co. v. Duke Levy & Assocs., LLC*, 475 F.3d 268, 270-71 (5th Cir. 2007) ("Equitable subrogation is a doctrine whereby a surety is permitted to stand in the shoes of the party that benefitted from its performance of the surety obligation in order to prevent unjust enrichment on the part of a wrongdoer who caused the surety's expense. 'Probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.'" (quoting *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 136-37 (1962) (alteration omitted))).

[308] *Id.* at 271 (citing *Prairie State Nat'l Bank v. United States,* 164 U.S. 227, 231 (1896)); *see also St. Paul Prop. & Liab. Ins. Co. v. Nance,* 577 So. 2d 1238, 1240-41 (Miss. 1991) ("'Subrogation is the substitution of one person in place of another, whether as a creditor or as the possessor of any rightful claim, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and to its rights, remedies, or securities.'" (quoting *Ind. Lumbermen's Mut. Ins. Co. v. Curtis Mathes Mfg. Co.,* 456 So. 2d 750, 754 (Miss.1984))).

30.     As reflected in the Settlement Agreement, the settlement among Travelers, FCI, the Parish, SKA, XL Specialty, and Philadelphia Gear was commercially reasonable and greatly reduced FCI's and Travelers' potential liability to the Parish.

31.     This Court finds that, in negotiating and entering into the Settlement Agreement, Travelers acted in fairness to the Indemnitors.[309]  The Indemnitors had almost four years to defend their position in this litigation, but, as recounted above, they rarely prevailed on any issue that was adjudicated.  Most notably, as early as August 2019, the Court rejected FCI's position as to its lack of responsibility under the contract documents for the Rotational Conflict and the invalidity of the Parish's termination notice.[310]  Undaunted, but without any new evidence, the Indemnitors have reasserted these arguments again and again over the last three years, including at the June 2022 trial.  In addition, the Indemnitors were included in the meetings and mediation leading to the Settlement Agreement and were afforded time after the mediation to make a counteroffer of settlement.  Nonetheless, the Indemnitors refused to participate in the settlement.  In short, Travelers' treatment of the Indemnitors with respect to both the litigation of this matter (including Travelers acting in accordance with the terms and conditions of the GAI) and the negotiation and execution of the Settlement Agreement (also including Travelers acting in accordance with the terms and conditions of the GAI) has been fair.

32.     The Court specifically rejects the Indemnitors' assertion that Travelers' rights under the GAI are only effective if there was no "Owner Default," as defined by the Bond.  Default is defined differently in these two instruments.  Regardless, the Indemnitors' argument concerning owner default is without foundation.  The Indemnitors claim that the Parish, as owner, defaulted in two ways: first, they say the Parish was in default because the plans and specifications of the

---

[309] *See, e.g., Morris v. Schlumberger, Ltd.,* 445 So. 2d 1242, 1246 (La. App. 1984).
[310] R. Doc. 300.

Prime Contract contained a design error; and second, they say the Parish was in default because it had not paid FCI for work done on the Project.[311]

33.     As to the first instance of owner default asserted by the Indemnitors, the alleged design error in the plans and specifications has been at the heart of this dispute since it arose, with FCI pointing its finger at SKA and the Parish and vice versa.  This kind of dispute cannot constitute an "Owner Default" as would preclude triggering a surety's obligations under a performance bond; otherwise, a bond provides no protection to an owner when the dispute involves a design error and the owner denies any such error.  The Indemnitors' proposed reading of the bond, in conjunction with and as a prerequisite to the surety's rights under the GAI, creates a circularity and absurdity that undermines the very purposes of a performance bond and an indemnity agreement.  In any event, FCI is presumed to know the contents of any instrument it signed (specifically, here, the Prime Contract, including its plans and specifications) and cannot avoid its obligations by claiming it has not read it or did not understand it.[312]  As the Court's previous rulings concluded, FCI should have been aware of the Rotational Conflict from its review of the plans and specifications.[313]  The existence of the Rotational Conflict was not the inevitable result of the plans and specifications – or any design error in them – and could have been avoided by the contractor's clearer reading and understanding of them.

34.     The second instance of owner default asserted by the Indemnitors – namely, the Parish's alleged failure to pay FCI what it was owed for the Project – lacks merit because SKA did not certify FCI's Pay Application No. 5 due to the Rotational Conflict and the ensuing cessation

---

[311] R. Doc. 671 at 4.

[312] *See, e.g., Payphone/ATM Connection Plus, Inc. v. Abdelmajid,* 204 So. 3d 646, 649 (La. App. 2016) ("A person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained or that he did not understand it.").

[313] R. Doc. 300.

of work on the Project, so the amounts FCI claimed in the application were not then owed by the

Parish under the terms and conditions of the contract documents.[314]

35.     At bottom, though, the rights Travelers asserts here arise under the GAI and are not

affected by whether there was an "Owner Default" within the meaning of the Bond or the Prime

Contract.

## VI.     Travelers Did Not Breach Any Duty of Good Faith to the Indemnitors.

36.     Under the GAI, Travelers, in its sole discretion, may decline to execute any bond

in favor of the Indemnitors without incurring any liability or waiving any right.[315]

37.     The plain terms of the relevant sections of the GAI regarding Travelers' right to

settle reveal that Travelers owes no contractual obligations to the Indemnitors in that regard.[316]

38.     Travelers did not act in bad faith by settling FCI's affirmative claims since the GAI

authorizes Travelers to do so in its sole discretion and specifically empowers Travelers to act as

the Indemnitors' attorney-in-fact to settle claims as Travelers sees fit.[317]

39.     Because Travelers was legally entitled to settle the Indemnitors' claims in its sole

discretion, as it saw fit, the Indemnitors have failed to state a claim against Travelers for breach of

the GAI or bad faith.[318]

---

[314] *See* Exhibits 171 & 59 at SKA002502-03.

[315] Exhibit 14, § 8.

[316] *Id.* §§ 4, 6, 11; *see also Am. Contractors Indem.*, 2021 WL 5998507, at *5 (holding that an indemnity agreement like the GAI gave the surety "the 'sole and absolute discretion' to settle any claims arising in connection with the Bonds issued to" the contractor); *Devs. Sur. & Indem. Co. v. Cercontec, L.L.C.,* 2020 WL 1271603, at *4 (W.D. La. Mar. 13, 2020) (holding that an indemnity agreement gave the surety "the absolute discretion to 'pay, compromise, defend, settle, investigate, appeal, or otherwise handle' any claims arising out of the bonds").

[317] Exhibit 14, §§ 4, 6, 11; *see also U.S. Specialty Ins. Co. v. Strategic Plan. Assocs., LLC*, 2019 WL 296864, at *6-8 (E.D. La. Jan. 23, 2019).

[318] *U.S. Specialty Ins. Co*., 2019 WL 296864, at *8 (examining a nearly identical claims resolution provision in an indemnity agreement, the court held: "[I]n executing the General Indemnity Agreement, the [contractor and its principals] gave [the surety] 'the right, *in its sole and absolute discretion*, to ... settle ... any claim, demand, suit, award, assessment, or judgment in connection with any Bond, Bonded Contract, or Contract.' Because [the surety] has the right, in its sole and absolute discretion, to settle [the contractor's] claims, it follows that [the surety] owes no fiduciary duty to [the contractor] in carrying out that right. Because [the surety] owes no fiduciary duty to [the

40.     In addition, under the clear and unambiguous terms of the GAI, while good faith is required in relation to Travelers establishing a reserve, no such duty is imposed on Travelers with respect to its exercise of any of the other rights and powers granted by the GAI.[319]

41.     Even if Travelers were required to exercise good faith in executing the Settlement Agreement, it did so.  Travelers struck a deal for a fraction of the potential liability the Indemnitors and Travelers faced.  In addition, Travelers was able to get SKA/XL Specialty to pay its full remaining policy limits and the Parish to make a significant contribution to settlement.[320]

42.     The rights granted to Travelers under the GAI, specifically the right of Travelers to act as attorney-in-fact, do not establish a mandate under Louisiana law.  A mandate confers authority on another to transact business for the principal, but the attorney-in-fact provision of the GAI allows Travelers to carry out the rights assigned to it by the Indemnitors for Travelers' own benefit.[321]

43.     In other words, the attorney-in-fact provision cannot be considered a mandate under Louisiana law since it does not require Travelers to undertake any performance.[322]

---

contractors] or [its principals], the[y] have failed to state a claim against [the surety] for bad faith breach of a fiduciary duty.") (emphasis in original).

[319] Exhibit 14, § 1.

[320] Testimony of Mark Marino (June 28, 2022) at 82-84; Testimony of David Jarrell (June 28, 2022) at 138-40.

[321] *See* La. Civ. Code. art. 2989 ("A mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal."); *U.S. Specialty Ins. Co.*, 2019 WL 296864, at *7.

[322] *See U.S. Specialty Ins. Co.*, 2019 WL 296864, at *7.  In addressing this issue, the court in *U.S. Specialty Insurance* first observed that "a mandate is a contract under which a person confers authority on another to transact business *for* the principal."  *Id.*  Then, after quoting the "attorney-in-fact" provision of the indemnity agreement at issue, the court concluded that "this power of attorney provision allows [the surety] to carry out the rights assigned to it by the [indemnitors] for [the surety]'s own benefit.  Unlike a mandate, this provision does not require [the surety] to undertake any performance."  *Id.*

44.     The GAI grants Travelers the right, in its sole and absolute discretion, to settle FCI's claims, and, thus, Travelers owes no fiduciary duty to the Indemnitors in carrying out that right.[323]

45.     Because Travelers owed no fiduciary duty to the Indemnitors in entering into the Settlement Agreement, the Indemnitors have failed to state a claim against Travelers for bad faith breach of a fiduciary duty.

## VII.     The Indemnitors' Other Claims Against Travelers Also Fail

46.     To the extent the Indemnitors purport to assert a claim against Travelers for abuse of right,[324] they merely list the elements of the doctrine but fail to sustain their burden that any such elements are satisfied on this record.  To be sure, the Indemnitors make no effort to do so.

47.     The Indemnitors also argue that the Prime Contract is null because it contains a closed specification and the required procedures for a closed specification were not followed.[325] This is a different position than FCI took earlier in the litigation when it argued that it had performed in accordance with the Prime Contract's plans and specifications by providing the Caterpillar 3512C engine it then said was called for, or at least "allowed," by the contract.[326]

48.     In rejecting FCI's position then, the Court carefully reviewed the pertinent provisions of the Prime Contract and its plans and specifications and concluded that the Prime Contract did not contain a closed specification for the Caterpillar 3512C engine.[327]  The Court determined that the pertinent provisions of the plans and specifications did not specify "a specific brand, make, model, or manufacturer for a replacement engine," but instead specified "certain

---

[323] Exhibit 14, §§ 4, 6, 11; *U.S. Specialty Ins. Co*., 2019 WL 296864, at *8.
[324] R. Doc. 671 at 22.
[325] *Id*. at 22-23.
[326] R. Doc. 300 at 11, 19.
[327] *Id*. at 21-26.

characteristics of the replacement engines."[328]  The contract documents provided all information necessary for the contractor (*i.e.,* FCI) to provide a compatible operating system, which was the objective of the Project.  The Court went on to observe that the reference to the Caterpillar 3512C engine in Appendix 2, which dealt with environmental permits, was intended "as a placeholder to delimit a quality (*viz.,* emissions data) of the equipment desired," but "the listing cannot reasonably be interpreted as an engine specification."[329]  Noting that Louisiana Public Bid Law generally prohibits a public works contract from prescribing a closed specification, the Court concluded that, while "a Caterpillar 3512C land engine represents an acceptable product for purposes of establishing emissions parameters, … it was not required for all purposes.  Neither the plain language of the specification provisions of the [Prime Contract], nor law, nor usage supports an interpretation of the [Prime Contract] that the Caterpillar 3512C land engine is the one and only specified replacement engine."[330]

49.    Nothing has changed since the Court's earlier decision, so it now holds again that the Prime Contract does not contain a closed specification for the Caterpillar 3512 engine. Consequently, the Prime Contract is not null on this basis.

## VIII.   The Indemnitors Have Failed to Prove Lost Profits

50.    The Indemnitors seek damages in the form of lost profits.[331]

51.    The Indemnitors are not entitled to recover any damages, including lost profits, because they have not proved that Travelers is liable in relation to its negotiation and execution of the Settlement Agreement, including the settlement of claims brought by and against the

---

[328] *Id*. at 22.
[329] *Id*. at 23.
[330] *Id*. at 24-25.
[331] R. Doc. 671 at 12-13 (revealing that the sum of lost profits the Indemnitors seek varies so the profits themselves are necessarily indefinite).

Indemnitors with respect to the Project.  Regardless, the Indemnitors are not entitled to recover lost profits because they have not borne their burden of proof for this kind of damages.

52.     Under Louisiana law, it "is well-settled that a claim for lost profits 'must be proven with reasonable certainty and cannot be based on conjecture and speculation,'"[332] and "'a claim for lost profits based solely on the testimony of the injured party and unsubstantiated by other evidence does not constitute reasonable certainty.'"[333]

53.     The lost profits claimed by FCI are purely conjectural because (1) they are based solely on the unsupported assumptions and testimony of representatives of FCI; and (2) they are unsubstantiated by other evidence.[334]  As Jack Nicholson, Travelers' accounting expert with specialization in construction and suretyship, testified, the Indemnitors failed to present reliable data to support their claim for lost profits.[335]

54.     Further, even if FCI's alleged lost profits were not based solely on its own representations and thus speculative, FCI's financial statements for the years 2018 and 2019 fail to prove that FCI suffered lost profits because the decrease in the company's net profit for those years was due almost wholly to the attorney's fees FCI had incurred for this matter and the money

---

[332] *Team Contractors, LLC v. Waypoint NOLA, LLC*, 2017 WL 4314599, at *3 (E.D. La. Sept. 28, 2017) (quoting *Mac Sales, Inc. v. E.I. du Pont de Nemours & Co.*, 24 F.3d 747, 753 (5th Cir. 1994)); *see also Hall v. Ark.-La. Gas Co.*, 368 So. 2d 984, 991 (La. 1979) (observing as to contractual damages that "[i]t must appear reasonably certain that the amount of damages rests upon a certain basis"); *A & W Sheet Metal, Inc. v. Berg Mech., Inc.*, 653 So. 2d 158, 163 (La. App. 1995) (observing that damages for lost profits in breach-of-contract action must be proven with reasonable certainty and will not be allowed where purely conjectural); *Barnett v. Jabusch*, 649 So. 2d 1158, 1161 (La. App. 1995) (observing that lost profits, as an element of damages for breach of contract, cannot be speculative or uncertain and must be proven with reasonable certainty); *Guy T. Williams Realty, Inc. v. Shamrock Constr. Co.*, 564 So. 2d 689, 694 (La. App. 1990) ("The loss of profits must be proven with reasonable certainty and cannot be based on conjecture and speculation.").  Reasonable certainty means proof "by a preponderance of the evidence as in other civil contexts."  *Mobil Expl. & Producing U.S., Inc. v. Cajun Constr. Servs., Inc.*, 45 F.3d 96, 101-02 (5th Cir. 1995).

[333] *Team Contractors, LLC*, 2017 WL 4314599, at *3 (quoting *La. Joint Underwriters of Audubon Ins. Co. v. Gant*, 439 So. 2d 1153, 1157 (La. App. 1983)) (alteration omitted).

[334] *See, e.g.,* Exhibits 60 & 75; Testimony of Edgar Deano (June 29, 2022) at 19-28 (explaining, as FCI's accountant, that financial statements supporting the Indemnitors' claim for lost profits were prepared by Clayton Fucich and that Deano did not verify the figures).

[335] *See* Exhibits 60, 75 & 118; Testimony of Jack Nicholson (June 29, 2022) at 40-41, 44-50.

FCI claimed to be owed by the Parish for this Project (which FCI labeled "bad debt"), while FCI's contract revenue for these two years was nearly identical.[336]

55.     Consequently, while FCI has not established its entitlement to any damages including lost profits, it cannot recover lost profits for the additional reason that it failed to adduce evidence sufficient to satisfy the requisite standard of proof for lost profits – namely, reasonable certainty.

## IX.     The Indemnitors Cannot Recover Double or Punitive Damages.

56.     Similarly, the Indemnitors are not entitled to recover double or punitive damages because they have not established that Travelers is liable in relation to its negotiation and execution of the Settlement Agreement, including the settlement of claims brought by and against the Indemnitors with respect to the Project.  Regardless, the Indemnitors are not entitled to recover double or punitive damages because they are not entitled to any such damages as a matter of law.

57.     Punitive damages under Louisiana law are only allowed when "expressly authorized by statute."[337]  The Indemnitors have no claim for punitive damages because they point to no statute authorizing recovery of such damages under the circumstances of this case.

58.     The double damages authorized for bad faith claims handling practices under the Louisiana Insurance Code, La. R.S. 22:1973,[338] are also unavailable to the Indemnitors because the good faith duties mentioned in this statute only extend to those deemed insureds or claimants under the Insurance Code.  The Indemnitors are neither insureds nor claimants.[339]

---

[336] *Compare* Exhibit 60 at EDJ000086, EDJ000093 *with* Exhibit 75 at EDJ000065, EDJ000072; Testimony of Edgar Deano (June 29, 2022) at 29-31.

[337] *Ross v. Conoco, Inc.*, 828 So. 2d 546, 555 (La. 2002).

[338] La. R.S. 22:1973 ("In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.").

[339] La. R.S. 22:1962(B) (defining an insured as "the party named on a policy or certificate as the individual with legal rights to the benefits provided by such policy"); *Tarver v. Safety Nat'l Cas. Corp.*, 2009 WL 700691, at *3 (W.D. La. Mar. 17, 2009) ("The Louisiana Supreme Court has interpreted the mention of 'claimants' in Section

59.     Here, the Bond was specifically provided for the benefit of the Parish, and the GAI exists for the benefit of Travelers.[340]

60.     Because the Indemnitors are not insureds or claimants within the meaning of the Insurance Code, including specifically La. R.S. 22:1962, the double damages afforded by statute are unavailable to them.[341]

61.     Further, even if the Indemnitors were insureds or claimants within the meaning of the Insurance Code, none of their allegations regarding Travelers' enforcement of its rights under the GAI falls within the specific acts listed in La. R.S. 22:1973 that, if knowingly committed or performed by an insurer, constitute a breach of the insurer's duties imposed by the statute, including:

(1)   Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2)   Failing to pay a settlement within thirty days after an agreement is reduced to writing.
(3)   Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
(4)   Misleading a claimant as to the applicable prescriptive period.
(5)   Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
(6)   Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.[342]

---

22:1220 [renumbered as 22:1973] as significant, concluding in dicta 'that the legislature intended to provide a right of action directly in favor of third-party claimants in certain situations when it enacted Section 22:[1973].'" (quoting *Theriot v. Midland Risk Ins. Co.*, 694 So. 2d 184, 188 (La. 1997))).

[340] Exhibits 14 & 71.

[341] *See Tarver*, 2009 WL 700691, at *3 (holding that plaintiffs had "no claims to benefits by virtue of the Indemnity Agreements" because "they agreed to indemnify [the] bail bond surety, in the event that a criminal defendant failed to appear in court as ordered," so were "neither insureds nor claimants within the meaning of Section 22:[1973]").

[342] La. R.S. 22:1973(B).

62.     Consequently, the double damages afforded by La. R.S. 22:1973 are unavailable to the Indemnitors.

## X.     Travelers is Entitled to a Permanent Injunction.

63.     On April 19, 2019, this Court granted Travelers' application for a preliminary injunction ordering the Indemnitors to provide Travelers with collateral sufficient to discharge Travelers' loss or anticipated loss under the Bond.[343] On May 17, 2019, after hearing, the Court fixed the amount of collateral to be provided by the Indemnitors at $2,563,930.00 (consisting of $1,263,930.00 for anticipated cost to complete; $300,000.00 for anticipated fees and costs; and $1,000,000.00 for liquidated damages).[344] Thereafter, the Indemnitors provided Travelers with an amount of collateral Travelers deemed satisfactory, albeit not the full amount ordered by the Court.[345]

64.     Travelers now asks that the preliminary injunction previously granted by the Court be made permanent.[346]

65.     As the Court previously determined, Travelers was legally authorized to make its demand for collateral security because the collateral security provision in the GAI unambiguously requires that Indemnitors provide such collateral, and Travelers was merely demanding that the Indemnitors honor their contract.[347]

66.     The collateral security provision in the GAI is intended to give Travelers broad protection against its risk of loss for having issued the Bond.[348]

---

[343] R. Doc. 184; *see also* Exhibit 110.
[344] R. Doc. 224.
[345] Exhibits 80, 81 & 82; Testimony of Mark Marino (June 28, 2022) at 84-86.
[346] Testimony of Mark Marino (June 28, 2022) at 85-86.
[347] *See* R. Doc. 184; Exhibit 14, § 5.
[348] *See, e.g., Emps. Mut. Cas. Co. v. Precision Constr. & Maint., LLC*, 2015 WL 5254706, at *7-8 (E.D. La. Sept. 8, 2015).

67.     "The legal standard for obtaining a permanent injunction mirrors the legal standard for obtaining a preliminary injunction."[349]

68.     "A plaintiff must demonstrate: '(1) actual success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) the injunction will not disserve the public interest.'"[350]

69.     As this Court previously held, the Indemnitors have "an obligation to indemnify Travelers for loss incurred with respect to Travelers' defense of the Parish's claim under the Bond, which is clearly and unambiguously set forth in Section 3 [of the GAI]."[351]  Section 3 of the GAI provides in pertinent part that "Indemnitors shall exonerate, indemnify and save [Travelers] harmless from and against all Loss."[352]

70.     Because Section 5 of the GAI provides in part that "Indemnitors agree to deposit with [Travelers], upon demand, an amount as determined by [Travelers] sufficient to discharge any Loss or anticipated Loss,"[353] this Court also previously held that "the collateral security provision delimits *what* Travelers may demand – 'an amount as determined by [Travelers] sufficient to discharge any Loss or anticipated Loss' – and *when* Travelers may demand it – anytime a demand or claim is made for 'any Loss or anticipated Loss.'"[354]

71.     "Applying [the GAI's] broad definition of loss to what Travelers may demand under Section 5, it is clear that Travelers may demand payment for an expansive range of debts,

---

[349] *Viet Anh Vo v. Gee*, 301 F. Supp. 3d 661, 664 (E.D. La. 2017) (citing *Lionhart v. Foster*, 100 F. Supp. 2d 383, 385-86 (E.D. La. 1999)).
[350] *Gee*, 301 F. Supp. 3d at 664 (quoting *Causeway Med. Suite v. Foster*, 43 F. Supp. 2d 604, 610 (E.D. La. 1999)).
[351] R. Doc. 184 at 11; *see also* Exhibit 110 at 11.
[352] Exhibit 14, § 3.
[353] *Id*. § 5.
[354] R. Doc. 184 at 12 (emphasis in original).

including monies it could expend in completing the Project or in responding to the Parish's lawsuit or its demand against Travelers under the Bond."[355]

72.     Thus, the collateral security provision in the GAI was intended to protect Travelers against the risk of uncertain future loss for having issued the Bond.[356]

73.     The provisions of the GAI work together to protect the surety against the risk of loss, including potential losses posed by claims brought in litigation, by providing it with prejudgment security, and there is no requirement, in the contract or in case law, that the surety prove its principal's actual liability before being made secure.  After all, any such requirement would defeat a primary purpose of the collateral security provision.[357]

74.     This Court previously rejected the Indemnitors' contention that Travelers' demand for collateral security was made in bad faith as a tactic to force FCI to settle.[358]  In doing so, the Court pointed to the GAI's settlement provision, which provides Travelers the right, at its sole discretion, to settle any claims made in relation to the Bond.[359]  "This provision undercuts FCI's contention that Travelers' collateral security demand was aimed at forcing FCI to settle because Travelers, not FCI, arguably has the right to settle the dispute in any event."[360]

75.     Travelers has demonstrated the merits of its demand for collateral security under the GAI, thereby establishing the first element for a permanent injunction, because the express

---

[355] *Id.* (relying on the GAI's definition of "Loss" as "[a]ll loss and expense of any kind or nature, including attorneys' and other professional fees, which [Travelers] incurs in connection with any Bond or this Agreement, including but not limited to all loss and expense incurred by reason of [Travelers']: … (b) prosecuting or defending any action in connection with any Bond; … (e) enforcing by litigation or otherwise any provision of this Agreement; and (f) all interest accruing thereon at the maximum legal rate." (quoting Exhibit 14, § 1)).  The phrase "anticipated Loss" is not defined in the GAI but, by its plain language, it must mean future loss, future monies expended in completing the Project, and future damages and attorney's fees.

[356] *See Emps. Mut. Cas. Co.*, 2015 WL 5254706, at *7-8.

[357] *See id.*; *see also Travelers Cas. & Surety Co. of Am. v. Padron*, 2017 WL 9360906, at *8 (W.D. Tex. Aug. 2, 2017).

[358] R. Doc. 184 at 13-18; *see also* Exhibit 110 at 13-18.

[359] R. Doc. 184 at 16; *see also* Exhibit 110 at 16.

[360] R. Doc. 184 at 16; *see also* Exhibit 110 at 16.

terms of the GAI, the facts of this case, and the applicable law favor Travelers' reading and application of the collateral security provision, and the Indemnitors have failed to provide any evidence or law to the contrary.

76. To prevail on the second element for a permanent injunction, Travelers must show that the threat of injury is likely and irreparable.[361] An injury is irreparable if it cannot be adequately compensated by money damages.[362]

77. In cases involving a surety's demand for collateral security under an indemnity agreement, courts have held that specific performance is warranted because the very loss of the bargained-for right to be collateralized is irreparable harm. A surety has no adequate remedy at law when it seeks specific performance to recover collateral prior to incurring loss.[363]

78. Equitable relief is warranted when the injury constitutes "either continuing harm or a real and immediate threat of repeated injury in the future."[364]

79. "[T]he Indemnitors stipulated in the [GAI] that Travelers would suffer irreparable harm if the demand for collateral is not met. In particular, the collateral security provision states: 'Indemnitors agree that [Travelers] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph.'"[365]

---

[361] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Gee*, 301 F. Supp. 3d at 666-67.

[362] *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).

[363] *See, e.g., Travelers Cas. & Sur. Co. of Am. v. W.P. Rowland Constructors Corp*., 2013 WL 2285204, at *4 (D. Ariz. May 22, 2013) (holding that there was no adequate remedy at law for defendants' repudiation of their collateral security obligations where the surety knew it would have claims filed against it, but did not know the amount of those claims); *Fid & Deposit Co. of Md. v. C.E. Hall Constr., Inc*., 2012 WL 1100658, at *3-4 (S.D. Ga. Mar. 30, 2012) ("[O]ther courts have recognized that where liability of a surety under an indemnification agreement has not yet been determined, but claims are expected, specific performance for any collateral security provision is proper."); *Safeco Ins. Co. of Am. v. M.E.S., Inc*., 2010 WL 3928606, at *5-6 (E.D.N.Y. Oct. 4, 2010) (holding that specific performance of collateral security provision was warranted for claims that had not yet been paid); *Eakin v. Cont'l Ill. Nat'l Bank & Trust Co. of Chic.*, 121 F.R.D. 363, 366 (N.D. Ill. 1988) (holding that specific performance was the only available remedy because the surety had not yet made any payments under the bonds and therefore had not suffered any damages for which it could receive compensation under law).

[364] *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992).

[365] R. Doc. 184 at 19 (quoting Exhibit 14, § 3); *see also Hartford Fire Ins. Co. v. 4-H Ventures, Inc*., 2008 WL 11389579, at *3 (S.D. Tex. June 25, 2008) (under "the plain language of indemnity agreements," which defeats

80.     At trial, Travelers demonstrated that, due to the Indemnitors' distressed financial condition, it may well be unable to collect amounts from the Indemnitors that it would have to pay on their behalf under a judgment in favor of the Parish.[366]

81.     When this showing is made, injunctive relief protects "three interests of the surety: the bargained-for benefit of collateral security, avoidance of present exposure to liability during pending litigation against indemnitors, and avoidance of risk that, should [i]ndemnitors become insolvent, the surety will be left as a general unsecured creditor, frustrating the purpose of the indemnity agreement."[367]

82.     At the hearing of Travelers' application for preliminary injunction, Travelers established that it was at risk of loss if the Parish recovered the full extent of its damage claim, presenting FCI's financial statement showing that FCI had a net worth of approximately $859,000 as of November 16, 2018, and a personal financial statement of Clayton Fucich showing a net worth of approximately $3 million as of February 8, 2018.[368]  Clayton Fucich also testified at the hearing that he would be unable to meet his other financial obligations if he were forced to comply with the collateral demand.[369]  Nothing was presented at trial to alter this conclusion.

83.     In fact, at the 2022 trial, Clayton Fucich testified as to the Indemnitors' worsening financial condition since these financial statements were produced, thereby substantiating Travelers' showing that it is at risk of loss as to any judgment against them on the Parish's claim.[370]

---

all "arguments to the contrary," indemnitors "expressly agreed that the failure to provide the requested collateral constitutes irreparable harm").

[366] *See Padron*, 2017 WL 9360906, at *8-11; *see also W. Sur. Co. v. PASI of La., Inc.*, 334 F. Supp. 3d 764, 795 (M.D. La. 2018) (observing that imminent harm may be demonstrated by showing indemnitor to be "insolvent or secreting assets, … in dire financial straits, no longer [having] a traditional source of credit, [having] been dishonest or is millions of dollars in the hole with various creditors") (internal citations and quotations omitted).

[367] *Padron*, 2017 WL 9360906, at *10 (quoting *Int'l Fidelity Ins. Co. v. Talbot Constr., Inc.*, 2016 WL 8814367, at *7 (N.D. Ga. Apr. 13, 2016)).

[368] R. Doc. 184 at 21.

[369] *Id*. at 21-22.

[370] Testimony of Clayton Fucich (June 27, 2022) at 86.

84.     Under the third element for a permanent injunction, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"[371]

85.     "The third factor requires the plaintiff to establish that his irreparable harm is greater than the hardship that the [permanent] injunction would cause the defendant."[372]

86.     On the one hand, in the absence of a permanent injunction, Travelers would be forced to face liability for the full sum of its loss and anticipated loss without the benefit of its bargained-for right to collateral under the GAI, while, on the other hand, a permanent injunction continuing to enforce the collateral security provision would simply compel the Indemnitors to perform an obligation to which they agreed in the GAI.[373]

87.     Thus, the hardship that Travelers will face if a permanent injunction does not issue outweighs the threatened harm to Indemnitors posed by any such injunction.

88.     Finally, the fourth element for seeking a permanent injunction examines whether granting the injunction will or will not disserve the public interest.[374]  When considering the public interest in a contract made between two private parties, a court is not constrained to the immediate

---

[371] *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

[372] *DS Waters of Am., Inc. v. Princess Abita Water, LLC*, 539 F. Supp. 2d 853, 863 (E.D. La. 2008) (citing *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997)).

[373] Exhibit 14, § 5; *see, e.g., Padron*, 2017 WL 9360906, at *12 (holding that balance of hardships weighed in favor of surety since it would otherwise face prospect of loss without being collateralized); *4-H Ventures, Inc.*, 2008 WL 11389579, at *4 (enforcing collateral security provision because harm to surety in not protecting its bargain outweighed harm to indemnitors in having to make deposit they expressly agreed to make); *Int'l Fid. Ins. Co. v. Anchor Env't, Inc.*, 2008 WL 1931004, at *7 (E.D. Pa. May 1, 2008) (weighing balance of hardships in favor of surety, the court observed: "Defendants are not unfairly prejudiced by being held to the Agreement of Indemnity to which they were signatories."); *Great Am. Ins. Co. v. Conart Inc.*, 2006 WL 839197, at *6 (M.D. Ga. Mar. 29, 2006) (holding that balance weighed in favor of surety given harm it faced in defending principal's bonded claims in absence of injunction); *Travelers Cas. & Sur. Co. v. Ockerlund*, 2004 WL 1794915, at *5 (N.D. Ill. Aug. 6, 2004) (holding that balance of hardships favored surety because it would face "serious harm" of using its own funds to defend claims or pay claims despite indemnitors' promises to the contrary).

[374] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

interests of the parties to the contract but considers the public interest as it would be affected by injunctive relief.[375]

89.     This Court previously concluded that granting Travelers' injunction will not disserve the public interest since "the public has an interest in courts upholding clearly written contracts, and the surety industry has an interest in the enforcement of collateral security provisions," and, more importantly, the Project that the GAI and the Bond "secure provides the vital public service of flood protection."[376]   In doing so, the Court noted: "One of the principal purposes of the surety arrangement is to ensure that public works projects are completed as envisioned for the public's benefit.   The public's interest in flood protection in this region is undeniable.   Thus, the public interest would not be disserved in granting Travelers' injunction; in fact, the public stands to benefit."[377]

## XI.     Travelers Is Entitled to Indemnification, Reimbursement, Exoneration, and Specific Performance.

90.     By executing the GAI, the Indemnitors agreed to reimburse Travelers for all loss it may incur in having issued the Bond on behalf of FCI.[378]   Travelers is entitled to judgment against the Indemnitors for the entirety of its "Loss" that Travelers has incurred or will incur pursuant to the GAI.

91.     Because Travelers has incurred substantial "Loss" (as defined by the GAI) in defending and responding to the Parish's claim against the Bond, Travelers is entitled to

---

[375] *Id.* at 625-26.
[376] R. Doc. 184 at 24; *see Int'l Fidelity Ins. Co.*, 2008 WL 1931004, at *7 (enforcing indemnity agreement to uphold integrity of surety industry and local government in public works construction projects).
[377] R. Doc. 184 at 24.
[378] Exhibit 14, § 3.

reimbursement.[379]  Travelers' losses include at least its attorney's fees and litigation expenses, the quantum of which will be decided by separate hearing or on motion, as ordered by the Court.

92.     Additionally, Travelers is entitled to exoneration for the amount it is obligated to pay the Parish in settlement pursuant to the Settlement Agreement.  The right of exoneration is not dependent upon an allegation that the principal will be unable to reimburse the surety for the loss if the surety discharges the principal's obligation.  Instead, the surety is entitled to relief under the doctrine of exoneration when the surety's obligation to pay has become fixed and absolute.[380]

93.     Pursuant to the Settlement Agreement, Travelers' obligation to pay the Parish has become fixed and absolute in the amount of $612,000.00.[381]  By virtue of the doctrine of exoneration, and pursuant to the indemnification provision of the GAI, before paying the debt to the Parish, Travelers, as surety, is entitled to a judgment against the Indemnitors to exonerate it by discharging this debt.[382]

94.     Pursuant to the clear and unambiguous terms of the GAI, Indemnitors are jointly and severally obligated to exonerate and indemnify Travelers and to save Travelers harmless from and against all loss and expense of any kind or nature, including attorney's and other professionals' fees, that Travelers may sustain or incur by reason of having issued the Bond, including enforcing the GAI.[383]

---

[379] *See id.*

[380] *See* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY §§ 18, 21 cmts. i, j, k (1996); *see also Admiral Oriental Line v. United States*, 86 F.2d 201, 204 (2d Cir. 1936) (explaining the principle of exoneration as follows: "[B]efore paying the debt a surety may call upon the principal to exonerate him by discharging it; he is not obliged to make inroads into his own resources when the loss must in the end fall upon the principal.") (Learned Hand, J.); *C.E. Hall Constr.*, 2012 WL 1100658, at *5-6 (upholding a surety's right to pursue an exoneration claim against its indemnitors under the rationale that "[t]he surety's right of exoneration is routinely confirmed and extended to indemnitees and a written indemnity agreement created as an inducement to the surety to provide bonds").

[381] Exhibit 79.

[382] Exhibit 14, § 3; *Admiral Oriental Line*, 86 F.2d at 204.

[383] Exhibit 14, § 3; *Admiral Oriental Line*, 86 F.2d at 204.  Pursuant to the parties' agreement at the pretrial conference, evidence of the amount of Travelers' loss, including its attorney's fees and related costs, is to be submitted to the Court for its determination in subsequent posttrial briefs, as directed by the Court.

95.     Further, for the reasons delineated above, and pursuant to the collateral security provision of the GAI, Travelers is entitled to a permanent injunction mandating specific performance of the Traveler's collateral demand on Indemnitors.[384]

## CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that any and all claims the Indemnitors asserted against Travelers, including specifically FCI's complaint for breach of contract and declaratory judgment, are DISMISSED WITH PREJUDICE;

**IT IS FURTHER ORDERED** that Travelers' crossclaim and third-party claim seeking contractual indemnification, reimbursement, attorney's fees, and a permanent injunction against the Indemnitors are GRANTED;[385] and

**IT IS FURTHER ORDERED** that Travelers shall file on or before November 16, 2022, a memorandum (with supporting evidence) addressing (1) the amount and reasonableness of the attorney's fees and costs (and any other category of "Loss") it should be awarded; (2) whether any conditions should attach to the permanent injunction to be issued (including, for example, whether the amount of the collateral security previously ordered to be provided should be reduced now or upon the occurrence of any event); and (3) the rationale for the form of judgment it proposes should be entered based on this Order & Reasons, attaching such proposed form of judgment.  The

---

[384] Travelers urges that the right to collateral also exists by virtue of the equitable doctrine of *quia timet* and that it is entitled to have the Indemnitors place funds or other security with Travelers sufficient to cover the liability, if any, of Travelers by reason of its having issued the Bond on behalf of FCI, including all costs incurred by Travelers to date as well as costs anticipated by Travelers, including attorney's fees, consultant fees, and other costs.  *See* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY §§ 18(2), 21; *see also U.S. Fid. & Guar. Co. v. Arch Ins. Co.*, 578 F.3d 45, 49 (1st Cir. 2009).  Thus, Travelers requests that the Court issue a writ of *quia timet* given its realistic fear that loss will continue to accrue through this litigation and likely appeals process.  The Court declines to do so, though, because Travelers is awarded herein other relief directed to the same end.

[385] Philadelphia Gear's counterclaim asserting breach of contract against FCI was previously resolved pursuant to the parties' stipulation and consent judgment.  R. Doc. 664.

Indemnitors shall file a response or opposition to Travelers' memorandum on or before December 5, 2022.  If it chooses, Travelers shall file any reply on or before December 15, 2022, at which time the Court will take the matter under submission on the papers, pursuant to the parties' pretrial agreement.  Each of the memoranda shall not exceed twenty-five (25) pages in length, and the reply shall not exceed ten (10) pages in length.

New Orleans, Louisiana, this 31st day of October, 2022.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE